# EXHIBIT A

## to the Declaration of Erin M. Cook

## in Support of

## Kohl's Inc.'s Motion for Partial Dismissal

| DOCUMENT | PAGE |
|---|---|
| Relevant portion of the Federal Register | 1 |
| FCC Report and Order and Further Notice of Proposed Rulemaking | 6 |
| FCC Fact Sheet | 52 |



■ 4. Section 4.9 is amended by revising paragraphs (a)(4), (c)(2)(iv), (e)(1)(v), (f)(4), and (g)(1)(i) and adding paragraph (i) to read as follows:

**§ 4.9 Outage reporting requirements—threshold criteria.**

(a) * * *

(4) Potentially affects a 911 special facility (as defined in § 4.5(e)) or potentially affects a 988 special facility (as defined in § 4.5(f)), in which case they also shall notify the affected facility in the manner described in paragraph (h) of this section. Not later than 72 hours after discovering the outage, the provider shall submit electronically an Initial Communications Outage Report to the Commission. Not later than 30 days after discovering the outage, the provider shall submit electronically a Final Communications Outage Report to the Commission. The Notification and the Initial and Final reports shall comply with all of the requirements of § 4.11.

* * * * *

(c) * * *

(2) * * *

(iv) Potentially affecting a 911 special facility (as defined in § 4.5(e)) or potentially affecting a 988 special facility (as defined in § 4.5(f)), in which case the affected facility shall be notified in the manner described in paragraph (h) of this section.

* * * * *

(e) * * *

(1) * * *

(v) That potentially affects a 911 special facility (as defined in § 4.5(e)) or potentially affects a 988 special facility (as defined in § 4.5(f)), in which case they also shall notify the affected facility in the manner described in paragraph (h) of this section.

* * * * *

(f) * * *

(4) Potentially affects a 911 special facility (as defined in § 4.5(e)) or potentially affects a 988 special facility (as defined in § 4.5(f)), in which case they also shall notify the affected facility in the manner described in paragraph (h) of this section. Not later than 72 hours after discovering the outage, the provider shall submit electronically an Initial Communications Outage Report to the Commission. Not later than 30 days after discovering the outage, the provider shall submit electronically a Final Communications Outage Report to the Commission. The Notification and the Initial and Final reports shall comply with all of the requirements of § 4.11.

(g) * * *

(1) * * *

(i) Within 240 minutes of discovering that they have experienced on any facilities that they own, operate, lease, or otherwise utilize, an outage of at least 30 minutes duration that potentially affects a 911 special facility (as defined in § 4.5(e)) or potentially affects a 988 special facility (as defined in § 4.5(f)), in which case they also shall notify the affected facility in the manner described in paragraph (h) of this section; or

* * * * *

(i) *988 special facility outage notification.* All covered 988 service providers shall notify any official at a 988 special facility who has been designated by the affected special facility as the provider's contact person(s) for communications outages at the facility of any outage that potentially affects that 988 special facility (as defined in § 4.5(f)) in the following manner:

(1) *Appropriate contact information.* To ensure prompt delivery of outage notifications to 988 special facilities, covered 988 service providers shall exercise special diligence to identify, maintain, and, on an annual basis, confirm current contact information appropriate for outage notification for each 988 special facility that serves areas that the service provider serves.

(2) *Content of notification.* Covered 988 service providers' outage notifications must convey all available material information about the outage. For the purpose of this paragraph (i), *material information* includes the following, where available:

(i) An identifier unique to each outage;

(ii) The name, telephone number, and email address at which the notifying 988 service provider can be reached for follow up;

(iii) The name of the covered 988 service provider experiencing the outage;

(iv) The date and time when the incident began (including a notation of the relevant time zone);

(v) The types of communications service(s) affected;

(vi) The geographic area affected by the outage;

(vii) A statement of the notifying covered 988 service provider's expectations for how the outage potentially affects the special facility (*e.g.,* dropped calls or missing metadata);

(viii) Expected date and time of restoration, including a notation of the relevant time zone;

(ix) The best-known cause of the outage; and

(x) A statement of whether the message is the notifying covered 988 service provider's initial notification to the special facility, an update to an initial notification, or a message intended to be the service provider's final assessment of the outage.

(3) *Means of notification.* Covered 988 service providers' outage notifications must be transmitted by telephone and in writing via electronic means in the absence of another method mutually agreed upon in writing in advance by the special facility and the service provider.

(4) *Timing of initial notification.* Covered 988 service providers shall provide an outage notification to a potentially affected 988 special facility as soon as possible, but no later than within 30 minutes of discovering that they have experienced on any facilities that they own, operate, lease, or otherwise utilize, an outage that potentially affects a 988 special facility (as defined in § 4.5(f)).

(5) *Follow-up notification.* Covered 988 service providers shall communicate additional material information to potentially affected 988 special facilities in notifications subsequent to the initial notification as soon as possible after that information becomes available, but providers shall send the first follow-up notification to potentially affected 988 special facilities no later than two hours after the initial contact. After that, covered 988 service providers are required to continue to provide material information to the special facilities as soon as possible after discovery of the new material information until the outage is completely repaired and service is fully restored.

[FR Doc. 2023–06712 Filed 4–6–23; 8:45 am]

**BILLING CODE 6712–01–P**

# FEDERAL COMMUNICATIONS COMMISSION

**47 CFR Parts 64**

[CG Docket Nos. 02–278, 21–402; FCC 23–21; FR ID 134449]

**Targeting and Eliminating Unlawful Text Messages**

**AGENCY:** Federal Communications Commission.

**ACTION:** Proposed rule.

**SUMMARY:** In this document, the Commission seeks comment on whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams. The Commission also

seeks comment on text message authentication. In addition, the Commission seeks comment on extending Do-Not-Call protections to marketing text messages. Finally, the Commission seeks comment on banning the practice of obtaining a single consumer consent as justification for calls and texts from multiple sellers and potential fraudsters.

**DATES:** Comments are due on or before May 8, 2023 and reply comments are due on or before June 6, 2023.

**ADDRESSES:** You may submit comments, identified by CG Docket Nos. 02–278 and 21–402, by any of the following methods:

• *Electronic Filers:* Comments may be filed electronically using the internet by accessing the ECFS: *http://apps.fcc.gov/ecfs/*.

• *Paper Filers:* Parties who choose to file by paper must file an original and one copy of each filing.

Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

• Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

• U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, DC 20554.

• Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID–19. *See* FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice, 35 FCC Rcd 2788 (OMD 2020), *https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy.* In the event that the Commission announces the lifting of COVID–19 restrictions, a filing window will be opened at the Commission's office located at 9050 Junction Drive, Annapolis Junction, MD 20701.

*People with Disabilities.* To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at 202–418–0530 (voice).

**FOR FURTHER INFORMATION CONTACT:** Mika Savir of the Consumer Policy Division, Consumer and Governmental Affairs Bureau, at *mika.savir@fcc.gov* or (202) 418–0384.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Further Notice of Proposed Rulemaking (*FNPRM*), in CG Docket Nos. 02–278 and 21–402; FCC 23–21, adopted on March 16, 2023 and released on March 17, 2023. The full text of this document is available online at *https://docs.fcc.gov/public/attachments/FCC-23-21A1.pdf.*

This matter shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's ex parte rules. 47 CFR 1.1200 *et seq.* Persons making oral ex parte presentations are reminded that memoranda summarizing the presentations must contain summaries of the substance of the presentations and not merely a listing of the subjects discussed. *See* 47 CFR 1.1206(b). Other rules pertaining to oral and written *ex parte* presentations in permit-but-disclose proceedings are set forth in § 1.1206(b) of the Commission's rules, 47 CFR 1.1206(b).

**Initial Paperwork Reduction Act of 1995 Analysis**

The Further Notice of Proposed Rulemaking (*FNPRM*) may contain proposed new or modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and OMB to comment on any information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104–13. Pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), the Commission seeks specific comment on how to further reduce the information collection burden for small business concerns with fewer than 25 employees.

**Synopsis**

1. In this *FNPRM,* the Commission seeks comment on additional protections for consumers against illegal robotexts. The Commission first seeks comment on whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams. The Commission also seeks comment on text message authentication. In addition, the Commission proposes to extend the National Do-Not-Call (DNC) Registry protections to marketing text messages. Finally, the Commission seeks to ban the practice of obtaining a single consumer consent as justification for calls and texts from multiple, sometimes hundreds, of sellers and potential fraudsters.

2. First, the Commission proposes to require terminating mobile wireless providers to investigate and potentially block texts from a sender after they are on notice from the Commission that the sender is transmitting suspected illegal texts, similar to our requirement for gateway providers with respect to voice calls. Where texts are clearly illegal, and the Commission has put providers on notice of the illegal texts, mobile wireless providers should have no legitimate reason to transmit the texts. The Commission therefore seeks comment on extending this approach, which is in place for call blocking, to text blocking.

3. Specifically, the Commission's rules (in 47 CFR 64.1200(n)(5)) require the Commission's Enforcement Bureau to issue a Notification of Suspected Illegal Traffic that: (1) identifies with as much particularity as possible the suspected illegal traffic; (2) provides the basis for the Enforcement Bureau's reasonable belief that the identified traffic is unlawful; (3) cites the statutory or regulatory provisions the suspected illegal traffic appears to violate; and (4) directs the provider receiving the notice that it must comply with the requirements in section 64.1200(n)(5) of the Commission's rules by a specified date that gives the provider a minimum of 14 days to comply. Notified gateway voice providers must then promptly investigate the identified traffic and either block the identified traffic and substantially similar traffic on an ongoing basis or respond to the Commission that the provider has a reasonable basis for concluding that the identified calls are not illegal. If a provider fails to comply, the Commission established a process through which the Enforcement Bureau can require all providers immediately downstream from that gateway provider to block all traffic from that provider.

4. The Commission seeks comment on whether there are any differences between calling and texting that would suggest that this model would not work well for texting. The Commission seeks comment on the cost to providers of implementing such a requirement. The Commission also seeks comment on whether providers and the Commission's Enforcement Bureau can properly trace text messages to their originating provider to effectuate these rules. Are there additional requirements the Commission should adopt to ease any traceback efforts for text messaging? Because providers state that they

already do a considerable amount of text blocking, the Commission does not expect the proposal to impose material additional costs. The Commission seeks comment on these questions specifically and this recommendation generally.

5. Second, the Commission seeks comment on the extent of number spoofing and if there are other solutions that are better targeted to address the problem of spoofed text messages. In the robocalling context, the Commission has found that a subset of small voice service providers are responsible for a large number of illegal robocalls. The Commission seeks comment on whether a similar dynamic at issue with robotexts. If so, how might the Commission target these specific providers? How might the Commission encourage industry members to collaborate and finalize technical solutions for authenticating text messages and mitigating illegal text messages? For example, should the Commission adopt a deadline for providers to develop a text message authentication solution or an alternative technical solution for addressing the problem of spoofed text messages? Commenters should address how the Commission can ensure non-discriminatory policies in adopting text authentication measures.

6. Third, the Commission proposes to clarify that the National Do-Not-Call Registry protections apply to text messages as well as voice calls and to codify this clarification in the Commission's rules. The National DNC Registry has been operational for almost two decades and currently protects over 246 million telephone numbers from telemarketing sales calls, or telephone solicitations. As such, it represents a critical component of the policy strategy against unwanted calls. Although the Commission has stated that text messages are calls for Telephone Consumer Protection Act (TCPA) purposes, it has not explicitly included text messages in the codified DNC rules that protect wireless phone subscribers by requiring prior express invitation or permission in writing for calls to wireless numbers on the National DNC Registry. The Commission's rules require that, before sending a marketing text to consumers, the texter must have the consumer's prior express invitation or permission, which must be evidenced by a signed, written agreement between the consumer and seller, which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed.

7. The Commission seeks comment on whether codifying the DNC protections

to marketing texts further protect consumers from unwanted marketing text messages. We note that the DNC protections do not depend on whether the caller uses an autodialer, unlike some provisions of the TCPA. The Commission seeks comment on whether the proposal would also represent an important codification of consumer protections. Are there downsides to the proposal?

8. Finally, the Commission proposes to ban the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent. In an illustration of the issue, Assurance IQ describes a website that purports to enable consumers to comparison shop for insurance. The website sought consumer consent for calls and texts from insurance companies and other various entities, including Assurance IQ's partner companies that were listed in a hyperlink on the web page (*i.e.,* they were not displayed on the website without clicking on the link) and the list of partner companies included both insurance companies and other entities that did not appear to be related to insurance. The telemarketer that obtains the consumer's contact information from the lead generator may believe that it has the consumer's prior express consent, but, commenters argue, the consumer has not consented to the particular caller or callers, which may be listed as partner companies in these arrangements.

9. The Commission seeks comment on amending the TCPA consent requirements to require that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page. The Commission has not addressed this aspect of consent in the past. Would this proposal better protect consumers from receiving large numbers of calls and texts they do not wish to receive when they visit websites such as comparison shopping websites? Consumers may find comparison shopping websites helpful; how can we ensure that they can consent to obtain further information from the site without receiving numerous calls and texts from unrelated companies? Commenters should discuss whether the proposal would limit the value of comparison-shopping sites to consumers. Are there alternatives that would better protect consumers from the harms identified? The Commission also seeks comment on whether prior express consent to receive calls or texts must be made directly to one entity at

a time. More broadly, the Commission seeks comment on the extent of the problem, the proposed rule, and whether the proposed rule will clarify consent and help to eliminate illegal text messages and calls. Are there different or additional limitations on multi-party consent the Commission should consider?

**Initial Regulatory Flexibility Analysis**

10. As required by the Regulatory Flexibility Act of 1980, as amended (RFA) the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies proposed in this *FNPRM.* Written public comments are requested on this IRFA. Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the *FNPRM,* provided on the first page of the *FNPRM.* The Commission will send a copy of the entire *FNPRM,* including the IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).

11. *Need for, and Objectives of, the Proposed Rules.* The *FNPRM* seeks comment on several issues, specifically, (i) whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams; (ii) text message authentication; (iii) extending Do-Not-Call protections to marketing text messages; and (iv) banning the practice of obtaining a single consumer consent as justification for calls and texts from multiple sellers and potential fraudsters.

12. *Legal Basis.* This action, including publication of proposed rules, is authorized under sections 4(i), 4(j), 201(b), 227(e), 254, 257, 301, and 303 of the Communications Act of 1934, as amended, 47 U.S.C. 154(i), 154(j), 201(b), 227(e), 254, 257, 301, and 303.

13. *Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply.* The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation;

3

and (3) satisfies any additional criteria established by the SBA.

14. *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* The Commission's actions, over time, may affect small entities that are not easily categorized at present. The Commission therefore describes, at the outset, three broad groups of small entities that could be directly affected herein. First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from SBA's Office of Advocacy, in general a small business is an independent business having fewer than 500 employees. These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.

15. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field." The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations. Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.

16. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." U.S. Census Bureau data from the 2017 Census of Governments indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States. Of this number, there were 36,931 general purpose governments (county, municipal, and town or township) with populations of less than 50,000 and 12,040 special purpose governments-independent school districts with enrollment populations of less than 50,000. Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."

17. *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves. Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services. The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year. Of that number, 2,837 firms employed fewer than 250 employees. Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 797 providers that reported they were engaged in the provision of wireless services. Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

18. *All Other Telecommunications.* This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Providers of internet services (*e.g.,* dial-up ISPs) or voice over internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry. The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small. U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year. Of those firms, 1,039 had revenue of less than $25 million. Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

19. *Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities.* This *FNPRM* may include a change to the Commission's current information collection, reporting, recordkeeping, or compliance requirements.

20. *Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered.* The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others: (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) and exemption from coverage of the rule, or any part thereof, for such small entities.

21. The *FNPRM* seeks comment on (i) whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams; (ii) text message authentication; (iii) extending Do-Not-Call protections to marketing text messages; and (iv) banning the practice of obtaining a single consumer consent as justification for calls and texts from multiple sellers and potential fraudsters.

22. These proposals would probably not be burdensome for small entities. The proposal to require those seeking consent from consumers to a list of entities, to clearly and conspicuously display the list where consent is requested would, if adopted, prevent those lead generators or telemarketers from failing to advise the consumer of the list of entities; instead the list would be displayed where the consent is requested. This should not be burdensome to small entities, as it merely requires disclosing the list where consent is requested, instead of in a hyperlink, and should reduce unwanted text messages and calls to consumers. The proposal to include texts in the DNC rules should not have an impact on small entities. Wireline and wireless phones are already included and this would just clarify that not only calls to wireless phones on the DNC list are covered, but text messages, too. The Commission anticipates that these rules, if adopted, would also reduce unwanted calls and texts to small entities. The proposal to require service providers to block texts after notice from the Commission of suspected illegality, including fraud should not be burdensome for small entities. Mobile wireless providers are already diligent in blocking fraudulent calls and texts to their customers and this would assist them in those efforts.

23. *Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules.* None.

## List of Subjects in 47 CFR Part 64

Communications common carriers, Reporting and recordkeeping

requirements, Telecommunications, Telephone.

Federal Communications Commission.

**Marlene Dortch,**

*Secretary, Office of the Secretary.*

**Proposed Rules**

For the reasons discussed in the preamble, the Federal Communications Commission proposed to amend 47 CFR part 64 as follows:

## PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

■ 1. The authority citation for part 64 continues to read as follows:

**Authority:** 47 U.S.C. 151, 152, 154, 201, 202, 217, 218, 220, 222, 225, 226, 227, 227b, 228, 251(a), 251(e), 254(k), 255, 262, 276, 403(b)(2)(B), (c), 616, 617, 620, 1401–1473, unless otherwise noted; Pub. L. 115–141, Div. P, sec. 503, 132 Stat. 348, 1091.

■ 2. Amend § 64.1200 by revising paragraphs (e) and (f)(9) to read as follows:

**§ 64.1200  Delivery Restrictions.**

\*    \*    \*    \*    \*

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or texts to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

(f) \*  \*  \*

(9) The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. Prior express written consent for a call or text may be to a single entity, or to multiple entities logically and topically associated. If the prior express written consent is to multiple entities, the entire list of entities to which the consumer is giving consent must be clearly and conspicuously displayed to the consumer at the time consent is requested. To be clearly and conspicuously displayed, the list must, at a minimum, be displayed on the same

web page where the consumer gives consent.

\*    \*    \*    \*    \*

[FR Doc. 2023–07069 Filed 4–6–23; 8:45 am]

**BILLING CODE 6712–01–P**

## FEDERAL COMMUNICATIONS COMMISSION

**47 CFR Part 64**

[WC Docket Nos. 12–375, 23–62; FCC 23–19; FR ID 134047]

**Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services**

**AGENCY:** Federal Communications Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) seeks comment from the public on the scope and implementation of the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or the Act). Through the Martha Wright-Reed Act, Congress expanded the Commission's jurisdiction over incarcerated people's communications services and expressly directs that the Commission adopt just and reasonable rates and charges for incarcerated people's audio and video communications services in correctional institutions. Specifically, the Commission seeks comment on how to interpret the Act's language to effectively implement the statute consistent with Congress's intent. The Commission seeks comment on how Congress's amendments to sections 2(b), 3(1), and 276 of the Communications Act of 1934 (Communications Act) affect the Commission's regulatory authority over incarcerated people's communications services and how to draft regulations to implement such authority. The Commission also seeks comment on how the Martha Wright-Reed Act affects its ability to ensure that incarcerated people's communications services and associated equipment are accessible to and usable by incarcerated people with disabilities.

**DATES:** Comments are due on or before May 8, 2023; and reply comments are due on or before June 6, 2023.

**ADDRESSES:** You may submit comments, identified by WC Docket Nos. 12–375 and 23–62, by either of the following methods:

• *Electronic Filers:* Comments may be filed electronically using the internet by accessing the Electronic Comment

Filing System (ECFS): *https://apps.fcc.gov/ecfs/.*

• *Paper Filers:* Parties who choose to file by paper must file an original and one copy of each filing.

Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

• Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

• U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, DC 20554.

• Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID–19. See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice, DA 20–304 (March 19, 2020). *https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy.*

*People with Disabilities:* To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov,* or call the Consumer and Governmental Affairs Bureau at (202) 418–0530 (voice) or (202) 418–0432 (TTY).

**FOR FURTHER INFORMATION CONTACT:** Peter Bean, Pricing Policy Division of the Wireline Competition Bureau, at (202) 418–0786 or via email at *peter.bean@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Notice of Proposed Rulemaking (*NPRM*), in WC Docket Nos. 12–375 and 23–62; FCC 23–19, adopted on March 16, 2023 and released on March 17, 2023. The full text of this document is available on the following internet address: *https://docs.fcc.gov/public/attachments/FCC-23-19A1.pdf.*

**Synopsis**

1. Nearly twenty years have passed since Martha Wright-Reed and her fellow petitioners first sought Commission relief from the exorbitant telephone rates they had to pay to talk to their incarcerated family members. More than a decade has passed since the Commission began to respond to those

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Targeting and Eliminating Unlawful Text Messages | **)** | CG Docket No. 21-402 |
| | **)** | |
| Rules and Regulations Implementing the | **)** | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | **)** | |
| | **)** | |

**REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: March 16, 2023**                                **Released: March 17, 2023**

Comment Date (30 days after date of publication in the Federal Register)
Reply Comment Date (60 days after date of publication in the Federal Register)

By the Commission: Chairwoman Rosenworcel and Commissioner Starks issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                  Paragraph #

I.   INTRODUCTION ................................................................................................................1
II.  BACKGROUND ..................................................................................................................6
III. REPORT AND ORDER ......................................................................................................13
    A.  Mandatory Blocking of Texts that are Highly Likely to be Illegal .............................16
    B.  Point of Contact .........................................................................................................27
    C.  Other Proposals .........................................................................................................32
    D.  Legal Authority .........................................................................................................38
    E.  Cost-Benefit Analysis .................................................................................................43
IV.  FURTHER NOTICE OF PROPOSED RULEMAKING .......................................................48
    A.  Block Texts Upon Commission Notification ................................................................50
    B.  Text Message Authentication and Spoofing ................................................................54
    C.  Clarifying Do-Not-Call Protections for Text Messages ...............................................55
    D.  Closing the Lead Generator Loophole ........................................................................58
    E.  Digital Equity and Inclusion .......................................................................................63
    F.  Legal Authority ..........................................................................................................64
V.   PROCEDURAL MATTERS ................................................................................................66
VI.  ORDERING CLAUSES ......................................................................................................76

APPENDIX A—FINAL RULES
APPENDIX B—LIST OF COMMENTERS
APPENDIX C—PROPOSED RULES
APPENDIX D—FINAL REGULATORY FLEXIBILITY ANALYSIS
APPENDIX E—INITIAL REGULATORY FLEXIBILITY ANALYSIS

## I.    INTRODUCTION

1.    Text messaging is among our most popular forms of communication, quickly connecting people to friends and family, businesses to customers, and governments to constituents.  However, with that popularity comes unique risks.  On many devices, consumers can immediately see some or all of these messages, potentially piquing their interest and enticing them to open the message.  Data shows consumers read nearly all texts, and do so nearly immediately; whereas calls from unknown callers are often ignored by consumers.  While some text messages may present similar problems as unwanted calls—they invade consumer privacy and are vehicles for consumer fraud and identity theft[1]—they also present harms beyond robocalls that can exacerbate the problem of such scams.  Text message-based scams can include links to well-designed phishing websites that appear identical to the website of a legitimate company and can fool a victim into providing personal or financial information.  Texted links can also load unwanted software onto a device, including malware that steals passwords, credentials, or other personal information.  We are therefore, for the first time, requiring all mobile wireless providers to block certain text messages that are highly likely to be illegal, so that all subscribers have a basic level of protection.[2]  This action will help to ensure that all wireless consumers receive the same protections, regardless of which mobile wireless provider they use to receive SMS and MMS messages.

2.    Mobile wireless providers and others have taken steps to protect consumers from potentially harmful text messages; nevertheless, unlawful text messaging is trending in the wrong direction.  One source, for example, reports that consumer losses from scam texts were $231 million for the first three quarters of 2022, up from $86 million for all of 2020.  The time is therefore right for us to take steps to protect consumers.

3.    In this Report and Order, we take Commission action to require mobile wireless providers to block certain robotext messages[3] that are highly likely to be illegal.[4]  Building on our call blocking work, we require mobile wireless providers to block—at the network level—texts purporting to be from North American Numbering Plan (NANP)[5] numbers on a reasonable Do-Not-Originate (DNO)[6]

---

[1] The scope of our decision here is text messaging originating from NANP numbers that use the wireless networks, e.g., Short Message Service (SMS) and Multimedia Messaging Service (MMS), not over-the-top (OTT) messaging, such as iMessage and WhatsApp or Rich Communications Services (RCS).  *See* 47 CFR § 64.1600(o) *et seq.*

[2] Commenters share this goal of protecting consumers from illegal text messages.  NCLC/EPIC Joint Reply at 1.

[3] Texting (SMS and MMS) is not a common-carrier service.  *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, WT Docket No. 08-7, Declaratory Ruling, 33 FCC Rcd 12075, 12082-12089, paras. 17-32 (2018) (*Messaging Declaratory Ruling*), *recon. pending*, Rept. No. 3011 (Feb. 5, 2019).  SMS and MMS wireless messaging services are not the functional equivalent of commercial mobile services (CMRS).  *Messaging Declaratory Ruling*, 33 FCC Rcd at 12093, para. 37.

[4] *Targeting and Eliminating Unlawful Text Messages*, CG Docket No. 21-402, Notice of Proposed Rulemaking, FCC 22-72, 2022 WL 4545905 (2022) (*NPRM*).  The list of comments, replies, and *ex parte* filings is in Appendix B.  We use "robotexts" to include text messages that may be legal or illegal.  Some robotext messages are both legal and wanted, just as some robocalls are legal and wanted.  Text messages may be illegal because they violate the Telephone Consumer Protection Act, such as by being made with an autodialer and being sent without the necessary consent, because the number displayed is illegally spoofed, which violates the Truth in Caller ID Act, or for other reasons, particularly if they are fraudulent.

[5] The "North American Numbering Plan" is the basic numbering scheme for the telecommunications networks located in American Samoa, Anguilla, Antigua, Bahamas, Barbados, Bermuda, British Virgin Islands, Canada, Cayman Islands, Dominica, Dominican Republic, Grenada, Jamaica, Montserrat, Saint Maarten, St. Kitts & Nevis, St. Lucia, St. Vincent, Turks & Caicos Islands, Trinidad & Tobago, and the United States (including Puerto Rico, the U.S. Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands).  47 CFR § 52.5(d).

[6] The Commission explained in the *2017 Call Blocking Report and Order* that calls from a DNO list, i.e., purporting to be from a telephone number that the subscriber did not consent to being used for outgoing calls, are very likely fraudulent and in violation of the Commission's anti-spoofing rule, and therefore, no reasonable consumer would

(continued….)

7

list, which include numbers that purport to be from invalid, unallocated, or unused numbers, and NANP numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked. At the same time, we take steps to ensure that any erroneous blocking can be quickly remedied by requiring providers and other entities to maintain a point of contact for texters to report erroneously blocked texts.

4. We also propose a set of additional protections that could further stem the tide of illegal text messages. We propose to require terminating providers to block texts from a sender after they are on notice from the Commission that the sender is sending illegal texts, to extend the National Do-Not-Call Registry's protections to text messages, and to ban the practice of marketers purporting to have written consent for numerous parties to contact a consumer, based on one consent.

5. We anticipate that the rules we adopt here will result in fewer illegal text messages to consumers.

## II. BACKGROUND

6. *The Illegal Text Problem*. Illegal robotext messages present the same problems as illegal robocalls—beyond nuisance, they invade a consumer's privacy and are vehicles for fraud.[7] Commission data show that consumers are receiving increasing numbers of these types of text messages.[8] The Commission's Consumer Advisory Committee (CAC)[9] recently reported that bad actors use a variety of tactics to commit fraud using text messages.[10] According to CTIA, between 2015 and 2020, while the total volume of text messages roughly doubled, the number of spam text messages that wireless providers blocked grew ten times, from an estimated 1.4 billion in 2015 to 14 billion in 2020.[11] The App Association observes that automated text messages have jumped nationally from 1 billion in July 2021 to 12 billion in June 2022.[12] This commenter also observes that illegal texts impose significant harm to

---

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯ wish to receive such a call. *See Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, WC Docket No. 17-97, Report and Order and Further Notice of Proposed Rulemaking, 32 FCC Rcd 9706, 9710, para. 10 (2017) (*2017 Call Blocking Report and Order*). The rules we adopt in this Report and Order define the group of numbers that shall be on a "reasonable DNO list." *See infra* para. 13. We do not require mobile wireless providers to use the same reasonable DNO list for purposes of our text message blocking rules as they use for purposes of our call blocking rules. "Reasonable" for these purposes is determined in the context of text messaging only. However, a list so limited in scope that it leaves out obvious numbers that could be included with little effort may be deemed unreasonable.

[7] For more information on how to avoid or report unwanted calls and texts, *see* FCC, Consumer Guides, *Stop Unwanted Robocalls and Texts*, https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Dec. 19, 2022); Federal Trade Commission, Consumer Advice, *How to Recognize and Report Spam Text Messages*, https://consumer.ftc.gov/articles/how-recognize-and-report-spam-text-messages (last visited Feb. 2, 2023).

[8] Since 2015, the Commission has seen a more than 500% increase in unwanted text complaints, from approximately 3,300 in 2015 to 18,900 in 2022.

[9] The CAC is a committee that makes recommendations to the Commission regarding consumer issues within the jurisdiction of the Commission and facilitates the participation of all consumers in proceedings before the Commission. FCC, Consumer Advisory Committee, *About CAC*, https://www.fcc.gov/consumer-advisory-committee (last visited Jan. 18, 2023).

[10] FCC, Consumer Advisory Committee, Report on the State of Text Messaging at 11-12 (2022) (CAC Report).

[11] CTIA Comments at 2.

[12] The App Association Reply at 2, citing Daisy Gonzalez-Perez, *Rise of the robotexts: As new rules curbed spam calls, texts took off,* Cronkite News, (July 21, 2022), https://cronkitenews.azpbs.org/2022/07/21/rise-of-the-robotexts-as-new-rules-curbed-spam-calls-texts-took-off.

8

consumers, particularly for aging Americans struggling with digital literacy.[13]  Robokiller reports 47.2 billion spam texts were sent in November 2022 alone.[14]  Consumer comments filed in this proceeding also describe personal experiences with unwanted and scam texts.[15]  And consumer groups note that, according to the Federal Trade Commission (FTC), consumers have reported greater losses, at $231 million, from text message scams in the first three quarters of 2022 than in all of 2020 and 2021 combined.[16]  Robokiller projects a 179% increase in the dollars lost from text messages between 2021 and 2022.[17]

7.      In their schemes, text scammers exploit emergencies such as the COVID-19 pandemic and natural disasters, along with other important topics that grab consumers' attention such as student loans and unemployment insurance.[18]  Illegal texts can include links to phishing[19] websites that appear to be the website of a legitimate company and deceive the victim into providing personal or financial information.[20]  Reports indicate that "smishing" fraud increased by 700% last year.[21]  The potential harm

---

[13] The App Association Reply at 2.

[14] *See* Robokiller, United States Spam Text Trends, 2022 United States Robotext Trends, https://www.robokiller.com/spam-text-insights (last visited Dec. 19, 2022).

[15] *See, e.g.*, Omoigui Express Comment (receiving scam text messages from unknown numbers with "Hi" or with a link, claiming to be a company like Amazon or CVS reaching out with a gift card); Anna K. Comment at 1; Boyd Express Comment; Hillenburg Comment at 1; Schmidt Comment at 1 ("I am in support of the proposed rule.  I am tired of receiving weird, questionable, and risky texts.").

[16] NCLC/EPIC Joint Reply at 5, citing FTC, Consumer Sentinel Network, *Fraud Reports*, https://public.tableau.com/app/profile/federal.trade.commission/viz/FraudReports/FraudFacts (adding the first three quarters of 2022, totaling $231M; the total for 2021 was $131M, and for 2020 was $86M) (last visited Feb. 2, 2023).

[17] NCLC/EPIC Joint Reply at 5, citing Robokiller, The Robokiller Report, *2022 Mid-Year Phone Scam Insights*, https://www.robokiller.com/the-robokiller-report (last visited Feb. 2, 2023).

[18] *See, e.g.*, FCC, *COVID-19 Text Scams*, https://www.fcc.gov/covid-19-text-scams (last visited Sept. 26, 2022); FCC, *Fear Fuels COVID-19 Contact Tracing Scams*, https://www.fcc.gov/fear-fuels-covid-19-contact-tracing-scams (last visited Dec. 21, 2022); FCC, Consumer Alert, *Scam Robotexts are a Rising Threat*, (Jul. 28, 2022), https://www.fcc.gov/robotext-scams-rise; FCC, Consumer Guides, *Stop Unwanted Robocalls and Texts*, https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Dec. 19, 2022); Federal Trade Commission, Consumer Advice, *How to Recognize and Report Spam Text Messages*, https://consumer.ftc.gov/articles/how-recognize-and-report-spam-text-messages (last visited Feb. 2, 2023); Department of Justice, Federal Bureau of Investigations, Cyber Division, *Cyber Criminals Create Fraudulent Cryptocurrency Investment Applications to Defraud US Investors*, (Jul. 18, 2022), https://www.ic3.gov/Media/News/2022/220718.pdf; Internal Revenue Service, News Releases, *IRS Reports Significant Increase in Texting Scams; Warns Taxpayers to Remain Vigilant*, (Sept. 28, 2022), https://www.irs.gov/newsroom/irs-reports-significant-increase-in-texting-scams-warns-taxpayers-to-remain-vigilant; NBC News, Kevin Collier, Odd Text from a Wrong Number?  It's Probably a Scam, (Jul. 29, 2022), https://www.nbcnews.com/tech/security/wrong-number-text-scam-rcna39793; WMC Global Comments at 4 (Millions of consumers are receiving links to phishing websites and phishing messages purportedly from their state's workforce agency in an extensive and far-reaching campaign targeting U.S. consumers.).

[19] WMC Global Comments at 2 (The most significant cyber threats to mobile users revolve around compromising their personal information, often through brand impersonation or phishing.  SMS phishing—commonly referred to as "smishing"—is an extremely effective method and scammers are learning just how simple and profitable it is.).  "Smishing" is a term that combines SMS and phishing.  Scammers use smishing to target consumers with deceptive text messages sent to their smart devices.  FCC, *Avoid the Temptation of Smishing Scams*, https://www.fcc.gov/avoid-temptation-smishing-scams (last visited Feb. 8, 2023).

[20] *See, e.g.*, Federal Trade Commission, Consumer Advice, *How to Recognize and Avoid Phishing Scams*, https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams (last visited Dec. 21, 2022); AT&T, Cyber Aware, *Text Message Scams*, https://about.att.com/pages/cyberaware/ni/blog/text_scams (last visited Dec. 21, 2022); Verizon, *Smishing and Spam Text Messages*, https://www.verizon.com/about/account-security/smishing-and-

(continued….)

from illegal texts is more than just economic in nature; fraudulent, misleading texts can also erode trust in our country's political and campaign infrastructure.[22] Scam links can load malware onto phones that steals passwords and other credentials.[23] WMC Global explains that account takeover is one of the most prevalent methods used to deliver phishing attacks to consumers.[24] In perpetrating these attacks, a scammer can use a stolen application programming interface (API) key assigned to a legitimate business to send SMS phishing messages to victims.[25]

8.  *Commission Action on Call Blocking.* The Commission has adopted call blocking[26] rules to address illegal and unwanted robocalls. Since 2017, the Commission has authorized voice service providers to block certain calls without consumers' consent.[27] In 2017, the Commission authorized voice service providers to block, at the network level, calls purporting to be from invalid, unallocated, or unused NANP numbers, and numbers on a DNO list.[28] In 2019, it clarified that voice service providers may offer call blocking services on an opt-out basis to new and existing customers, and that such services may block calls where the blocking is based on reasonable analytics designed to identify unwanted calls.[29] In the *Call Blocking Third Report and Order*, the Commission enabled additional voice service provider blocking, establishing two safe harbors from liability under the Communications Act and the Commission's rules for erroneous call blocking.[30] Subsequently, the Commission expanded one of those safe harbors, allowing terminating voice service providers to block calls at the network level, without consumer consent, if that blocking is based on reasonable analytics that incorporate caller ID authentication information designed to identify calls and call patterns that are highly likely to be illegal.[31]

(Continued from previous page) ————————————
spam-text-messages (last visited Dec. 21, 2022). *See* WMC Global Comments at 2 (During the COVID-19 pandemic, scammers began leveraging phishing kits, i.e., back-end source code packages used to launch phishing attacks, to defraud both U.S. citizens and government agencies out of unemployment payments.)

[21] Infobip Reply at 2-3, citing Weston Sabina. "Smishing attacks increased 700% in first six months of 2021," ITPro, (Sept. 14, 2021), https://www.itpro.co.uk/security/scams/360873/smishing-attacks-increase-700-percent-2021.

[22] Campaign Verify Comments at 3.

[23] Public Knowledge Reply at 2.

[24] WMC Global Comments at 3.

[25] *Id.* The API keys are typically stolen through data breaches, business email compromise, and insider threats. *Id.*

[26] Call blocking is "stopping calls outright so that they do not ring a phone, routing the calls directly to voicemail without ringing the phone, or some other treatment, such as interactive voice response session or voice call screening." *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, WC Docket No. 17-97, Declaratory Ruling and Third Further Notice of Proposed Rulemaking, 34 FCC Rcd 4876, 4884 n.47 (2019) (*2019 Call Blocking Declaratory Ruling*).

[27] *2017 Call Blocking Report and Order*, 32 FCC Rcd at 9710-21, paras. 10-40; *2019 Call Blocking Declaratory Ruling*, 34 FCC Rcd at 4886-88, paras. 33-34; 47 CFR § 64.1200(k)(1), (2).

[28] *2017 Call Blocking Report and Order*, 32 FCC Rcd at 9710-21, paras. 10-40. Phone numbers that are only used by their subscribers to receive inbound calls can be placed on a DNO list. *Id.* at 9710, para. 10.

[29] *2019 Call Blocking Declaratory Ruling*, 34 FCC Rcd at 4886-88, paras. 33-34.

[30] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Third Report and Order, Order on Reconsideration, and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 7614, 7623-31, paras. 20-45 (2020) (*Call Blocking Third Report and Order*). The first of these safe harbors protects terminating voice service providers that block calls based on reasonable analytics, including caller ID authentication information, designed to identify unwanted calls so long as the consumer is given the opportunity to opt out. *Id.* at 7625-27, paras. 25-34. The second safe harbor protects any voice service provider that blocks calls from a bad-actor upstream voice service provider that fails to effectively mitigate illegal traffic when notified of such traffic by the Commission. *Id.* at 7627-31, paras. 35-45.

The *Call Blocking Fourth Report and Order* also required voice service providers to take steps to stop illegal traffic on their networks and assist the Commission, law enforcement, and the industry traceback consortium[32] in tracking down callers that make such calls.[33]

9.      The Commission expanded these rules further last year in the *Gateway Provider Order*, making its previously permissive blocking policy mandatory in certain circumstances.[34]  That Order, among other things, required gateway providers to block calls based on any reasonable DNO list, block illegal traffic upon Commission notification, respond to traceback requests within 24 hours, and adopted a know-your-upstream-provider policy for gateway providers.[35]

10.      *The TCPA and Do-Not-Call.*  In addition to the rules described above, the Commission has other protections for consumers, specifically in the Telephone Consumer Protection Act (TCPA)[36] and the Do Not Call (DNC) rules.  For example, certain calls and texts sent using an automatic telephone dialing system and calls made using a prerecorded or artificial voice to mobile telephone numbers require consumer consent.[37]  In 2015, the Commission also clarified that Internet-to-phone text messages, which are sent via the Internet to a mobile wireless provider and then routed to a consumer's phone over the provider's wireless network, are also covered by the TCPA's protections.[38]

11.      The Commission's DNC rules also protect consumers from unwanted telephone solicitations or telemarketing calls to wireless and wireline phones when the consumer has added their

---

(Continued from previous page)

[31] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Fourth Report and Order, 35 FCC Rcd 15221, 15236, at para. 42 (2020) (*Call Blocking Fourth Report and Order*).  The Commission made clear that this blocking must be managed "with human oversight and network monitoring sufficient to ensure that the blocking works as intended," which "must include a process that reasonably determines that the particular call pattern is highly likely to be illegal prior to blocking calls that are part of that pattern." *Id.* at 15234-5, 15236, paras. 39, 42-43.

[32] The current industry traceback consortium is the Industry Traceback Group (ITG), which is a group of voice service providers, wireline, wireless, and VoIP, that are tracing and identifying the source of illegal robocalls.  *See* ITG, https://tracebacks.org (last visited Dec. 21, 2022).

[33] *Call Blocking Fourth Report and Order*, 35 FCC Rcd at 15226-27, para 13.  *See* 47 CFR § 64.1200(n)(2).  In our Further Notice of Proposed Rulemaking we are seeking comment on extending to text messages the existing requirement that voice service providers take steps to effectively mitigate illegal traffic when a voice service provider receives actual written notice of such traffic from the Commission.

[34] *Advanced Methods to Target and Eliminate Illegal Robocalls*, CG Docket No. 17-59, WC Docket No. 17-97, Sixth Report and Order in CG Docket No. 17-59, Fifth Report and Order in WC Docket No. 17-97, Order, Seventh Further Notice of Proposed Rulemaking in CG Docket No. 17-59 & Fifth Further Notice of Proposed Rulemaking in WC Docket No. 17-97, 2022 WL 1631842 at paras. 74-86, FCC 22-31 (rel. May 20, 2022) (*Gateway Provider Report and Order*).

[35] *See* 47 CFR §§ 64.1200 (k)(5), (k)(6), (n)(1), (f)(19), (n)(4), (n)(5), (n)(6), (o), (p).

[36] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003) (*2003 TCPA Order*).  The DNC rules apply to calls to wireline and wireless phones.  *Id.* at 14115-16, paras. 165-66.

[37] 47 U.S.C. § 227(b)(1)(A).  In the *Facebook v. Duguid* decision, the Supreme Court clarified that "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called."  *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163, 1171 (2021) (*Facebook*).  The Commission made clear in 2003 that "calls" include text messages to wireless numbers including, for example, SMS calls, provided the call is made to a telephone number assigned to such service.  *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[38] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 30 FCC Rcd 7961, 8019-20, para. 113-15 (2015) (*2015 TCPA Declaratory Ruling and Order*).

wireline or wireless number to the National DNC Registry.[39]  DNC rules state that telemarketers, subject to certain exceptions,[40] are prohibited from initiating any telephone solicitation to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations";[41] this rule also applies to wireless telephone numbers.[42]  Yet, while the Commission included both wireless and wireline numbers in the DNC protections, it has not explicitly included text messages in the DNC rules.[43]

12.     *Text Blocking Notice of Proposed Rulemaking*.  In the *NPRM*, we proposed to protect consumers from the increasing numbers of illegal text messages by extending to text messages some of the consumer protections that have been successful against illegal voice calls.[44]  We proposed to adopt a rule requiring mandatory blocking of texts that purport to be from numbers on a reasonable DNO list.  We also sought comment on whether to adopt a requirement that mobile service providers maintain a single point of contact for senders to report erroneously blocked texts.  We also sought comment on the extent to which spoofing[45] is a problem with regard to text messaging and on applying caller ID authentication standards to text messaging.[46]

## III.     REPORT AND ORDER

13.     In this Report and Order, we for the first time require mobile wireless providers[47] to take action to protect consumers from certain text messages that are highly likely to be illegal.  We require these mobile wireless providers to block texts that purport to be from NANP numbers on a reasonable DNO list, which include numbers that purport to be from invalid, unallocated, or unused numbers, and NANP numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked; these are texts that no reasonable consumer would wish to receive because they are highly likely to be illegal.  At the same time, and also consistent with our work on call blocking, we take steps to mitigate the risk of erroneous blocking by requiring mobile wireless providers to ensure that senders have access to points of contact to report erroneously blocked texts.

---

[39] *2003 TCPA Order*, 18 FCC Rcd at 14115-16, paras. 165-66.

[40] *Id.* at 14042-46, paras. 42-47; 47 CFR § 64.1200(f)(15)(i)-(iii) (exempting certain types of calls from the definition of "telephone solicitation").  Telemarketers may claim a safe harbor by demonstrating that any violation was the result of an error.  *2003 TCPA Order*, 18 FCC Rcd at 14040, para. 38; 47 CFR § 64.1200(c)(2)(i)-(iii).

[41] 47 CFR § 64.1200(c)(2).  *See also 2003 TCPA Order*, 18 FCC Rcd at 14034, para. 28.

[42] 47 CFR § 64.1200(e).

[43] The Commission has previously concluded that SMS and MMS text messaging is an information service and not a common-carrier service. *See Messaging Declaratory Ruling*, 33 FCC Rcd at 12082-12089, paras. 17-32, *recon. pending*, Rept. No. 3011 (Feb. 5, 2019).

[44] *NPRM* at para. 18.

[45] Spoofing is falsifying the caller ID information that appears on the called party's phone with the intent to defraud, cause harm, or wrongfully obtain something of value.  47 U.S.C. § 227(e).

[46] We are not adopting a caller ID authentication requirement here.  Commenters generally opposed this and explained that illegal and unwanted messages rarely come from spoofed numbers and a caller ID authentication solution, even if feasible, would be unlikely to reduce unwanted and illegal text messages. *See, e.g.*, CTIA Comments at 4-5, 11; EZ Texting Comments at 5-6; M³AAWG Comments at 10; NetNumber Comments at 7 & Reply at 2-3; Sinch Comments at 6-7; Telesign Comments at 2-3; T-Mobile Comments at 9-10; Verizon Comments at 7 & Reply at 4-5; WMC Global Comments at 2; AT&T Reply at 9-10; Cloud Communications Reply at 1-2; RWA Reply at 3-5; Vibes Reply at 2-4.

[47] The rules we adopt in this Order are limited to SMS and MMS text messaging; therefore, for purposes of this Order, the service providers offering SMS and MMS text messaging are "mobile wireless providers."

14. We recognize at the outset the efforts providers and others have made in protecting consumers from illegal, or otherwise harmful, texts.[48] As commenters have discussed, providers and others have adopted measures to protect consumers from such text messages, such as upfront vetting for bulk message senders, the CTIA Messaging Principles and Best Practices, and providers' own requirements and guidance.[49] We believe that our actions and proposals today complement those efforts while ensuring customers of all providers get a baseline of protection. While we believe industry efforts to date are important to protect consumers, the increases in consumer complaints and consumer harm from robotext messages convinces us to take additional measures to protect consumers. As some commenters note, robotexts will likely increase as scammers migrate from calling to texting.[50] We agree with industry commenters that say fostering information and collaboration is an important part of the effort. But, in light of increased scams robbing consumers of their money and time, we disagree that we should wait to take targeted action.

15. We choose to act now and, for the first time, require text blocking by all mobile wireless providers so that all subscribers have the same basic level of protection.[51] As the number of illegal text messages grows, so does the risk to consumers. Our action ensures protection for all wireless consumers, regardless of which mobile wireless provider they use to receive messages. We therefore disagree with CTIA, that we could undermine current efforts by mobile wireless providers to protect consumers from scam texts because there is a risk that some providers will "divert resources away from innovative solutions that can more accurately and effectively target spam text messages."[52] Given the limited nature of the rules we adopt and the unchallenged record data that consumers are increasingly harmed by text scams, we are not persuaded that mobile wireless providers would divert significant resources from other anti-spam initiatives and that they are not needed at this time. Nor does anything in the rules we adopt here prevent mobile wireless providers from engaging in existing or future anti-spam efforts or require them to block messages from short codes or OTT applications.[53]

## A. Mandatory Blocking of Texts that are Highly Likely to be Illegal

16. We adopt our proposal to require mobile wireless providers to block text messages at the network level (i.e., without requiring consumer opt in or opt out). The rule we adopt requires that they block texts purporting to be from numbers on a reasonable DNO list.[54] As the Commission determined

---

[48] *See, e.g.* CTIA Comments at 8-9; INCOMPAS Comments at 6; T-Mobile Comments at 6; VON Comments at 3; AT&T Reply at 5; NCLC/EPIC Joint Reply at 5.

[49] *See, e.g.*, CTIA Comments at 9; Sinch Comments at 3; T-Mobile Comments at 4-7; Verizon Comments at 2; AT&T Reply at 3-6.

[50] NORC Reply at 1.

[51] Commenters share this goal of protecting consumers from illegal text messages. *See, e.g.*, AB Handshake Comments at 1; Campaign Verify Comments at 3; CCA Comments at 4; CTIA Comments at 2-3; T-Mobile Comments at 10-11; Verizon Comments at 2; VON Comments at 2; AT&T Reply at 5-6; NCLC/EPIC Joint Reply at 1; Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 12, 2023) at 1 (CTIA 3/12/23 *ex parte*); Letter from Christopher L. Shipley, INCOMPAS; David Casem, Telnyx; Paula Boyd, Microsoft; Helen Marie Berg, Google, Michael Pryor, Cloud Communications Alliance; Greg Rogers, Bandwidth to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 10, 2023) at 1 (INCOMPAS Joint *ex parte*).

[52] CTIA Comments at 13-14.

[53] *See id.* (expressing concerns about blocking of legitimate text messages).

[54] *NPRM* at para. 19. The text messaging services discussed in this proceeding are information services that route messages through the wireless mobile provider networks. *Messaging Declaratory Ruling*, 33 FCC Rcd at 12078, para. 8. In the *NPRM*, we observed that the definition of text message includes SMS messages but "does not include . . . a message sent over an IP-enabled messaging service to another user of the same messaging service." *NPRM* at para. 23. Commenters generally agree that OTT messaging is not covered by our current definition of text

(continued….)

with calls, we find that no reasonable consumer would wish to receive text messages that spoof a number that is not in operation or, worse, purports to be from a well-known, trusted organization that does not send text messages and thus is highly likely to be a scam. Our requirement to block texts that purport to be from numbers on a reasonable DNO list does not include text messages from short codes.

17. We find it appropriate to adopt a mandatory rule here for blocking texts that purport to be from numbers on a reasonable DNO list for several reasons: (i) the texts from such numbers are likely to be illegal; (ii) illegal text messages can have links to malware, a problem that voice calls do not have; (iii) the volume of illegal text messages is increasing, particularly since we adopted measures to block such voice calls; (iv) consumers expect to receive texts from unfamiliar numbers, e.g., as appointment reminders and for double factor authentication, and therefore are more likely to open such messages even when they do not recognize the sending party; and (v) our approach provides benefits to consumers while imposing minimal burden on mobile wireless providers.

18. Our decision to require blocking here, rather than simply rely on industry's voluntary efforts to block, as we have done in the past with certain call blocking, is in part the result of the heightened risk of text messages as both annoyance and vehicles for fraud. The ubiquity and familiarity of text messaging and the alerts that accompany texts contribute to consumers' receptiveness to text messages.[55] Data indicates that consumers read nearly all texts they receive, and do so nearly immediately.[56] Indeed, industry data suggests that consumers open a far larger percentage of text messages than email, and open such messages much more quickly.[57] This stands in contrast to calls where, as we have said repeatedly, consumers report no longer trusting calls from an unfamiliar number and refusing to answer them. Further, we believe this requirement does not impede text messaging by legitimate businesses because our rule is narrowly focused on a set of messages that are highly likely to be illegal: they purport to be from numbers from which no consumer should receive a text message.[58]

19. As the Senate Committee on Commerce, Science, and Transportation (Senate Commerce Committee) observed: "In recent years, spoofing scams in the United States have used text messaging services and other alternative voice communications services."[59] And Senator Schatz explains, "[t]exts

(Continued from previous page)
messaging. *See, e.g.*, ABA Joint Commenters at 8; CRC Comments at 3; INCOMPAS Comments at 7 & Reply at 7. The App Association contends, and we agree, that imposing such new rules on OTT messaging services could disproportionately burden smaller carriers and OTT providers and suppress the development of new innovative solutions. App Association Reply at 5. Therefore, for purposes of this rule, we use the same definition of text message that the Commission has used for purposes of the Truth-in-Caller ID Act. *See* 47 CFR § 64.1600(o) *et seq*. That is, a "text message" is a "message consisting of text, images, sounds or other information that is transmitted to or from a device that is identified as the receiving or transmitting device by means of a 10-digit telephone number or N11 service code." *Id*. It includes SMS and MMS messages, but does not include voice communication or messages sent over an IP-enabled messaging service to another user of the same messaging service. *See id*.

[55] *Messaging Declaratory Ruling*, 33 FCC Rcd at 12079-80, para 12 & n.41.

[56] *Id.*

[57] *Id*.

[58] *See* ABA Joint Commenters at 3; Weave Reply at 2-3. We agree with commenters that this step will help combat the rise of text message scams that rely on spoofing. *See, e.g*., Ad Hoc Comments at 3; ABA Joint Commenters at 5; Public Knowledge Reply at 3-4; Neustar Comments at 1; Schatz Letter at 1; State AGs Reply at 3-4. For example, iconectiv observes that SMS fraudsters often use unallocated numbers from foreign jurisdictions. iconectiv Comments at 1-2. For this reason, some mobile wireless providers already incorporate this DNO information into their blocking algorithms. iconectiv Comments at 2.

[59] *See Spoofing Prevention Act of 2017*, *Report of the S. Comm. On Commerce, Sci. & Transp. On S. 134*, S. Rep No. 115-91, at 2 (2017) (Spoofing Prevention Act of 2017), available at https://www.congress.gov/congressional-report/115th-congress/senate-report/91/1 (last visited Feb. 22, 2023) (explaining proposed changes to 47 U.S.C. § 227(e)).

from these numbers are surely illegal or unwanted, and it makes sense that mobile wireless carriers should block them."[60]  Fifty-one State Attorneys General, a frontline of law enforcement, observe that they are receiving an increasing number of consumer complaints concerning illegal and/or unwanted text messages.[61]  They contend:

> As with voice calls purporting to be from [a reasonable DNO list], text messages from such numbers are also highly likely to be illegal.  Simply stated, no wireless subscriber should be receiving any voice call or text message from these numbers.  For example, a person receiving a text message from a number purporting to have an area code "000" would be receiving a text message from an invalid phone number.  In this circumstance, a scammer has most likely spoofed an invalid number when sending the text message, and this type of fraudulent and misleading representation of information by the purported sender of the text message should not be permitted.[62]

We agree with the State AGs that this is a commonsense approach to blocking because it attacks those texts that are most likely to be fraudulent.[63]

20.      Even if the number of texts using such spoofing is small, the costs to individual consumers that receive them can be high.  For example, AB Handshake observes that the daily damage caused by "smishing" cases to the consumers of a single financial institution can reach $85,000.[64]  AB Handshake agrees that blocking invalid numbers can help to filter out some illegal messages.[65]  Further, the Senate Commerce Committee mentioned in its report accompanying the Spoofing Prevention Act of 2017 that phone fraud cost Americans $8.6 billion in 2014.[66]  We further agree with Public Knowledge, which notes that current voluntary text blocking means that mandatory blocking may not have considerable additional effect for some providers' customers, but it also means that implementation should be relatively easy, inexpensive, and unlikely to result in excessive blocking.[67]  Indeed, commenters do not argue otherwise.[68]

21.      We also find that the rule we adopt today will impose a minimal burden on mobile wireless providers while providing a necessary baseline level of protection to consumers.  As many industry commenters note, many mobile wireless providers already employ measures to block text messages.[69]  These efforts include DNO-based blocking.[70]  For providers that already employ such

---

[60] Schatz Letter at 1.

[61] State AGs Reply at 2.

[62] *Id.* at 3.

[63] State AGs Reply at 3.

[64] AB Handshake Comments at 1.

[65] *Id.* at 3.

[66] *See* Spoofing Prevention Act of 2017 at 2.

[67] Public Knowledge Reply at 3.

[68] *See, e.g.*, CTIA Comments at 17 (mobile messaging networks already incorporate a substantial degree of authentication, and the wireless industry is working to improve its authentication capabilities today); T-Mobile Comments at 7 (T-Mobile only allows active, provisioned telephone numbers to originate text messages on the T-Mobile network); Vibes Reply at 3 (the industry already includes substantial registration and verification processes that are not present in the voice world).

[69] *See, e.g.*, AAPC Comments at 2; Blooston Comments at 3; CCA Comments at 3; CTIA Comments at 6-11 & Reply at 3-7; EZ Texting Comments at 6; M3AAWG Comments at 10; iconectiv Comments at 2; Pinger Comments at 2; Sinch Comments at 7-8; Somos Comments at 7-8; Telesign Comments at 3; T-Mobile Comments at 3, 7-8; Verizon Comments at 2; VON Comments at 3; AT&T Reply at 5; Infobip Reply at 2.  Such efforts include a common means for consumers to report unwanted text messages through "7726 (SPAM)."  *See* CTIA Comments at

(continued....)

measures, our rule imposes no additional burden. For the limited number of providers that do not currently employ such measures, our rule will provide consumers with a baseline level of protection against illegal and fraudulent text messages. We believe the rule we adopt today strikes the best balance between protecting consumers from illegal text messages while imposing minimal burden on mobile wireless providers.

22. We disagree with commenters who argue that consumers will become accustomed to seeing their text messages periodically blocked and will seek other messaging solutions.[71] Because this blocking will occur at the network level, consumer recipients will not be aware of each blocked text, but will be protected before illegal robotexts ever reach their phones. We do not believe that any reasonable consumer would seek other messaging solutions because illegal texts, particularly scam texts, did not reach their phones. And we agree with Public Knowledge that commenters opposing this step have provided no evidence that texts are not delivered using such numbers or that that their current voluntary blocking already stops them.[72]

23. We disagree with CTIA's argument that "given that the Commission's call blocking rules for voice services—a service generally governed by Title II common carrier obligations—are largely *permissive*, it would be highly incongruous for the Commission to adopt *mandatory* blocking rules for text messaging, a Title I information service."[73] We recognize that, historically, our rules for voice calls generally permit and do not mandate blocking.[74] However, we have recently adopted mandatory blocking requirements for gateway providers, some of which are not Title II services.[75] Furthermore, the unique concerns of text messaging as vehicles for malware and as a more trusted form of communications than

---

(Continued from previous page)

8-9. Wireless providers use information from this reporting mechanism to "track and aggregate the information that consumers report . . . and further calibrate their spam filters and blocking tools." *Id.*

[70] *See, e.g.*, CTIA Comments at 11 (explaining that existing countermeasures prevent messages from invalid, unallocated, unused, or DNO telephone numbers from being transmitted to consumer's wireless devices); T-Mobile Comments at 7-8 (messages on T-Mobile's network are either consumer messages, directly originated on a device with a valid number and sent to another device with a valid number, or they are non-consumer messages that must be part of a pre-approved campaign with validated origination information).

[71] CCA Comments at 8.

[72] Public Knowledge Reply at 3.

[73] CTIA Comments at 15 n.44.

[74] *See* 47 CFR § 64.1200(k)(1), (2).

[75] 47 CFR § 64.1200(o) provides:

> A provider that serves as a gateway provider for particular calls must, with respect to those calls, block any calls purporting to originate from a number on a reasonable do-not-originate list. A list so limited in scope that it leaves out obvious numbers that could be included with little effort may be deemed unreasonable. The do-not-originate list may include only:
>
> (i) Numbers for which the subscriber to which the number is assigned has requested that calls purporting to originate from that number be blocked because the number is used for inbound calls only;
>
> (ii) North American Numbering Plan numbers that are not valid;
>
> (iii) Valid North American Numbering Plan Numbers that are not allocated to a provider by the North American Numbering Plan Administrator; and
>
> (iv) Valid North American Numbering Plan numbers that are allocated to a provider by the North American Numbering Plan Administrator, but are unused, so long as the provider blocking the calls is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of blocking.

calling, convince us that we should act quickly to mandate specific blocking of a narrow set of texts that are highly likely to be illegal.

24.     We also disagree with AT&T's contention that our estimation of costs to consumers due to illegal texts, at $6.3 billion, gives us the ability to justify any regulation as long as it costs the industry less than $6.3 billion to implement.[76]  Although AT&T disagrees with our estimate of the cost to consumers, it has not provided an estimate of industry's cost to block texts that purport to be from numbers on a reasonable DNO list—a cost that we believe will be minimal due to the industry existing voluntary actions.  These actions are reasonable responses to the harm and specifically focused to mitigate the ongoing damages consumers face from illegal, fraudulent text messages that mobile wireless providers transmit today.

25.     Our requirement for mandatory blocking of texts that purport to be from numbers on a reasonable DNO list is straightforward and does not define "highly likely to be illegal" or ask mobile wireless providers to determine whether particular messages are "highly likely to be illegal."  We therefore disagree with CTIA that regulation of criteria used by mobile wireless providers to determine which text messages are "highly likely to be illegal" would be inconsistent with the classification of wireless messaging as Title I information service.[77]

26.     We recognize that the Commission earlier concluded that, in the absence of Title II regulation, mobile wireless providers have employed effective methods to protect consumers from unwanted messages and thereby made wireless messaging a trusted and reliable form of communication for millions of Americans.[78]  The rule we adopt here does not affect providers' ability to continue to employ such methods to protect consumers.  Under our rules, mobile wireless providers are now required to block texts that purport to be from numbers on a reasonable DNO list.[79]  Mobile wireless providers remain free to continue the measures they are currently using to protect consumers from unwanted and illegal text messages.[80]

### B.     Point of Contact

27.     We require each mobile wireless provider to establish a point of contact for text senders, or have providers require their aggregator partners or blocking contractors to establish such a point of contact.[81]  This point of contact will enable texters to contact mobile wireless providers, with the goal of swiftly receiving and resolving complaints of unwarranted blocking of text messages.[82]  Several

---

[76] AT&T Reply at 14.

[77] CTIA Comments at 15.

[78] *Messaging Declaratory Ruling*, 33 FCC Rcd at 12095, para. 43.

[79] CCA asks whether a subscriber request for blocking a number as part of a reasonable DNO list would apply to blocking network-wide.  Letter from Angela Simpson, Senior Vice President and General Counsel, Competitive Carriers Association to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023) at 1 (CCA *ex parte*).  CCA is not clear as to their concern.  As a general matter, however a number on a reasonable DNO list would be blocked by any provider in the text path.

[80] We recognize that CTIA and the industry has established guidelines to encourage the innovative use of messaging, while also guarding against unwanted and unlawful text messages.  For example, CTIA's Messaging Principles and Best Practices promote the establishment of expectations that non-consumer message senders will obtain consumer consent *prior* to messaging consumers, and that they will honor consumer opt-outs, among other practices.  CTIA Comments at 8.  The rules we adopt here are not inconsistent with the measures that the industry has taken already.

[81] *See NPRM* at para. 27 (seeking comment on requiring such single point of contact for resolving issues of erroneous blocking).

[82] We recognize that there may be instances where a sender cannot readily identify the mobile wireless provider that blocked the text message.  In such cases, we encourage the sender to work with its mobile wireless provider to

(continued….)

commenters observe that it would be helpful to have a point of contact, as already exists for blocked voice calls, in order to address and mitigate any text blocking issues.

28.       In order to ensure the effectiveness of this requirement as a means of curing blocking of legitimate text messages, we adopt certain safeguards to protect providers from unscrupulous texters. First, we require that providers need only accept blocking complaints from senders that can provide documented, objective evidence of blocking.[83]  We agree with CTIA that, without this restriction, unscrupulous texters could flood the points of contact with bogus claims of erroneous blocking and thus divert focus from legitimate blocking concerns.

29.       We also agree with CTIA that entities other than mobile wireless providers, such as aggregators or contractors, could be responsible for blocking.[84]  We therefore give providers flexibility to either establish their own point of contact[85] or to require their aggregator partners and blocking contractors to establish such a point of contact, which we would expect could resolve the blocking more quickly than the provider.  In any case, we emphasize that any legitimate sender of text messages with documented, objective evidence of blocking should be able to easily contact the entity responsible for that blocking to resolve the dispute and expect providers, aggregators and contractors to respond appropriately.

30.       Just as for blocked voice calls, we find that an easy means for texters to resolve potentially erroneous blocking will help ensure that consumers are not deprived of texts they would want to receive.  While we anticipate minimal risk from our rule above, requiring mandatory blocking of texts from certain types of numbers,[86] there may be instances of erroneous blocking due to providers' voluntary blocking.[87]  For example, a provider or its blocking partners could choose to block texts of a sender who fails to comply with its terms of usage or who exhibits suspicious texting behavior.  For these and other reasons where otherwise legal texts may be blocked, it is important for senders to easily resolve their texting problems with providers.

31.       We decline to set time limits on resolving blocking error complaints.[88]  The ABA Joint Commenters contend that, when a sender makes a credible claim of erroneous blocking and the blocker determines that the text message should not have been blocked, the blocker should be required to cease

---

(Continued from previous page)
identify the appropriate contact.  *See Call Blocking Fourth Report and Order*, 35 FCC Rcd at 15246 & n.175 (discussing requiring a point of contact for blocked calls).

[83] *CTIA 3/7/23 ex parte* at 4.

[84] *Id.*

[85] Such point of contact may be the same point of contact for voice call blocking error complaints.

[86] Sinch Comments at 10 (the risk of erroneous blocking is minimal when only text messages deemed "highly likely" to be illegal are subject to blocking); Public Knowledge Reply at 4.

[87] *See, e.g.*, ABA Joint Commenters at 7; CCA Comments at 10-11; Coalition for Open Messaging Comments at 3 (contending that wireless carriers impose barriers that prevent organizations' ability to use person-to-person (P2P) messaging because such messaging is classified by the providers as business-to-consumer (A2P, thereby requiring the sender to register with carrier programs); INCOMPAS Comments at 3 & Reply at 4 (observing that some of the wireless carriers' methods, like The Campaign Registry, carry significant operational burdens, privacy concerns, and high costs, but with little demonstrable consumer value being added); NORC Comments at 6 & Reply at 5 (contending that discretion in blocking legal texts should not be unbounded and that carriers use non-transparent "trust scores" to block); Pinger Comments at 2 (stating that overly broad carrier classifications can lead to situations where analytics programs indiscriminately block essential, urgent, and wanted messages and such indiscriminate blocking jeopardizes individuals' health and safety); State Voices Comments at 12 (explaining that, if the text message sender exceeds a threshold of 0.1% of texts reported by consumers as spam, service providers may suspend services for that texter); Cloud Communications Reply at 2-5.

[88] *See NPRM* at para. 27.

blocking text messages from that number until circumstances change.[89] We cannot, based on the record, adopt a standard to determine whether a text should be blocked or a reasonable time for the provider for make such a determination. These commenters also ask us to require that blocking disputes be resolved immediately, and no longer than six hours after receiving the dispute.[90] We do not have any information in the record regarding a reasonable amount of time to resolve a dispute.

## C. Other Proposals

32.     We decline to adopt rules for several of the other topics on which we sought comment.[91] First, we decline to require text blocking notifications.[92] The record indicates that service providers are already providing adequate notice when they block texts.[93] For instance, NORC states that "wireless carriers already have an established response system that consists of approximately 2,000 codes" and, "[w]hen a text fails to send, the sender will receive a code reply from a specific carrier's number with granular information about why the text failed, e.g., 'Failed because of analytics blocking by carriers.'"[94]

33.     We also decline at this time to enact rules regarding safeguarding against blocking of texts to 911 and other emergency numbers based on the record. For example, the Texas 911 Entities state that illegal texting to 911 currently does not appear to be a problem at Public Safety Answering Points (PSAPs).[95] We will continue to monitor potential threats from unauthorized 911 communications to public safety and PSAPs, as these commenters suggest.[96] Should industry or consumer complaints indicate that the situation has changed and that this category of texts is being blocked in a way that is problematic, we will not hesitate to revisit this issue.

34.     Additionally, we are not adopting standards to ensure competitively neutral and content-neutral grounds for blocking;[97] the rule we are adopting here, mandatory blocking of texts that purport to be from numbers on a reasonable DNO list, does not require a mobile wireless provider to examine the content of texts themselves. Mandatory blocking is based solely on the spoofed number associated with

---

[89] ABA Joint Commenters at 7.

[90] *Id.*

[91] In the *NPRM*, we sought comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility. One commenter observed that our proposal may have a disparate effect on deaf, hard of hearing, visually impaired, impoverished, and neurodivergent people because they are more likely to rely on text messages than phone calls. CRC Comments at 3-4. However, the rules we adopt here should protect all consumers, including deaf, hard of hearing, visually impaired, impoverished, and neurodivergent persons from illegal texts. We do not find, based on the record, that this Report and Order will inhibit advances in diversity, equity, inclusion, and accessibility.

[92] *See, e.g.*, ABA Joint Commenters at 7; Ad Hoc Comments at 4-5; CCA Comments at 10-11; INCOMPAS Reply at 4-5; Weave Reply at 5-6.

[93] *See, e.g.*, NORC Comments at 5; Campaign Registry Reply at 3 (parties can track messaging back to its origins so that they can conduct the necessary follow up for the messaging in question); Verizon Reply at 3. Consumers may use apps or features on their mobile device to filter or block texts; the reply code discussed by commenters would apply to texts blocked by the mobile wireless providers.

[94] NORC Comments at 5. Likewise, providers following CTIA's "Messaging Security Best Practices" consent requirements, or similar standards, are blocking texts that fail to comply with such best practices. *See Messaging Security Best Practices*, https://api.ctia.org/wp-content/uploads/2022/06/Messaging-Security-Best-Practices-June-2022.pdf. The CTIA Messaging Security Best Practices provides that "parties should respond within a reasonable timeframe to lawful inquiries from other stakeholders regarding the sending of Unwanted Messages or other potential abuses." CTIA Messaging Security Best Practices at 3.22.

[95] Texas 911 Entities Comments at 2.

[96] *Id.*

[97] *See NPRM* at para. 24.

the text message.  We also decline to adopt a safe harbor for text blocking.[98]  Because the blocking we adopt is mandatory rather than discretionary, and because the texts that may be blocked are highly likely to be illegal, we do not believe a safe harbor is necessary.

35.        In the *NPRM*, we asked how consumer education and outreach could help address the problem and if there are ways the Commission can enhance its spam text message consumer education outreach and content.[99]  We are encouraged by the measures that mobile wireless providers are taking to inform their customers about unwanted and illegal text messages and the ways that they have facilitated consumer reporting of such texts, such as forwarding spam to 7726 in order to report spam to wireless service providers.[100]  As CTIA explains, wireless providers have established 7726 (SPAM) for consumers to report unwanted text messages.[101]  Mobile wireless providers use information consumers report through 7726 to further calibrate their spam filters and blocking tools.[102]  Further, reporting tools native to wireless device operating systems, from both Apple and Google, provide consumers with a more streamlined means of reporting spam text messages.[103]  In addition, our website and the FTC's website offer helpful information on spam prevention to assist consumers.[104]

36.        We also decline to adopt PACE's proposals regarding the maintenance of a DNO list.[105]  PACE suggests that the Commission clarify who is responsible for maintaining a DNO list and adopt a centralized DNO list maintained by a single body; it also asks that the Commission require that the DNO list be scrubbed against the Reassigned Numbers Database and that any reassigned numbers be removed from the DNO list.[106]  We decline to do so because PACE does not identify why our current approach for DNO lists is flawed and thus how its proposal would correct a problem.

37.        Finally, we decline to adopt caller ID authentication requirements for text messages based on record uncertainty about the current feasibility of such a requirement.[107]  For example, CTIA

---

[98] *See id.* at para. 27.

[99] *See id.* at paras. 37-38.

[100] *See, e.g.*, CTIA Comments at 8-9; M³AAG Comments at 4; Sinch Comments at 4; T-Mobile Comments at 6 (explaining that consumers can report spam by forwarding the message to 7726 (SPAM) and responding with the message sender's telephone number or other identifier); AT&T Reply at 5.  T-Mobile also notes that it works with Apple and Google to allow customers to report spam text messages.  T-Mobile Comments at 6-7.  Commenters observe that device software automatically asks the device holder if a deleted message should be reported as "junk," which streamlines the spam reporting process for consumers and yields useful information about bad actors.  Telesign Comments at 4; T-Mobile Comments at 6-7.

[101] CTIA Comments at 8.

[102] *Id.* at 8-9.

[103] *Id.*at 9, citing Apple, *Block, filter, and report messages on iPhone*, https://support.apple.com/guide/iphone/block-filter-and-report-messages-iph203ab0be4/ios; Google Android, *Report Spam*, https://support.google.com/messages/answer/9061432?hl=en.  *See also* Apple, *Recognize and avoid phishing messages, phony support calls, and other scams,* https://support.apple.com/en-us/HT204759 (last visited Feb. 17, 2023).

[104] *See, e.g.*, FCC, Consumer Alert, *Scam Robotexts are a Rising Threat*, (Jul. 28, 2022), https://www.fcc.gov/robotext-scams-rise; FCC, Consumer Guides, *Stop Unwanted Robocalls and Texts*, https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Dec. 19, 2022); Federal Trade Commission, Consumer Advice, *How to Recognize and Report Spam Text Messages*, https://consumer.ftc.gov/articles/how-recognize-and-report-spam-text-messages (last visited Feb. 2, 2023).

[105] PACE *ex parte* at 2-3.

[106] *Id.*

[107] *See* CTIA Comments at 18 (noting that STIR/SHAKEN applies exclusively to SIP technology, which does not apply to the majority of text messages).  Commenters explain that illegal and unwanted messages rarely come from

(continued….)

explains that the architecture of wireless messaging platforms is such that wireless providers already know the transmitting provider (e.g., wireless provider or messaging solutions aggregator) and user identifier (whether long code, short code, or other marker) for text messages.[108] CTIA notes that mobile wireless providers use this information to deliver text messages typically only from authorized providers and user identifiers using valid originating information through appropriate routing channels, and to more readily identify unauthorized traffic using illegitimate channels.[109] T-Mobile also notes that the current anti-robocall regime is targeted at the primary sources of illegal robocalls, i.e., unverified telephone caller ID information and a common carrier regulatory regime, which does not apply to text messages.[110] Other commenters explain that STIR/SHAKEN would not be a viable solution if spoofing were more prevalent, because among other reasons, STIR/SHAKEN only works on the Session Internet Protocol (SIP).[111] We agree with providers, who argue that caller authentication solutions are "being actively considered that may be able to complement the vetting and monitoring solutions in use today," but that these efforts are preliminary and require more study.[112] In the *Further Notice*, we seek comment on whether and how the Commission can encourage efforts to develop technical solutions for text message authentication.

### D.    Legal Authority

38.    We find that we have legal authority to require providers to block certain text messages originating from NANP numbers and to require blockers to establish a point of contact for receiving and resolving blocking complaints. First, we find that, under the TCPA, the Commission has authority over the unsolicited text messages that fall within the scope of this order.[113] The TCPA restricts certain autodialed and prerecorded or artificial voice calls to residential and wireless telephone numbers absent the prior express consent of the called party.[114] The Commission has found that, for the purposes of the TCPA, texts are included in the term "call."[115] Because the Commission has authority to regulate certain text messages under the TCPA, particularly with regard to messages sent using an autodialer and without the consent of the called party, we have legal authority for the rules we adopt today.

39.    Second, we find that we have authority under the Truth in Caller ID Act to adopt a blocking requirement. The Truth in Caller ID Act makes unlawful the spoofing of caller ID information "in connection with any voice service or text messaging service . . . with the intent to defraud, cause harm, or wrongfully obtain anything of value."[116] We find that adopting this requirement is necessary to

---

(Continued from previous page)

spoofed numbers and a caller ID authentication solution, even if feasible, would be unlikely to reduce unwanted and illegal text messages. *See, e.g.*, CTIA Comments at 4-5, 11; EZ Texting Comments at 5-6; M³AAWG Comments at 10; NetNumber Comments at 7 & Reply at 2-3; Sinch Comments at 6-7; Telesign Comments at 2-3; T-Mobile Comments at 9-10; Verizon Comments at 7 & Reply at 4-5; WMC Global Comments at 2; Cloud Communications Reply at 1-2; RWA Reply at 3-5; Vibes Reply at 2-4.

[108] CTIA Comments at 17.

[109] *Id.*

[110] T-Mobile Comments at 2.

[111] CTIA Comments at 18-19; Verizon Comments at 8; AT&T Reply at 9-10.

[112] *See, e.g.*, CTIA Comments at 18-19 & Reply at 13; iconectiv Comments at 3; NTCA Comments at 2-3; Sinch Comments at 14; T-Mobile Comments at 10.

[113] The Commission stated in the *2003 TCPA Order* that the authority to regulate telemarketing derives from the TCPA. *2003 TCPA Order*, 18 FCC Rcd at 14070, para. 95. The Commission also observed that Congress anticipated "that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Id.* at 14092, para. 132.

[114] 47 U.S.C. § 227(b)(1)(A).

[115] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[116] 47 U.S.C. § 227(e)(1).

block calls that unlawfully spoof numbers on reasonable DNO lists, and thus is authorized by the Truth in Caller ID Act.

40. Finally, we find that we have authority under Title III of the Act to adopt these measures. As courts have recognized, Title III "endow[s] the Commission with 'expansive powers' and a 'comprehensive mandate to "encourage the larger and more effective use of radio in the public interest."'"[117] Section 303 of the Act grants the Commission authority to establish operational obligations for licensees that further the goals and requirements of the Act if such obligations are necessary for the "public convenience, interest, or necessity" and are not inconsistent with other provisions of law.[118] In particular, section 303(b) authorizes the Commission to "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within each class," and that is what our mandatory blocking rule addresses here.[119] In addition, sections 307 and 316 of the Act allow the Commission to authorize the issuance of licenses or adopt new conditions on existing licenses if such actions will promote public interest, convenience, and necessity.[120] We find the requirements we adopt for mobile wireless providers here are necessary to protect the public from illegal text messages and that such a requirement is in the public interest. Because we find that the sources of authority identified above provide sufficient authority for the rules we adopt today, we find it unnecessary to address other possible sources of authority to adopt these rules.

41. We disagree with AT&T's position that our regulatory intervention would have "an enormous economic impact, and in view of the lack of clear statutory authority . . . the Commission should await more direct authorization from Congress before proceeding to rules."[121] First, AT&T's reliance on the Supreme Court's decision in *West Virginia v. EPA* is inapt in this regulatory context, where Congress has granted the Commission "expansive powers" and a "comprehensive mandate" to "encourage the larger and more effective use of radio in the public interest" in Title III of the Act.[122] Congress's delegation of broad spectrum management authority to the Commission—which is longstanding and remains unaltered—recognizes that the field of radio communications is "dynamic" and rapidly changing, and court decisions such as *Cellco Partnership* have recognized that the Commission has broad authority under Title III to adopt rules addressing what services must be rendered by licensees.[123] Second, the limited obligations on mobile wireless providers adopted here are far from the "extraordinary case" involving the kind of "transformative" regulations at issue in *West Virginia v.*

---

[117] *Cellco P'ship v. FCC,* 700 F.3d 534, 542 (D.C. Cir. 2012) (*Cellco Partnership*) (upholding the Commission's authority under Title III to adopt data roaming rules) (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943) (*Nat'l Broad Co.*)).

[118] 47 U.S.C. § 303.

[119] *See Cellco P'ship,* 700 F.3d at 543 ("Like other rules that govern Title III services, the data roaming rule merely defines the form mobile-internet service must take for those who seek a license to offer it."). We find several other provisions of Section 303 relevant here. *See* 47 U.S.C. § 303(g) (requiring the Commission to "encourage the larger and more effective use of radio in the public interest"); *id*. § 303(r) (authorizing the Commission to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this [Act]").

[120] *See* 47 U.S.C. § 307; 316*; see also Cellco P'ship,* 700 F.3d at 543 (recognizing section 316 as additional Title III authority for our data roaming rules).

[121] AT&T Reply at 14 (citing *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022)).

[122] *Nat'l Broad. Co.*, 319 U.S. at 219.

[123] *See Cellco P'ship,* 700 F.3d at 542-43; *see also Implementation of the National Suicide Hotline Improvement Act of 2018*, Second Report and Order. 36 FCC Rcd 16901, 16933 (2021) (relying on the Commission's Title III authority, including sections 303, 307, and 316, to impose text-to-988 obligations on CMRS providers).

*EPA*,[124] especially given the record evidence regarding licensees' existing blocking practices.[125]

42.     AT&T's argument is based on the premise that we would be adopting rules on the full range of issues on which we sought comment in the *NPRM*, including caller ID authentication for text messages, as well as an unsupported assertion that the rules would have an "enormous economic impact."[126]  However, we are adopting only two narrow rules in this Report and Order, and we find that these rules will not have an enormous economic impact and will not be overly burdensome for mobile wireless providers to implement (in part, because some providers, like AT&T, are already "broadly block[ing] text messages sent from invalid, unallocated, unassigned, and spoofed numbers").[127]  Further, AT&T has not provided any evidence that the  rules adopted here would, in fact, have an enormous economic impact.  For the reasons explained above, we find that the Commission does have ample authority to adopt these new rules.

### E.     Cost-Benefit Analysis

43.     AT&T challenges the proposed cost benefit analysis in the *NPRM*, but it provides no basis for challenging the assumptions behind it.[128]  In the analysis of the expected benefits, we estimated that consumers incur a 5 cent nuisance harm for each spam text received.[129]  Further, we estimated that consumers incur $2 billion in harm due to fraudulent spam texts annually.[130]  Our estimates were based on our experience estimating the harms caused by illegal robocalls.  In that context, we assumed that each robocall causes a 10 cent nuisance harm and that fraudulent robocalls result in annual harm of $10.5 billion.[131]  We proposed to attribute a lower nuisance harm of 5 cents to a spam text because we believed that they are less disruptive to consumers, e.g., because consumers can simply delete a text instead of having to listen to a robocall first then delete it.  Further, we assumed that harm from fraudulent spam texts is about 20% of the harm caused by fraudulent robocalls fraud costs.

44.     Our estimate of the harm due to fraudulent texts was conservative.  For example, one source puts financial losses due to spam texts at $28 billion in 2022.[132]  In total, we estimated that the blocking of illegal robotexts would achieve an annual benefit of at least $6.3 billion.[133]  In the *NPRM* we sought comment on these assumptions and received no alternatives in the record.[134]

---

[124] *West Virginia v. EPA*, 142 S. Ct. at 2608, 2610.

[125] *See, e.g.*, AAPC Comments at 2; Blooston Comments at 3; CCA Comments at 3; CTIA Comments at 6-11 & Reply at 3-7; EZ Texting Comments at 6; M³AAWG Comments at 10; iconectiv Comments at 2; Infobip Reply at 2; Pinger Comments at 2; Sinch Comments at 7-8; Somos Comments at 7-8; Telesign Comments at 3; T-Mobile Comments at 3; Verizon Comments at 2; VON Comments at 3; AT&T Reply at 5 (AT&T employs a multi-layered defense against illegal and unwanted text messages that incorporates technological innovation and proactive collaboration).

[126] AT&T Reply at 5.

[127] *Id.*

[128] *Id.*at 13-14.

[129] *NPRM* at para. 43.

[130] *Id.* at para. 44.

[131] *Call Authentication Trust Anchor, Implementation of TRACED Act Section 6(a)—Knowledge of Customers by Entities with Access to Numbering Resources*, WC Docket Nos. 17-97, 20-67, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241, 3263, paras. 47-48 (2020) (*STIR/SHAKEN Order*).

[132] Robokiller, The Robokiller Report:  2022 Mid-Year Phone Scam Insights at 9 (2022), https://www.robokiller.com/the-robokiller-report (last visited Feb. 14, 2023).

[133] *See NPRM* at para. 43.

45.     Since we released the *NPRM*, the number of spam texts has increased to an estimated 147 billion annually.[135]  Assuming a 5 cent nuisance cost per spam text and a conservative $2 billion fraud cost for all spam texts, the total harm of spam texts would be $9.35 billion annually.[136]  While the rule we adopt today will not block all spam texts, it will block some percentage of them.  Even a small reduction in spam texts would result in benefit to consumers of many millions of dollars annually.  Because costs to providers are expected to be modest, given the record evidence regarding licensees' existing blocking practices,[137] we expect the benefits of this policy to exceed its costs.

46.     In our analysis of the expected costs in the *NPRM*, we estimated that the text blocking requirement would result in an overall *reduction* of costs to text service providers due to the expected reduction in network congestion costs incurred by providers as a result of spam texts.[138]  We sought comment on these estimated net cost savings due to reduction in network congestion,[139] and received no comments challenging this estimate.[140]  In addition, we estimate that out-of-pocket costs to mobile wireless providers to comply with the new blocking rule will be modest given the record evidence regarding providers' existing blocking practices and, as noted above, that any such costs will be more than offset by cost savings from reduced network congestion.

47.     Based on the analysis of the anticipated benefits and costs discussed above, and in light of the record evidence regarding mobile wireless providers' existing blocking practices, we believe the benefits of the rules adopted in this Report and Order significantly outweigh their costs.

## IV.     FURTHER NOTICE OF PROPOSED RULEMAKING

48.     In this Further Notice of Proposed Rulemaking, we seek comment on additional protections for consumers against illegal robotexts.  We first seek comment on whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams.  We also seek comment on text message authentication.  Next, we propose to extend Do-Not-Call protections to marketing text messages.  We also seek to ban the practice of obtaining a single consumer consent as justification for calls and texts from multiple, sometimes hundreds, of sellers and potential fraudsters.

49.     Our action in the Report and Order above provides a baseline level of consumer protection from spoofed text messages.  The actions we propose below would address more potentially illegal messages.  Consumers have come to rely on texts from trusted institutions that may not be on a DNO list, such as a child's school, a doctor's office, state and local governments, utility providers, and financial institutions.  The messages they carry are often brief and consumers' expectation upon receipt is that such messages contain important, and perhaps urgent, information.  For that reason, consumers may have a more difficult time recognizing these scams.[141]

---

(Continued from previous page) ─────────────

[134] We note that AT&T offers no alternative estimate of the economic benefit from blocking illegal texts.  *See* AT&T Reply at 13-14.

[135] *Id.* at 4.

[136] $0.05*147 billion + $2 billion = $9.35 billion.

[137] *See* para. 21, *supra*.

[138] *See NPRM* at para. 47.

[139] *See id.* at para. 46.  The *NPRM* stated that the Commission would analyze "any detailed cost data" received in comments.  *See id.* at para. 47.  However, no detailed cost data was submitted in the record.

[140] We note that AT&T does not challenge this point.  *See* AT&T Reply at 13-14.

[141] Public Knowledge Reply at 2.

### A.    Block Texts Upon Commission Notification

50.    We propose to require terminating mobile wireless providers to investigate and potentially block texts from a sender after they are on notice from the Commission that the sender is transmitting suspected illegal texts, similar to our requirement for gateway providers with respect to voice calls.  Where texts are clearly illegal, and where the Commission has put providers on notice of the illegal texts, we believe mobile wireless providers have no legitimate reason to transmit the texts.  We therefore seek comment on extending this approach, which the Commission has in place for call blocking, to text blocking.[142]

51.    In the *Gateway Provider Report and Orde*r, the Commission required gateway providers to block illegal voice traffic when notified of such traffic by the Commission through the Enforcement Bureau.[143]  We seek comment on whether we should adopt the same process here for mobile wireless providers and texts, as we did there for gateway providers and voice calls.

52.    Specifically, our rules (in section 64.1200(n)(5)) require the Enforcement Bureau to issue a Notification of Suspected Illegal Traffic that: (1) identifies with as much particularity as possible the suspected illegal traffic; (2) provides the basis for the Enforcement Bureau's reasonable belief that the identified traffic is unlawful; (3) cites the statutory or regulatory provisions the suspected illegal traffic appears to violate; and (4) directs the provider receiving the notice that it must comply with the requirements in section 64.1200(n)(5) of the Commission's rules by a specified date that gives the provider a minimum of 14 days to comply.[144]  Notified gateway voice providers must then promptly investigate the identified traffic and either block the identified traffic and substantially similar traffic on an ongoing basis or respond to the Commission that the provider has a reasonable basis for concluding that the identified calls are not illegal.[145]  If a provider fails to comply, the Commission established a process through which the Enforcement Bureau can require all providers immediately downstream from that gateway provider to block all traffic from that provider.[146]

53.    We seek comment on whether there are any differences between calling and texting that would suggest that this model would not work well for texting.  What would be the cost to providers of implementing such a requirement?  Can providers and the Commission's Enforcement Bureau properly trace text messages to their originating provider to effectuate these rules?  Are there additional requirements the Commission should adopt to ease any traceback efforts for text messaging?  Because providers state that they already do a considerable amount of text blocking,[147] we would not expect our proposal to impose material additional costs.  Is that correct?  We seek comment on these questions specifically and this recommendation generally.

### B.    Text Message Authentication and Spoofing

54.    In the *Order*, we declined to adopt caller ID authentication requirements for text

---

[142] *See* 47 CFR § 64.1200(n)(2).

[143] *Gateway Provider Report and Order*, 2022 WL 1631842 at paras. 74-86; *see* 47 CFR § 64.1200(n)(5).

[144] 47 CFR § 64.1200(n)(5)(i)(A); *see also Gateway Provider Report and Order*, 2022 WL 1631842 at para. 80.

[145] 47 CFR § 64.1200(n)(5)(i)(A), (B); *see also Gateway Provider Report and Order*, 2022 WL 1631842 at para. 83.

[146] 47 CFR §§ 64.1200(n)(5)(ii), (iii), 64.1200(o); *see also Gateway Provider Report and Order*, 2022 WL 1631842 at paras. 84-86.

[147] *See, e.g.*, AAPC Comments at 2; Blooston Comments at 3; CCA Comments at 3; CTIA Comments at 6-11 & Reply at 3-7; EZ Texting Comments at 6; M³AAWG Comments at 10; iconectiv Comments at 2; Infobip Reply at 2; Pinger Comments at 2; Sinch Comments at 7-8; Somos Comments at 7-8; Telesign Comments at 3; T-Mobile Comments at 3; Verizon Comments at 2; VON Comments at 3; AT&T Reply at 5.

messages based on the current record.[148]We seek comment on the extent of number spoofing and if there are other solutions that are better targeted to address the problem of spoofed text messages. If so, what are they and how can the Commission encourage their development and adoption? We note that, while some commenters say number spoofing is not a problem for text messages,[149] others say bad actors spoof their phone numbers or identities.[150] In the robocalling context, the Commission has found that a subset of small voice service providers are responsible for a large number of illegal robocalls.[151] Is a similar dynamic at issue with robotexts? If so, how might the Commission target these specific providers? How might the Commission encourage industry members to collaborate and finalize technical solutions for authenticating text messages and mitigating illegal text messages? For example, should the Commission adopt a deadline for providers to develop a text message authentication solution or an alternative technical solution for addressing the problem of spoofed text messages? Commenters should address how the Commission can ensure non-discriminatory policies in adopting text authentication measures.[152]

### C.  Clarifying Do-Not-Call Protections for Text Messages

55.  To the extent it remains unclear, we propose to clarify that National DNC Registry protections apply to text messages as well as voice calls and to codify this clarification in our rules. The National Do-Not-Call Registry has been operational for almost two decades and currently protects over 246 million telephone numbers from telemarketing sales calls, or "telephone solicitations."[153] As such, it represents a critical component of our policy strategy against unwanted calls. Although the Commission has stated that "text messages" are "calls" for TCPA purposes,[154] it has not explicitly included text messages in the codified DNC rules.[155] The Commission's DNC rules protect wireless phone subscribers

---

[148] Most commenters to our NPRM observe that illegal and unwanted messages rarely come from spoofed numbers and a caller ID authentication solution, even if feasible, would be unlikely to reduce unwanted and illegal text messages. *See, e.g.*, CTIA Comments at 4-5, 11; EZ Texting Comments at 5-6; M³AAWG Comments at 10; NetNumber Comments at 7 & Reply at 2-3; Sinch Comments at 6-7; Telesign Comments at 2-3; T-Mobile Comments at 9-10; Verizon Comments at 7 & Reply at 4-5; WMC Global Comments at 2; Cloud Communications Reply at 1-2; RWA Reply at 3-5; Vibes Reply at 2-4.

[149] CTIA Comments at 4-5.

[150] ABA Joint Commenters Comment at 3 (stating that "[o]ur members report that bad actors illegally 'spoof' phone numbers belonging to legitimate businesses when sending text messages – i.e., the bad actor sends a text message from a number that appears to belong to the legitimate business or sends a text message from the bad actor's own number, making it appear that it is from a legitimate business, with the intent to defraud the recipient").

[151] *Call Blocking Fourth Report and Order*, 36 FCC Rcd at 17844-17845, paras. 10-13.

[152] *See, e.g.*, VON Comments at 5 (observing that competitive neutrality must be at the forefront of any solution to illegal texting and solutions must not endorse or enable anti-competitive practices that providers have seen in the industry); Cloud Communications Reply at 3 (noting concerns that the industry's application of current principles and practices has led to discriminatory conduct and the blocking of legitimate texts); NORC Reply at 2 (noting that the record demonstrates that there is a lack of transparency and accountability in blocking by mobile wireless providers).

[153] *See* FTC National Do-Not-Call Registry Data Book for Fiscal Year 2022, https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2022 (last visited Feb. 2, 2023). The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" but not including calls or messages made with prior express invitation or permission, to any person with whom the caller has as established business relationship, or by a tax exempt nonprofit organization. 47 U.S.C. § 227(a)(3).

[154] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[155] Although the inclusion of text messages in the National DNC Registry protections has not been codified, the Commission has previously taken the position that the National DNC Registry protects consumers from unwanted text messages that contain marketing when the consumer has placed their number on the National DNC Registry. *See Emanuel (Manny) Hernandez, Click Cash Marketing, LLC, and Rock Solid Traffic*, Citation and Order,

(continued….)

by requiring prior express invitation or permission in writing for calls to wireless numbers on the DNC Registry.[156]

56.      Commenters ask us to clarify that the DNC rules apply to both voice calls and texts.[157] As these commenters note, the DNC rules would bring considerable protection for recipients of marketing texts. Specifically, our rules require that, before sending a marketing text to consumers, the texter must have the consumer's prior express invitation or permission, which must be evidenced by a signed, written agreement between the consumer and seller, which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed.[158]

57.      We seek comment on this proposal. Would codifying the DNC protections to marketing texts further protect consumers from unwanted marketing text messages? We note that the DNC protections do not depend on whether the caller uses an autodialer, unlike some provisions of the TCPA.[159] In this regard, would our proposal also represent an important codification of consumer protections? Are there downsides to our proposal?

### D.    Closing the Lead Generator Loophole

58.      We propose to ban the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent.

59.      In an illustration of the issue, Assurance IQ describes a website that purports to enable consumers to comparison shop for insurance.[160] The website sought consumer consent for calls and texts from insurance companies and other various entities, including Assurance IQ's "partner companies."[161] The "partner companies" were listed in a hyperlink on the web page (i.e., they were not displayed on the website without clicking on the link) and the list of "partner companies" included both insurance companies and other entities that did not appear to be related to insurance.[162]

60.      Public Knowledge argues that lead generators and data brokers use hyperlinked lists to harvest consumer telephone numbers and consent agreements on a website and pass that information to

---

(Continued from previous page) ————————————

Unauthorized Text Message Violations, 33 FCC Rcd 12382 (EB 2018) (*Hernandez Citation*) (Mr. Hernandez was responsive to the citation and no fine was issued.).

[156] 47 CFR § 64.1200(e), (c)(2)(ii); *2003 TCPA Order*, 18 FCC Rcd at 14034, paras. 28, 36. As we stated in the *2003 TCPA Order*, "wireless subscribers may participate in the national do-not-call list" and "we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers'" for purposes of our DNC rules. *Id.* at 14039, para. 36.

[157] NCLC/EPIC Joint Reply at 7 (the prohibition against making telephone solicitation calls to telephone numbers registered on the National DNC Registry without consent applies to texts and calls that include solicitations).

[158] 47 CFR 64.1200(c)(2)(ii).

[159] *See* 47 U.S.C. §§ 227(b)(1)(A), (b)(1)(D), (d)(1)(A).

[160] Assurance IQ filed a petition before the Commission seeking clarification that a caller may rely on presumed consent from online forms for TCPA purposes, among other things. Comments were due July 6, 2020. Assurance IQ Petition (CG Docket No. 02-278, filed May 12, 2020) (Assurance IQ Petition). A request to withdraw the Assurance IQ Petition was submitted May 10, 2022. Letter from Paul C. Besozzi, counsel for Assurance IQ, LLC, to Marlene H. Dortch, Secretary, Federal Communications Commission (May 10, 2022), filed in CG Docket No. 02-278.

[161] Assurance IQ Petition at 2-3 (CG Docket No. 02-278, filed May 12, 2020).

[162] *Id.*

telemarketers and scam callers.[163]  Commenters also provide an example of another insurance company website that has 8,423 entities on the hyperlinked page.[164]  The telemarketer that obtains the consumer's contact information from the lead generator may believe that it has the consumer's prior express consent, but, commenters argue, the consumer has not consented to the particular caller or callers, which may be listed as "partner companies" in these arrangements.[165]

61.      We seek comment on amending our TCPA consent requirements to require that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page.[166]  The Commission has not addressed this aspect of consent in the past.  Would our proposal better protect consumers from receiving large numbers of calls and texts they do not wish to receive when they visit websites such as comparison shopping websites?  Consumers may find comparison shopping websites helpful; how can we ensure that they can consent to obtain further information from the site without receiving numerous calls and texts from unrelated companies?  Commenters should discuss whether our proposal would limit the value of comparison-shopping sites to consumers.  Are there alternatives to our proposal that would better protect consumers from the harms we have identified?  We also seek comment on Public Knowledge's request that prior express consent to receive calls or texts must be made directly to one entity at a time.[167]

62.      More broadly, we seek comment on the extent of the problem, our proposed rule, and whether the proposed rule will clarify consent and help to eliminate illegal text messages and calls.[168]  Are there different or additional limitations on multi-party consent we should consider?

### E.    Digital Equity and Inclusion

63.      The Commission, as part of its continuing effort to advance digital equity for all,[169]

---

[163] Public Knowledge Reply at 5-6.  Commenters explain that telemarketers ignore the requirement that the express invitation or permission can only be provided by the consumer directly to the seller.  NCLC/EPIC Joint Reply at 7-8.

[164] Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, Secretary, Federal Communications Commission (Dec. 16, 2022) at slide 10-11 (NCLC/EPIC 12/16 *ex parte*).

[165] NCLC/EPIC Joint Comments at 4; NCLC/EPIC Joint Reply at 8 (explaining that clicking on a link that contains a hidden URL with the names of thousands of sellers does not meet the E-Sign definition of an "electronic signature," because there was no separate agreement with each seller, and the consumer could not have had the intent to sign such a separate agreement with each of the thousands of sellers listed on the webpage connected with the URL).

[166] Under our Truth in Billing rules, "clear and conspicuous" is notice that would be apparent to a reasonable consumer.  47 CFR § 64.2401(e).  We use the same definition for junk fax opt-out notice requirements.  *See Rules and Regulations Implementing the Telecommunications Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005*, CG Docket 02-278, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787, 3801, para. 26 (2006) (Consistent with the definition in our truth-in-billing rules, "clear and conspicuous" for purposes of the opt-out notice means a notice that would be apparent to a reasonable consumer.).

[167] Public Knowledge Reply at 5.  REACH contends that its standards limit the number of partners that may be included in a disclosure, clearly advise the consumer that telemarketing calls will result from an online submission, and prevent the use of prerecorded calls as the first contact to a consumer providing their information online.  REACH *ex parte* at 3.  QuinStreet argues that any approach to consent should continue to enable consumer choice and website owner flexibility, because many high-quality site owners are small- and medium-sized businesses.  Letter from Yaron Dori, Covington and Burling, LLP, counsel to Quinstreet, Inc., to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023).

[168] One commenter contends that the lack of standards in the lead generation industry is to blame for between 500,000,000 and 1 billion unwanted calls per month.  REACH *ex parte* at 2.

[169] Section 1 of the Communications Act provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, invites comment on any equity-related considerations[170] and benefits (if any) that may be associated with the proposals and issues discussed herein.  Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility.

### F.    Legal Authority

64.    In the Further Notice of Proposed Rulemaking, we seek comment on  four issues:  (i) whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams; (ii) text message authentication; (iii) extending Do-Not-Call protections to marketing text messages; and (iv) preventing marketers from using a single consumer consent as justification for calls and texts from numerous parties.

65.    We seek comment on our authority to adopt each of the measures.  We note that the Commission has authority to regulate certain text messages under the TCPA, particularly with regard to messages sent using an autodialer and without the consent of the called party.  We seek comment on whether we have legal authority for the proposed rules under the TCPA.  Do the TRACED Act or the TCPA provide authority for our proposals?  Do we have authority for our proposals under section 251(e) of the Act, which provides us "exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States?"[171]  The Commission found authority to implement STIR/SHAKEN for voice service providers under section 251(e) in order to prevent the fraudulent exploitation of numbering resources.[172]  Does section 251(e) of the Act grant us authority to adopt implementation of authentication for text messages?  We seek comment on whether that authority extends to text messages.  We seek comment on our authority under the Truth in Caller ID Act for these proposals.  The Commission found authority under this provision to mandate STIR/SHAKEN implementation, explaining that it was "necessary to enable voice service providers to help prevent these unlawful acts and to protect voice service subscribers from scammers and bad actors."[173]  We believe that same reasoning applies here, especially given Congress's focus on text messages, and seek comment on that conclusion.

## V.    PROCEDURAL MATTERS

66.    *Paperwork Reduction Act*.  This document may contain new and modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA.  OMB, the general public, and other federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding.  In this present document, we have assessed the effects of our requirement that mobile wireless providers block texts purporting to be from NANP numbers on a reasonable DNO list, which include numbers that purport to be from invalid, unallocated, or unused numbers, and NANP

---

[170] We define the term "equity" consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality. *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

[171] 47 U.S.C. § 251(e).

[172] *STIR/SHAKEN Order*, 35 FCC Rcd at 3260-61, para. 42.

[173] *Id.* at 3262, para. 44.

numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked. We find that, to the extent this requirement constitutes an information collection, such collection will not present a substantial burden for small business concerns with fewer than 25 employees and that any such burdens would be far outweighed by the benefits to consumers from blocking text messages that are highly likely to be illegal.

67.     The Further Notice of Proposed Rulemaking may contain proposed new or modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and OMB to comment on any information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

68.     *Compliance Deadline*. We acknowledge that mobile wireless providers will need sufficient time in which to comply with these new requirements.[174] We therefore require mobile wireless providers to comply with both rules we adopt here no later than six months after publication of notice of OMB approval under the Paperwork Reduction Act. This allows parties sufficient time to update their processes and come into compliance.

69.     *Regulatory Flexibility Act*. The Regulatory Flexibility Act of 1980, as amended (RFA),[175] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[176] Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the impact of the rule changes contained in the Report and Order on small entities. The FRFA is set forth in Appendix D. We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the possible impact of the rule changes contained in the Further Notice on small entities. The IRFA is set forth in Appendix E.

70.     *Congressional Review Act*. The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

71.     *Ex Parte Rules*. The proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[177] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation

---

[174] Several parties have requested the Commission give them additional time to implement these new requirements. *See, e.g.*, Blooston Comments at 4 (small providers should have additional time to comply); Weave Reply at 8 (same); RWA Reply at 5 (small providers should not have to comply until after the larger carriers have implemented the new rule); CTIA *ex parte* at 4 (requesting 12 months at minimum, and longer for smaller providers); Letter from Angela Simpson, Senior Vice President and General Counsel, Competitive Carriers Association to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023) at 1 (CCA *ex parte*) (30 days is insufficient).

[175] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601, *et seq*., has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996). The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

[176] *Id.* § 605(b).

[177] 47 CFR §§ 1.1200 *et seq.*

must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b) of the Commission's rules. In proceedings governed by section 1.49(f) of the Commission's rules or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.[178]

72.    *Filing of Comments and Reply Comments*. Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See* Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

• Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://apps.fcc.gov/ecfs/.

• Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing.

• Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

• Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701. U.S. Postal Service first class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, D.C. 20554.

• Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19. *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy*, Public Notice, 35 FCC Rcd 2788 (OMD 2020).

73.    *People with Disabilities*. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice).

74.    *Availability of Documents*. Comments, reply comments, *ex parte* submissions, and the Report and Order and Further Notice of Proposed Rulemaking will be available via ECFS. Documents will be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat. When the FCC Headquarters reopens to the public, documents will also be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 45 L Street NE, Washington, D.C. 20554.

75.    *Additional Information*. For additional information on this proceeding, contact Mika Savir, mika.savir@fcc.gov or 202 418-0384, of the Consumer and Governmental Affairs Bureau,

---

[178] 47 CFR § 1.49(f).

Consumer Policy Division.

## VI.    ORDERING CLAUSES

76.    Accordingly, **IT IS ORDERED**, pursuant to sections 4(i), 4(j), 227, 301, 303, 307, and 316 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 227, 301, 303, 307, and 316, that this Report and Order and Further Notice of Proposed Rulemaking IS ADOPTED.

77.    **IT IS FURTHER ORDERED** that, pursuant to applicable procedures set forth in sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on the Further Notice of Proposed Rulemaking on or before 30 days after publication in the Federal Register, and reply comments on or before 60 days after publication in the Federal Register.

78.    **IT IS FURTHER ORDERED** that the Report and Order SHALL BE EFFECTIVE 30 days after publication in the Federal Register  Compliance with sections 64.1200(p) and (r) of the Commission's rules, 47 CFR §§ 64.1200(p), (r), which may contain new or modified information collection requirements, will not be required until six months after the Office of Management and Budget completes review of any information collection requirements that the Consumer and Governmental Affairs Bureau determines are required under the Paperwork Reduction Act.  The Commission directs the Consumer and Governmental Affairs Bureau to announce the compliance date for sections 64.1200(p) and (r) by subsequent Public Notice and to cause section 64.1200 to be revised accordingly.

79.    **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order and Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis and the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

80.    **IT IS FURTHER ORDERED** that the Office of the Managing Director, Performance Evaluation and Records Management, SHALL SEND a copy of this Report and Order in a report to be sent to Congress and to the Governmental Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## APPENDIX A

### Final Rules

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS
Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

1. Amend § 64.1200 by adding new paragraphs (p) and (q) to read:

(p) A mobile wireless provider must block a text message purporting to originate from a North American Numbering Plan number on a reasonable do-not-originate list. A list so limited in scope that it leaves out obvious North American Numbering Plan numbers that could be included with little effort may be deemed unreasonable. The do-not-originate list may include only:

    (1) North American Numbering Plan Numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked;

    (2) North American Numbering Plan numbers that are not valid;

    (3) Valid North American Numbering Plan numbers that are not allocated to a provider by the North American Numbering Plan Administrator; and

    (4) Valid North American Numbering Plan numbers that are allocated to a provider by the North American Numbering Plan Administrator, but are unused, so long as the provider blocking the message is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of blocking.

(q) Paragraph (p) of this section may contain an information-collection and/or recordkeeping requirement. Compliance with paragraph (p) will not be required until this paragraph (q) is removed or contains a compliance date, which will not occur until after the Office of Management and Budget completes review of such requirements pursuant to the Paperwork Reduction Act or until after the Consumer and Governmental Affairs Bureau determines that such review is not required. The Commission directs the Consumer and Governmental Affairs Bureau to announce a compliance date for paragraph (p) by subsequent Public Notice and to cause this section 64.1200 to be revised accordingly.

2. Amend § 64.1200 by adding new paragraph (r) to read:

(r) A mobile wireless provider must provide a point of contact or ensure its aggregator partners or blocking contractors that block text messages on its network provide a point of contact to resolve complaints about erroneous blocking from message senders that can document that their messages have been blocked. Such point of contact may be the same point of contact for voice call blocking error complaints.

**APPENDIX B**

**List of Commenters**

| Commenter | Abbreviated Name | Date Filed |
|---|---|---|
| Aaron Read | Aaron Read | 10/3/22 |
| AB Handshake Corporation | AB Handshake | 11/10/22 |
| Ad Hoc Telecom Users Committee | Ad Hoc | 11/10/22 |
| Aigbe Omoigui et al | Omoigui Express Comment | 10/11/22 |
| American Association of Political Consultants | AAPC | 11/10/22 |
| American Bankers Association, ACA International, American Financial Services Association, Credit Union National Association, Mortgage Bankers Association, National Association of Federally-Insured Credit Unions, National Council of Higher Education Resources, and Student Loan Servicing Alliance | ABA Joint Commenters | 11/10/22 |
| Anna K. | Anna K. Express Comment | 10/18/22 |
| Anonymous | | 10/13/22 |
| Belle Hillenburg | Hillenburg | 10/10/22 |
| Blooston Rural Carriers | Blooston | 11/10/22 |
| Cameron Boyd | Boyd Express Comment | 11/9/22 |
| CallFire, Inc. (EZ Texting) | EZ Texting | 11/10/22 |
| Campaign Verify, Inc. | Campaign Verify | 11/10/22 |
| Cloud Communications Alliance | Cloud Communications | 11/10/22 |
| Coalition for Open Messaging | Coalition for Open Messaging | 11/10/22 |
| Competitive Carriers Association | CCA | 11/10/22 |
| Consumer Relations Consortium | CRC | 11/9/22 |
| CTIA—The Wireless Association® | CTIA | 11/10/22 |
| Electronic Privacy Information Center (EPIC), the National Consumer Law (NCLC) on behalf of its low-income clients, Consumer Action, Consumer Federation of America, National Association of Consumer Advocates, National Consumers League, Public Knowledge, and U.S. PIRG | NCLC/EPIC Joint Commenters | 11/10/22 |

| INCOMPAS | INCOMPAS | 11/10/22 |
|---|---|---|
| iconectiv, LLC | iconectiv | 11/10/22 |
| Messaging Malware Mobile Anti-Abuse Working Group | M$^3$AAWG | 11/8/22 |
| National Opinion Research Center | NORC | 11/10/22 |
| NetNumber, Inc. | NetNumber | 11/10/22 |
| Neustar, Inc. | Neustar | 11/10/22 |
| NTCA—The Rural Broadband Association | NTCA | 11/10/22 |
| Pinger, Inc. | Pinger | 11/9/22 |
| Professional Associations for Customer Engagement | PACE | 11/10/22 |
| Rebekah Schmidt | Schmidt | 11/21/22 |
| Sinch America, Inc. | Sinch | 11/10/22 |
| Somos, Inc. | Somos | 11/10/22 |
| State Voices | State Voices | 11/10/22 |
| Telesign Corporation | Telesign | 11/9/22 |
| Terra Nova Telecom, Inc. | Terra Nova | 11/10/22 |
| Texas 9-1-1 Alliance, the Texas Commission on State Emergency Communications, and the Municipal Emergency Communication Districts Association | Texas 911 Entities | 11/10/22 |
| T-Mobile USA, Inc. | T-Mobile | 11/10/22 |
| Verizon | Verizon | 11/10/22 |
| Voice on the Net Coalition | VON | 11/10/22 |
| WMC Global | WMC | 10/21/22 |

| Reply Commenter | Abbreviated Name | Date Filed |
|---|---|---|
| ACT \| The App Association | App Association | 12/9/22 |
| AT&T Services, Inc. | AT&T | 12/9/22 |
| Campaign Registry, Inc. | Campaign Registry | 12/9/22 |
| Cloud Communications Alliance | Cloud Communications | 12/9/22 |
| CTIA—The Wireless Association® | CTIA | 12/9/22 |
| Fifty-one State Attorneys General | State AGs | 12/9/22 |
| INCOMPAS | INCOMPAS | 12/11/22 |
| Infobip, Inc. | Infobip | 12/9/22 |

| NetNumber, Inc. | NetNumber | 12/9/22 |
|---|---|---|
| National Consumer Law Center (NCLC), Electronic Privacy Information Center (EPIC) on behalf of NCLC's low-income clients, Appleseed Foundation, Center for Responsible Lending, Consumer Action, Consumer Federation of America, Jacksonville Area Legal Aid, Inc. (FL), Legal Services of New Jersey, Mobilization for Justice (NY), Mountain State Justice (WV), National Association of Consumer Advocates, National Consumers League, Shriver Center on Poverty Law (IL), South Carolina Appleseed, Texas Appleseed, Tzedek DC, U.S. PIRG, and Virginia Poverty Law Center. | NCLC/EPIC Joint Reply | 12/9/22 |
| National Opinion Research Center | NORC | 12/9/22 |
| Overwhelmed Citizen | | 11/28/22 |
| Public Knowledge | Public Knowledge | 11/25/22 |
| Rural Wireless Association, Inc. | RWA | 12/9/22 |
| Twilio, Inc. | Twilio | 12/9/22 |
| Verizon | Verizon | 12/9/22 |
| Vibes Media, LLC | Vibes | 12/9/22 |
| Weave Communications, Inc. | Weave | 12/8/22 |

| *Ex Parte* **Filing/Congressional** | **Abbreviated Name** | **Date filed** |
|---|---|---|
| Letter from The Honorable Brian Schatz, U.S. Senate, to Jessica Rosenworcel, Chairwoman, Federal Communications Commission | Schatz Letter | 12/19/22 |
| Letter from Nadejda Papernaia, AB Handshake Corp., to Marlene H. Dortch, Secretary, Federal Communications Commission (Nov. 4, 2022) | AB Handshake 11/4 *ex parte* | 11/4/22 |
| Letter from Nadejda Papernaia, AB Handshake Corp., to Marlene H. Dortch, Secretary, Federal Communications Commission (Dec. 13, 2022) | AB Handshake 12/13 *ex parte* | 12/13/22 |
| Letter from Harold Feld, Public Knowledge, to Marlene H. Dortch, | Public Knowledge 12/5 *ex* | 12/5/22 |

| | | |
|---|---|---|
| Secretary, Federal Communications Commission (Dec. 5, 2022) | *parte* | |
| Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, Secretary, Federal Communications Commission (Dec. 16, 2022) | NCLC/EPIC 12/16 *ex parte* | 12/16/22 |
| Letter from Coalition for Open Messaging and State Voices to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023) | Coalition for Open Messaging and State Voices Joint *ex parte* | 3/9/23 |
| Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 7, 2023) | CTIA 3/8/23 *ex parte* | 3/8/23 |
| Letter from Leah Dempsey, Counsel, ACA International, Elizabeth M. Sullivan, Senior Director of Advocacy and Counsel, Credit Union National Association, Celia Winslow, Senior Vice President, American Financial Services Association, Ann Petros, Vice President of Regulatory Affairs, National Association of Federally-Insured Credit Unions to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023) | ACA Joint *ex parte* | 3/9/23 |
| Letter from Yaron Dori, Covington and Burling, LLP, counsel to Quinstreet, Inc., to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023) | Quinstreet *ex parte* | 3/9/23 |
| Letter from Angela Simpson, Senior Vice President and General Counsel, Competitive Carriers Association to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023) | CCA *ex parte* | 3/9/23 |
| Letter from Michele A. Shuster, MacMurray and Shuster, counsel for Professional Associations for Customer Engagement to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. | PACE *ex parte* | 3/9/23 |

37

| | | |
|---|---|---|
| 9, 2023) | | |
| Letter from Eric J. Troutman, President, Responsible Enterprises Against Consumer Harassment to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 9, 2023) | REACH *ex parte* | 3/9/23 |
| Letter from Christopher L. Shipley, INCOMPAS; David Casem, Telnyx; Paula Boyd, Microsoft; Helen Marie Berg, Google, Michael Pryor, Cloud Communications Alliance; Greg Rogers, Bandwidth to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 10, 2023) | INCOMPAS Joint *ex parte* | 3/10/23 |
| Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 10, 2023) | CTIA 3/10/23 *ex parte* | 3/10/23 |
| Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, Federal Communications Commission (Mar. 12, 2023) | CTIA 3/12/23 *ex parte* | 3/12/23 |

**APPENDIX C**

**Proposed Rules**

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS
Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

1. Amend § 64.1200 by revising section (e) to add "or texts" to read as follows:

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or texts to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

2. Amend § 64.1200 by revising section (f)(9) to read as follows:

(f)(9) The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. Prior express written consent for a call or text may be to a single entity, or to multiple entities logically and topically associated. If the prior express written consent is to multiple entities, the entire list of entities to which the consumer is giving consent must be clearly and conspicuously displayed to the consumer at the time consent is requested. To be clearly and conspicuously displayed, the list must, at a minimum, be displayed on the same web page where the consumer gives consent.

**APPENDIX D**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980,[1] as amended, an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Notice of Proposed Rulemaking (*NPRM*).[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  The Commission received no comments in response to the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.        Need for, and Objectives of, the Report and Order**

2.        The *Order* requires mobile wireless providers to block texts, at the network level, that purport to be from numbers on a reasonable Do-Not-Originate (DNO) list.  Such texts are highly likely to be illegal and for that reason the Commission is adopting a requirement to block at the network level.  The *Order* also requires providers and other entities to maintain a point of contact for texters to report erroneously blocked texts.

**B.        Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

3.        There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

**C.        Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

4.        None. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.

5.        The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

**D.        Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

6.        The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]  A "small

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Targeting and Eliminating Unlawful Text Messages*, CG Docket No. 21-402, Notice of Proposed Rulemaking, FCC 22-72, 2022 WL 4545905 (2022) (NPRM).

[3] *See* 5 U.S.C. § 604.

[4] 5 U.S.C. § 603(b)(3).

[5] 5 U.S.C. § 601(6).

[6] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[7]

7. *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[8] First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[9] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.[10]

8. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[11] The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[12] Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[13]

9. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[14] U.S. Census Bureau data from the 2017 Census of Governments[15] indicate there were 90,075 local governmental jurisdictions consisting of general

[7] 15 U.S.C. § 632.

[8] *See* 5 U.S.C. § 601(3)-(6).

[9] *See* SBA, Office of Advocacy, Frequently Asked Questions, "What is a small business?," https://cdn.advocacy.sba.gov/wp-content/uploads/2021/11/03093005/Small-Business-FAQ-2021.pdf (Nov 2021).

[10] *Id.*

[11] *See* 5 U.S.C. § 601(4).

[12] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number small organizations in this small entity description. S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[13] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii. This data does not include information for Puerto Rico.

[14] *See* 5 U.S.C. § 601(5).

[15] *See* 13 U.S.C. § 161. The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7". *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

purpose governments and special purpose governments in the United States.[16]  Of this number, there were 36,931 general purpose governments (county,[17] municipal, and town or township[18]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[19] with enrollment populations of less than 50,000.[20]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[21]

10.     *Wireless Telecommunications Carriers (except Satellite).*  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[22]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services.[23]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[24]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[25]  Of that number, 2,837 firms employed fewer than 250 employees.[26]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report,

---

[16] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes_Local Governments by Type and State_2017.

[17] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[18] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[19] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2017.

[20] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[21] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls.5, 6 & 10.

[22] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[23] *Id.*

[24] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[25] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[26] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

as of December 31, 2020, there were 797 providers that reported they were engaged in the provision of wireless services.[27]  Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees.[28]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

11.     *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[29]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[30]  Providers of Internet services (e.g. dial-up ISPs) or voice over Internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[31]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[32]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[33]  Of those firms, 1,039 had revenue of less than $25 million.[34]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

**E.     Description of Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities**

12.     This *Order* may include new or modified information collection requirements.  The Order adopts a requirement that mobile wireless providers block texts purporting to be from NANP numbers on a reasonable DNO list, which include numbers that purport to be from invalid, unallocated, or unused numbers, and NANP numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked.  In addition, the *Order* requires providers to establish a point of contact for senders to resolve issues of erroneously blocked texts.  To the extent these new requirements constitute an information collection, such collection will not present a substantial burden for small business concerns with fewer than 25 employees; any such burdens would be far outweighed by the benefits to consumers from blocking text messages that are highly likely to be illegal.  Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

13.     The RFA requires an agency to describe any significant alternatives that it has considered

---

[27] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*public*/attachments/DOC-379181A1.pdf.

[28] *Id.*

[29] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[30] *Id.*

[31] *Id*.

[32] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[33] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[34] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

43

in reaching its approach, which may include the following four alternatives, among others:  "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities."[35]

14.    The *Order* requires mobile wireless providers to block texts, at the network level, that purport to be from numbers on a reasonable Do-Not-Originate list.  Such texts are highly likely to be illegal and for that reason the Commission is adopting a requirement to block at the network level.  The Commission recognizes that mobile wireless providers, including small entities, already take measures to block illegal text messages from reaching their customers' phones and this requirement should not be burdensome.  The *Order* also requires providers and other entities to establish a point of contact for texters to report erroneously blocked texts.  Because many of these providers and entities maintain a point of contact for call blocking purposes, and because the *Order* states that providers and entities may use the same point of contact for the text blocking requirement, the requirement should not be burdensome.

## F.    Report to Congress

15.    The Commission will send a copy of the Report and Order, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[36]  In addition, the Commission will send a copy of the Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  The Order and FRFA (or summaries thereof) will also be published in the Federal Register.[37]

---

[35] 5 U.S.C. § 603(c)(1)–(c)(4).

[36] *See* 5 U.S.C. § 801(a)(1)(A).

[37] *See id.* § 604(b).

## APPENDIX E

## Initial Regulatory Flexibility Analysis

1.    As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies proposed in this *Further Notice of Proposed Rulemaking* (*FNPRM*).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the *FNPRM* provided on the first page of the *FNPRM*.  The Commission will send a copy of this entire *FNPRM*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the *FNPRM* and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

### A.    Need for, and Objectives of, the Proposed Rules

2.    The *Notice* seeks comment on several issues, specifically, (i) whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams; (ii) text message authentication; (iii) extending Do-Not-Call protections to marketing text messages; and (iv) banning the practice of obtaining a single consumer consent as justification for calls and texts from multiple sellers and potential fraudsters.

### B.    Legal Basis

3.    This action, including publication of proposed rules, is authorized under sections 4(i), 4(j), 201(b), 227(e), 254, 257, 301, and 303 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 201(b), 227(e), 254, 257, 301, and 303.

### C.    Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

4.    The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[7]

5.    *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at

---

[1] 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996)

[2] 5 U.S.C. § 603(a).

[3] *Id.*

[4] 5 U.S.C. § 603(b)(3).

[5] 5 U.S.C. § 601(6).

[6] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[7] 15 U.S.C. § 632.

the outset, three broad groups of small entities that could be directly affected herein.[8]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[9]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.[10]

6.      Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[11]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[12]  Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[13]

7.      Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[14]  U.S. Census Bureau data from the 2017 Census of Governments[15] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[16]  Of this number, there were

---

[8] *See* 5 U.S.C. § 601(3)-(6).

[9] *See* SBA, Office of Advocacy, Frequently Asked Questions, "What is a small business?," https://cdn.advocacy.sba.gov/wp-content/uploads/2021/11/03093005/Small-Business-FAQ-2021.pdf. (Nov 2021).

[10] *Id.*

[11] *See* 5 U.S.C. § 601(4).

[12] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[13] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii.  This data does not include information for Puerto Rico.

[14] *See* 5 U.S.C. § 601(5).

[15] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

[16] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG2], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

36,931 general purpose governments (county,[17] municipal, and town or township[18]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[19] with enrollment populations of less than 50,000.[20]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[21]

8.    *Wireless Telecommunications Carriers (except Satellite).*  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[22]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services.[23]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[24]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[25]  Of that number, 2,837 firms employed fewer than 250 employees.[26]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 797 providers that reported they were engaged in the provision of wireless services.[27]  Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees.[28]  Consequently, using the SBA's small business size standard, most of these providers can be

---

[17] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[18] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[19] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2017.

[20] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[21] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls.5, 6 & 10.

[22] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[23] *Id.*

[24] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[25] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, Employment Size of Firms for the U.S.: *2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[26] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[27] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*public*/attachments/DOC-379181A1.pdf.

[28] *Id.*

considered small entities.

9.  *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[29]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[30]  Providers of Internet services (e.g. dial-up ISPs) or voice over Internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[31]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[32]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[33]  Of those firms, 1,039 had revenue of less than $25 million.[34]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

**D.  Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

10.  This *Notice* may include a change to the Commission's current information collection, reporting, recordkeeping, or compliance requirements.

**E.  Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

11.  The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others:  "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) and exemption from coverage of the rule, or any part thereof, for such small entities."

12.  The *Notice* seeks comment on (i) whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams; (ii) text message authentication; (iii) extending Do-Not-Call protections to marketing text messages; and (iv) banning the practice of obtaining a single consumer consent as justification for calls and texts from multiple sellers and potential fraudsters.

13.  These proposals would probably not be burdensome for small entities.  The proposal to require those seeking consent from consumers to a list of entities, to clearly and conspicuously display the

---

[29] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[30] *Id.*

[31] *Id.*

[32] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[33] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[34] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

list where consent is requested would, if adopted, prevent those lead generators or telemarketers from failing to advise the consumer of the list of entities; instead the list would be displayed where the consent is requested.  This should not be burdensome to small entities, as it merely requires disclosing the list where consent is requested, instead of in a hyperlink, and should reduce unwanted text messages and calls to consumers.  The proposal to include texts in the DNC rules should not have an impact on small entities. Wireline and wireless phones are already included and this would just clarify that not only calls to wireless phones on the DNC list are covered, but text messages, too.  The Commission anticipates that these rules, if adopted, would also reduce unwanted calls and texts to small entities.  The proposal to require service providers to block texts after notice from the Commission of suspected illegality, including fraud should not be burdensome for small entities.  Mobile wireless providers are already diligent in blocking fraudulent calls and texts to their customers and this would assist them in those efforts.

      **F.**       **Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

      14.      None.

**STATEMENT OF
CHAIRWOMAN JESSICA ROSENWORCEL**

Re:     *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; Report and Order and Further Notice of Proposed Rulemaking (March 16, 2023)

More than a century ago, physiologist Ivan Pavlov did a series of experiments with food, buzzers, and dogs.  He was able to train the dogs to associate a buzzing noise with food, so much so that they began to drool whenever they heard this sound, even if there was no food around.

Sometimes I wonder what Pavlov would think about us and our smartphones.  Because most of us are conditioned to reach for our phones anytime we hear the familiar buzz telling us a text is incoming.  In our defense, those noises have become an effective way to stay connected.  They help us keep up with family and friends and receive timely information from those we trust.

But there are those who want to take advantage of this trust—and our instinct, like the subjects of Pavlov's experiment, to assume something needs attention every time we hear our devices buzz.  We see this clearly in the growing number of junk texts showing up on our phones.  Scam artists have found that sending us messages about a package you never ordered or a payment that never went through along with a link to a shady website is a quick and easy way to get us to engage on our devices and fall prey to fraud.

These robotexts are making a mess of our phones.  They are reducing trust in a powerful way to communicate.  So today we take our first step to stop these unwanted texts at the network level.  We put in place rules that require mobile wireless carriers to block texts that come from invalid, unallocated, or unused numbers.  In other words, we require providers to stop the texts that are most likely to be illegal.  This approach has the support of Attorneys General from all 50 states and the District of Columbia.  It's good stuff.  But we are not stopping here.  Because we also adopt a rulemaking to explore other way stop unwanted text messages, including authentication measures and rules to prevent the abuse of consumer consent.

Thank you to those at the agency who worked on this effort, including Mika Savir, Kim Wild, James Brown, Zac Champ, Kristi Thornton, Aaron Garza, Mark Stone, and Jerusha Burnett from the Consumer and Governmental Affairs Bureau; Rakesh Patel, Lisa Zaina, Daniel Stepanicich, Kristi Thompson, Cait Barbas, Jessica Manuel, and Alexander Hobbs from the Enforcement Bureau; Susanna Larson, Garnet Hanley, Kari Hicks, and Jennifer Salhus from the Wireless Telecommunications Bureau; Elizabeth Drogula, Jonathan Lechter, and Connor Ferraro from the Wireline Competition Bureau; Kenneth Carlberg and David Furth from the Public Safety and Homeland Security Bureau; Joycelyn James, Cara Grayer and Joy Ragsdale from the Office of Communications Business Opportunities; Emily Talaga, Kim Makuch, Mark Montano, Michelle Schaefer, Patrick Brogan from the Office of Economics and Analytics; and Derek Yeo, Bill Richardson, Rick Mallen, and Valerie Hill from the Office of General Counsel.

**STATEMENT OF**
**COMMISSIONER GEOFFREY STARKS**

Re:     *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; Report and Order and Further Notice of Proposed Rulemaking (March 16, 2023)

Texting is increasingly becoming Americans' preferred way to communicate.[1]  But unfortunately, as we've seen before, the more popular a communications service is, the more it's targeted by spammers and bad actors.  The rise of robotexts – unwanted or illegal text messages – means a similar rise in harm to consumers, in the form of phishing attacks, malware, and scams.  And robotexts are different than robocalls.  Recipients of a robocall have the ability to either pick up the phone or not.  But on most devices, recipients of a robotext see at least some of an unwanted message immediately, exposing them – and potentially luring them into – harm.

And you know as well as I do that we've been getting more of these unwanted texts.  In 2022, Americans received over 225 billion robotexts – a 157 percent year-over-year increase, and a 307 percent increase from 2020.[2]  Last month, February 2023, 10.7 billion spam texts were reported – nearly 39 for every person in the United States.[3]  Given this growth, failure to act could lead to robotexting to become so pervasive that it negatively affects texting, just as robocalls have done for phone calls.  I can confidently say that's the last thing we want.

It is time for the Commission to act.  We build upon our experience combatting robocalls, and today move to protect consumers from the threat of illegal or harmful robotexts.  Industry has taken impressive steps on its own, but more needs to be done.  The item we adopt today will require providers, at the network level, to take important steps to stop robotexts before they reach consumers.  Adopting mandatory blocking of texts that are highly likely to be illegal based on a Do-Not-Originate list based on invalid, unallocated, or unused numbers is a reasonable first step to stem the flow of these texts.  At the same time, we require providers to adopt a single point of contact for texters to report erroneously blocked messages, to balance the needs of industry and consumers.  And finally, we recognize that this is just the first step, and seek additional comment on further proposals to protect consumers.

I will stay vigilant in pushing the Commission to do all it can to eliminate these illegal and unwanted text messages going forward, especially at a time where we have seen the expansion of texting to 988 and as part of NG911.  I thank the Commission staff who work on robocall and robotext issues – I know there are many – for their hard work.  I approve.

---

[1] Aaron Weiche, *SURVEY: Texting Is The Preferred Way To Communicate*, Leadferno, https://leadferno.com/blog/survey-texting-is-the-preferred-way-to-communicate (last visited Mar. 14, 2023).

[2] Robokiller, *The Robokiller phone scam report: 2022 insights & analysis*, https://www.robokiller.com/robokiller-2022-phone-scam-report (last visited Mar. 14, 2023).

[3] Robokiller, *2023 United States robotext trends*, https://www.robokiller.com/spam-text-insights (last visited Mar. 14, 2023).

Targeting and Eliminating Unlawful Text Messages
Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991
Report and Order and Further Notice of Proposed Rulemaking - CG Docket Nos. 21-402 and 02-278

**Background**:

Text messaging is among our most popular forms of communication, quickly connecting people to friends and family, businesses to customers, and governments to constituents. But with that popularity comes risk. While unwanted text messages present similar problems as unwanted calls—they invade consumer privacy and are vehicles for consumer fraud and identity theft—they also present harms beyond robocalls that can exacerbate the problem of such scams. This Report and Order, if adopted, will be the Commission's first action to protect consumers from unwanted and illegal texts requiring that all mobile wireless providers block certain text messages that are highly likely to be illegal so that all subscribers have a basic level of protection. The accompanying Further Notice of Proposed Rulemaking would propose and seek comment on additional steps to further protect consumers and protect the integrity of the text messages as a form of communication.

**What the *Report and Order* Would Do:**

- Require mobile wireless providers to block text messages from numbers on a reasonable Do Not Originate list, which includes numbers that purport to be from invalid, unallocated, or unused North American Numbering Plan numbers, and numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked. The Commission already requires similar blocking of voice calls by gateway providers.

- Ensure that any erroneous text blocking can be reported to the provider doing the blocking by requiring mobile wireless providers to maintain a single point of contact for texters to report erroneously blocked texts. This single point of contact is already required for voice call blocking.

**What the *Further Notice of Proposed Rulemaking* Would Do:**

- Propose to require terminating providers to block texts from a sender after they are on notice from the Commission that the sender is sending illegal texts.

- Propose to extend the National Do-Not-Call Registry's protections to text messages.

- Propose to ban the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent.

- Seek comment on text authentication measures.

---

[*] This document is being released as part of a "permit-but-disclose" proceeding. Any presentations or views on the subject expressed to the Commission or its staff, including by email, must be filed in CG Docket Nos. 21-402 and 02-278, which may be accessed via the Electronic Comment Filing System (https://www.fcc.gov/ecfs). Before filing, participants should familiarize themselves with the Commission's *ex parte* rules, including the general prohibition on presentations (written and oral) on matters listed on the Sunshine Agenda, which is typically released a week prior to the Commission's meeting. *See* 47 CFR § 1.1200 *et seq*.

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

|                                                      |     |                       |
|------------------------------------------------------|-----|-----------------------|
| In the Matter of                                     | )   |                       |
|                                                      | )   |                       |
| Targeting and Eliminating Unlawful Text Messages     | )   | CG Docket No. 21-402  |
|                                                      | )   |                       |
| Rules and Regulations Implementing the               | )   | CG Docket No. 02-278  |
| Telephone Consumer Protection Act of 1991            | )   |                       |
|                                                      | )   |                       |

### REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING[*]

**Adopted: "Insert Adopted Date"**           **Released: "Insert Release Date"**

Comment Date (30 days after date of publication in the Federal Register)
Reply Comment Date (60 days after date of publication in the Federal Register)

By the Commission:

### TABLE OF CONTENTS

Heading          Paragraph #

I. INTRODUCTION ................................................................................................................. 1
II. BACKGROUND ................................................................................................................. 6
III. REPORT AND ORDER ..................................................................................................... 13
    A. Mandatory Blocking of Texts that are Highly Likely to be Illegal ............................... 16
    B. Single Point of Contact ................................................................................................. 27
    C. Other Proposals ............................................................................................................. 31
    D. Legal Authority ............................................................................................................. 36
    E. Cost Benefit Analysis .................................................................................................... 43
IV. FURTHER NOTICE OF PROPOSED RULEMAKING ..................................................... 48
    A. Block Texts Upon Commission Notification ................................................................. 50
    B. Text Message Authentication ........................................................................................ 54
    C. Extending Do-Not-Call Protections to Text Messages ................................................. 57
    D. Closing the Lead Generator Loophole .......................................................................... 60

[*] This document has been circulated for tentative consideration by the Commission at its March 2023 open meeting. The issues referenced in this document and the Commission's ultimate resolution of those issues remain under consideration and subject to change. This document does not constitute any official action by the Commission. However, the Chairwoman has determined that, in the interest of promoting the public's ability to understand the nature and scope of issues under consideration, the public interest would be served by making this document publicly available. The FCC's *ex parte* rules apply and presentations are subject to "permit-but-disclose" *ex parte* rules. *See, e.g.*, 47 C.F.R. §§ 1.1206, 1.1200(a). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules, including the general prohibition on presentations (written and oral) on matters listed on the Sunshine Agenda, which is typically released a week prior to the Commission's meeting. *See* 47 CFR §§ 1.1200(a), 1.1203.

    E.   Digital Equity and Inclusion ................................................................................................... 65
    F.   Legal Authority............................................................................................................................. 66
V.  PROCEDURAL MATTERS............................................................................................................. 68
VI. ORDERING CLAUSES.................................................................................................................... 76

APPENDIX A—FINAL RULES
APPENDIX B—LIST OF COMMENTERS
APPENDIX C—PROPOSED RULES
APPENDIX D—FINAL REGULATORY FLEXIBILITY ANALYSIS
APPENDIX E—INITIAL REGULATORY FLEXIBILITY ANALYSIS

# I.    INTRODUCTION

1.    Text messaging is among our most popular forms of communication, quickly connecting people to friends and family, businesses to customers, and governments to constituents.  However, with that popularity comes unique risks.  On many devices, consumers can immediately see some or all of these messages, potentially piquing their interest and enticing them to open the message.  Data shows consumers read nearly all texts, and do so nearly immediately; whereas calls from unknown callers are often ignored by consumers.  While unwanted text messages present similar problems as unwanted calls—they invade consumer privacy and are vehicles for consumer fraud and identity theft[1]—they also present harms beyond robocalls that can exacerbate the problem of such scams.  Text message-based scams can include links to well-designed phishing websites that appear identical to the website of a legitimate company and can fool a victim into providing personal or financial information.  Texted links can also load unwanted software onto a device, including malware that steals passwords, credentials, or other personal information.  We are therefore, for the first time, requiring all mobile wireless providers to block certain text messages that are highly likely to be illegal, so that all subscribers have a basic level of protection.[2]  This action is a necessary first step to protect all wireless consumers, regardless of which mobile wireless provider they use to receive messages.

2.    Mobile wireless providers and others have taken steps to protect consumers from unwanted text messages; nevertheless, unwanted text messaging is trending in the wrong direction.  One source, for example, reports that consumer losses from scam texts were $231 million for the first three quarters of 2022, up from $86 million for all of 2020.  The time is therefore right for us to take steps to protect consumers.

3.    In this Report and Order, we take the first steps to enlist mobile wireless providers in the effort to protect consumers by requiring them to block certain robotext messages[3] that are highly likely to be illegal.[4]  Building on our call blocking work, we require mobile wireless providers to block—at the

---

[1] The scope of our decision here is text messaging that uses the wireless networks, e.g., Short Message Service (SMS) and Multimedia Messaging Service (MMS), not over-the-top (OTT) messaging, such as iMessage and WhatsApp or Rich Communications Services (RCS).  *See* 47 CFR § 64.1600(o) *et seq.*

[2] Commenters share this goal of protecting consumers from unwanted and illegal text messages.  NCLC/EPIC Joint Reply at 1.

[3] Texting (SMS and MMS) is not a common-carrier service.  *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, WT Docket No. 08-7, Declaratory Ruling, 33 FCC Rcd 12075, 12082-12089, paras. 17-32 (2018) (*Messaging Declaratory Ruling*), *recon. pending*, Rept. No. 3011 (Feb. 5, 2019).  SMS and MMS wireless messaging services are not the functional equivalent of commercial mobile services (CMRS).  *Messaging Declaratory Ruling*, 33 FCC Rcd at 12093, para. 37.

[4] *Targeting and Eliminating Unlawful Text Messages*, CG Docket No. 21-402, Notice of Proposed Rulemaking, [[cite xx]] (2022) (*NPRM*).  The list of comments, replies, and *ex parte* filings is in Appendix B.  We use "robotexts" to include text messages that may be either unwanted or illegal.  Some robotext messages are both legal

network level—texts purporting to be from numbers on a reasonable Do-Not-Originate (DNO)[5] list, which include numbers that purport to be from invalid, unallocated, or unused North American Numbering Plan (NANP)[6] numbers, and numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked. At the same time, we take steps to ensure that any erroneous blocking can be quickly remedied by requiring mobile wireless providers to maintain a single point of contact for texters to report erroneously blocked texts.

    4.      We also propose a set of additional protections that could further stem the tide of unwanted text messages. We propose to require terminating providers to block texts from a sender after they are on notice from the Commission that the sender is sending illegal texts, to extend the National Do-Not-Call Registry's protections to text messages, and to ban the practice of marketers purporting to have written consent for numerous parties to contact a consumer, based on one consent. In addition, we seek comment on text authentication measures in the attached Further Notice of Proposed Rulemaking.

    5.      We anticipate that the rules we adopt here, and the proposals in the Further Notice of Proposed Rulemaking, will result in fewer unwanted and illegal text messages to consumers.

## II.      BACKGROUND

    6.      *The Unwanted and Illegal Text Problem.* Unwanted and illegal robotext messages present the same problems as unwanted and illegal robocalls—beyond nuisance, they invade a consumer's privacy and are vehicles for fraud.[7] Commission data show that consumers are receiving increasing numbers of illegal and unwanted text messages.[8] The Commission's Consumer Advisory

and wanted, just as some robocalls are legal and wanted. Text messages may be illegal because they violate the Telephone Consumer Protection Act, such as by being made with an autodialer and being sent without the necessary consent, because the number displayed is illegally spoofed, which violates the Truth in Caller ID Act, or for other reasons, particularly if they are fraudulent.

[5] The Commission explained in the *2017 Call Blocking Report and Order* that calls from a DNO list, i.e., purporting to be from a telephone number that the subscriber did not consent to being used for outgoing calls, are very likely fraudulent and in violation of the Commission's anti-spoofing rule, and therefore, no reasonable consumer would wish to receive such a call. *See Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, WC Docket No. 17-97, Report and Order and Further Notice of Proposed Rulemaking, 32 FCC Rcd 9706, 9710, para. 10 (2017) (*2017 Call Blocking Report and Order*). The rules we adopt in this Report and Order define the group of numbers that shall be on a "reasonable DNO list." *See infra* para. 13. We do not require mobile wireless providers to use the same reasonable DNO list for purposes of our text message blocking rules as they use for purposes of our call blocking rules. "Reasonable" for these purposes is determined in the context of text messaging only. However, a list so limited in scope that it leaves out obvious numbers that could be included with little effort may be deemed unreasonable.

[6] The "North American Numbering Plan" is the basic numbering scheme for the telecommunications networks located in American Samoa, Anguilla, Antigua, Bahamas, Barbados, Bermuda, British Virgin Islands, Canada, Cayman Islands, Dominica, Dominican Republic, Grenada, Jamaica, Montserrat, Saint Maarten, St. Kitts & Nevis, St. Lucia, St. Vincent, Turks & Caicos Islands, Trinidad & Tobago, and the United States (including Puerto Rico, the U.S. Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands). 47 CFR § 52.5(d).

[7] For more information on how to avoid or report unwanted calls and texts, *see* FCC, Consumer Guides, *Stop Unwanted Robocalls and Texts*, https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Dec. 19, 2022); Federal Trade Commission, Consumer Advice, *How to Recognize and Report Spam Text Messages*, https://consumer.ftc.gov/articles/how-recognize-and-report-spam-text-messages (last visited Feb. 2, 2023).

[8] The Commission received approximately 189,000 consumer complaints about unwanted texts in 2022; 153,000 such complaints in 2021; and 140,000 complaints in 2020.

Committee (CAC)[9] recently reported that bad actors use a variety of tactics to commit fraud using text messages.[10] According to CTIA, between 2015 and 2020, while the total volume of text messages roughly doubled, the number of spam text messages that wireless providers blocked grew ten times, from an estimated 1.4 billion in 2015 to 14 billion in 2020.[11] The App Association observes that automated text messages have jumped nationally from 1 billion in July 2021 to 12 billion in June 2022.[12] This commenter also observes that illegal texts impose significant harm to consumers, particularly for aging Americans struggling with digital literacy.[13] Robokiller reports 47.2 billion spam texts were sent in November 2022 alone.[14] Consumer comments filed in this proceeding also describe personal experiences with unwanted and scam texts.[15] And consumer groups note that, according to the Federal Trade Commission (FTC), consumers have reported greater losses, at $231 million, from text message scams in the first three quarters of 2022 than in all of 2020 and 2021 combined.[16] Robokiller projects a 179% increase in the dollars lost from text messages between 2021 and 2022.[17]

7. In their schemes, text scammers exploit emergencies such as the COVID-19 pandemic and natural disasters, along with other important topics that grab consumers' attention such as student

[9] The CAC is a committee that makes recommendations to the Commission regarding consumer issues within the jurisdiction of the Commission and facilitates the participation of all consumers in proceedings before the Commission. FCC, Consumer Advisory Committee, *About CAC*, https://www.fcc.gov/consumer-advisory-committee (last visited Jan. 18, 2023).

[10] FCC, Consumer Advisory Committee, Report on the State of Text Messaging at 11-12 (2022) (CAC Report).

[11] CTIA Comments at 2.

[12] The App Association Reply at 2, citing Daisy Gonzalez-Perez, *Rise of the robotexts: As new rules curbed spam calls, texts took off,* Cronkite News, (July 21, 2022), https://cronkitenews.azpbs.org/2022/07/21/rise-of-the-robotexts-as-new-rules-curbed-spam-calls-texts-took-off.

[13] The App Association Reply at 2.

[14] *See* Robokiller, United States Spam Text Trends, 2022 United States Robotext Trends, https://www.robokiller.com/spam-text-insights (last visited Dec. 19, 2022).

[15] *See, e.g.*, Omoigui Express Comment (receiving scam text messages from unknown numbers with "Hi" or with a link, claiming to be a company like Amazon or CVS reaching out with a gift card); Anna K. Comment at 1; Boyd Express Comment; Hillenburg Comment at 1; Schmidt Comment at 1 ("I am in support of the proposed rule. I am tired of receiving weird, questionable, and risky texts.").

[16] NCLC/EPIC Joint Reply at 5, citing FTC, Consumer Sentinel Network, *Fraud Reports*, https://public.tableau.com/app/profile/federal.trade.commission/viz/FraudReports/FraudFacts (adding the first three quarters of 2022, totaling $231M; the total for 2021 was $131M, and for 2020 was $86M) (last visited Feb. 2, 2023).

[17] NCLC/EPIC Joint Reply at 5, citing Robokiller, The Robokiller Report, *2022 Mid-Year Phone Scam Insights*, https://www.robokiller.com/the-robokiller-report (last visited Feb. 2, 2023).

loans and unemployment insurance.[18]  Illegal texts can include links to phishing[19] websites that appear to be the website of a legitimate company and deceive the victim into providing personal or financial information.[20]  Reports indicate that "smishing" fraud increased by 700% last year.[21]  The potential harm from illegal texts is more than just economic in nature; fraudulent, misleading texts can also erode trust in our country's political and campaign infrastructure.[22]  Scam links can load malware onto phones that steals passwords and other credentials.[23]  WMC Global explains that account takeover is one of the most prevalent methods used to deliver phishing attacks to consumers.[24]  In perpetrating these attacks, a scammer can use a stolen application programming interface (API) key assigned to a legitimate business to send SMS phishing messages to victims.[25]

[18] *See, e.g.*, FCC, *COVID-19 Text Scams*, https://www.fcc.gov/covid-19-text-scams (last visited Sept. 26, 2022); FCC, *Fear Fuels COVID-19 Contact Tracing Scams*, https://www.fcc.gov/fear-fuels-covid-19-contact-tracing-scams (last visited Dec. 21, 2022); FCC, Consumer Alert, *Scam Robotexts are a Rising Threat*, (July 28, 2022), https://www.fcc.gov/robotext-scams-rise; FCC, Consumer Guides, *Stop Unwanted Robocalls and Texts*, https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Dec. 19, 2022); Federal Trade Commission, Consumer Advice, *How to Recognize and Report Spam Text Messages*, https://consumer.ftc.gov/articles/how-recognize-and-report-spam-text-messages (last visited Feb. 2, 2023); Department of Justice, Federal Bureau of Investigations, Cyber Division, *Cyber Criminals Create Fraudulent Cryptocurrency Investment Applications to Defraud US Investors*, (Jul. 18, 2022), https://www.ic3.gov/Media/News/2022/220718.pdf; Internal Revenue Service, News Releases, *IRS Reports Significant Increase in Texting Scams; Warns Taxpayers to Remain Vigilant*, (Sept. 28, 2022), https://www.irs.gov/newsroom/irs-reports-significant-increase-in-texting-scams-warns-taxpayers-to-remain-vigilant; NBC News, Kevin Collier, *Odd Text from a Wrong Number?  It's Probably a Scam*, (Jul. 29, 2022), https://www.nbcnews.com/tech/security/wrong-number-text-scam-rcna39793; WMC Global Comments at 4 (Millions of consumers are receiving links to phishing websites and phishing messages purportedly from their state's workforce agency in an extensive and far-reaching campaign targeting U.S. consumers.).

[19] WMC Global Comments at 2 (The most significant cyber threats to mobile users revolve around compromising their personal information, often through brand impersonation or phishing.  SMS phishing—commonly referred to as "smishing"—is an extremely effective method and scammers are learning just how simple and profitable it is.).  "Smishing" is a term that combines SMS and phishing.  Scammers use smishing to target consumers with deceptive text messages sent to their smart devices.  FCC, *Avoid the Temptation of Smishing Scams*, https://www.fcc.gov/avoid-temptation-smishing-scams (last visited Feb. 8, 2023).

[20] *See, e.g.*, Federal Trade Commission, Consumer Advice, *How to Recognize and Avoid Phishing Scams,* https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams (last visited Dec. 21, 2022); AT&T, Cyber Aware, *Text Message Scams*, https://about.att.com/pages/cyberaware/ni/blog/text_scams (last visited Dec. 21, 2022); Verizon, *Smishing and Spam Text Messages*, https://www.verizon.com/about/account-security/smishing-and-spam-text-messages (last visited Dec. 21, 2022).  *See* WMC Global Comments at 2 (During the COVID-19 pandemic, scammers began leveraging phishing kits, i.e., back-end source code packages used to launch phishing attacks, to defraud both U.S. citizens and government agencies out of unemployment payments.)

[21] Infobip Reply at 2-3, citing Weston Sabina. "Smishing attacks increased 700% in first six months of 2021," ITPro, (Sept. 14, 2021), https://www.itpro.co.uk/security/scams/360873/smishing-attacks-increase-700-percent-2021.

[22] Campaign Verify Comments at 3.

[23] Public Knowledge Reply at 2.

[24] WMC Global Comments at 3.

[25] WMC Global Comments at 3.  The API keys are typically stolen through data breaches, business email compromise, and insider threats.  *Id.*

8.    *Commission Action on Call Blocking*.  The Commission has adopted call blocking[26] rules to address illegal and unwanted robocalls.  Since 2017, the Commission has authorized voice service providers to block certain calls without consumers' consent.[27]  In 2017, the Commission authorized voice service providers to block, at the network level, calls purporting to be from invalid, unallocated, or unused NANP numbers, and numbers on a DNO list.[28]  In 2019, it clarified that voice service providers may offer call blocking services on an opt-out basis to new and existing customers, and that such services may block calls where the blocking is based on reasonable analytics designed to identify unwanted calls.[29]  In the *Call Blocking Third Report and Order*, the Commission enabled additional voice service provider blocking, establishing two safe harbors from liability under the Communications Act and the Commission's rules for erroneous call blocking.[30]  Subsequently, the Commission expanded one of those safe harbors, allowing terminating voice service providers to block calls at the network level, without consumer consent, if that blocking is based on reasonable analytics that incorporate caller ID authentication information designed to identify calls and call patterns that are highly likely to be illegal.[31]  The *Call Blocking Fourth Report and Order* also required voice service providers to take steps to stop illegal traffic on their networks and assist the Commission, law enforcement, and the industry traceback consortium[32] in tracking down callers that make such calls.[33]

9.    The Commission expanded these rules further last year in the *Gateway Provider Order*,

---

[26] Call blocking is "stopping calls outright so that they do not ring a phone, routing the calls directly to voicemail without ringing the phone, or some other treatment, such as interactive voice response session or voice call screening."  *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, WC Docket No. 17-97, Declaratory Ruling and Third Further Notice of Proposed Rulemaking, 34 FCC Rcd 4876, 4884 n.47 (2019) (*2019 Call Blocking Declaratory Ruling*).

[27] *2017 Call Blocking Report and Order*, 32 FCC Rcd at 9710-21, paras. 10-40; *2019 Call Blocking Declaratory Ruling*, 34 FCC Rcd at 4886-88, paras. 33-34; 47 CFR § 64.1200(k)(1), (2).

[28] *2017 Call Blocking Report and Order*, 32 FCC Rcd at 9710-21, paras. 10-40.  Phone numbers that are only used by their subscribers to receive inbound calls can be placed on a DNO list.  *Id*. at 9710, para. 10.

[29] *2019 Call Blocking Declaratory Ruling*, 34 FCC Rcd at 4886-88, paras. 33-34.

[30] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Third Report and Order, Order on Reconsideration, and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 7614, 7623-31, paras. 20-45 (2020) (*Call Blocking Third Report and Order*).  The first of these safe harbors protects terminating voice service providers that block calls based on reasonable analytics, including caller ID authentication information, designed to identify unwanted calls so long as the consumer is given the opportunity to opt out.  *Id.* at 7625-27, paras. 25-34.  The second safe harbor protects any voice service provider that blocks calls from a bad-actor upstream voice service provider that fails to effectively mitigate illegal traffic when notified of such traffic by the Commission.  *Id.* at 7627-31, paras. 35-45.

[31] *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Fourth Report and Order, 35 FCC Rcd 15221, 15236, at para. 42 (2020) (*Call Blocking Fourth Report and Order*).  The Commission made clear that this blocking must be managed "with human oversight and network monitoring sufficient to ensure that the blocking works as intended," which "must include a process that reasonably determines that the particular call pattern is highly likely to be illegal prior to blocking calls that are part of that pattern." *Id.* at 15234-5, 15236, paras. 39, 42-43.

[32] The current industry traceback consortium is the Industry Traceback Group (ITG), which is a group of voice service providers, wireline, wireless, and VoIP, that are tracing and identifying the source of illegal robocalls.  *See* ITG, https://tracebacks.org (last visited Dec. 21, 2022).

[33] *Call Blocking Fourth Report and Order*, 35 FCC Rcd at 15226-27, para 13.  *See* 47 CFR § 64.1200(n)(2).  In our Further Notice of Proposed Rulemaking we are seeking comment on extending to text messages the existing requirement that voice service providers take steps to effectively mitigate illegal traffic when a voice service provider receives actual written notice of such traffic from the Commission.

making its previously permissive blocking policy mandatory in certain circumstances.[34]  That Order, among other things, required gateway providers to block calls based on any reasonable DNO list, block illegal traffic upon Commission notification, respond to traceback requests within 24 hours, and adopted a know-your-upstream-provider policy for gateway providers.[35]

10.     *The TCPA and Do-Not-Call.*  In addition to the rules described above, the Commission has other protections for consumers, specifically in the Telephone Consumer Protection Act (TCPA)[36] and the Do Not Call (DNC) rules.  For example, certain calls and texts sent using an automatic telephone dialing system and calls made using a prerecorded or artificial voice to mobile telephone numbers require consumer consent.[37]  In 2015, the Commission also clarified that Internet-to-phone text messages, which are sent via the Internet to a mobile wireless provider and then routed to a consumer's phone over the provider's wireless network, are also covered by the TCPA's protections.[38]

11.     The Commission's DNC rules also protect consumers from unwanted telephone solicitations or telemarketing calls to wireless and wireline phones when the consumer has added their wireline or wireless number to the National DNC Registry.[39]  DNC rules state that telemarketers, subject to certain exceptions,[40] are prohibited from initiating any telephone solicitation to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations";[41] this rule also applies to wireless telephone numbers.[42]  Yet, while the Commission included both wireless and wireline numbers in the DNC protections, it has not explicitly included text messages in the DNC rules.[43]

12.     *Text Blocking Notice of Proposed Rulemaking.*  In the *NPRM*, we proposed to protect

---

[34] *Advanced Methods to Target and Eliminate Illegal Robocalls*, CG Docket No. 17-59, WC Docket No. 17-97, Sixth Report and Order in CG Docket No. 19-59, Fifth Report and Order in WC Docket No. 17-97, Order, Seventh Further Notice of Proposed Rulemaking in CG Docket No. 17-59 & Fifth Further Notice of Proposed Rulemaking in WC Docket No. 17-97, XX FCC Rcd XX, XX, paras. 74-86 (rel. May 20, 2022) (*Gateway Provider Report and Order*).

[35] *See* 47 CFR §§ 64.1200 (k)(5), (k)(6), (n)(1), (f)(19), (n)(4), (n)(5), (n)(6), (o), (p).

[36] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003) (*2003 TCPA Order*).  The DNC rules apply to calls to wireline and wireless phones.  *Id.* at 14115-16, paras. 165-66.

[37] 47 U.S.C. § 227(b)(1)(A).  In the *Facebook v. Duguid* decision, the Supreme Court clarified that "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called."  *Facebook, Inc. v. Duguid,* 141 S.Ct.1163, 1171 (2021) (*Facebook*).  The Commission made clear in 2003 that "calls" include text messages to wireless numbers including, for example, SMS calls, provided the call is made to a telephone number assigned to such service.  *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[38] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 30 FCC Rcd 7961, 8019-20, para. 113-15 (2015) (*2015 TCPA Declaratory Ruling and Order*).

[39] *2003 TCPA Order*, 18 FCC Rcd at 14115-16, paras. 165-66.

[40] *2003 TCPA Order*, 18 FCC Rcd at 14042-45, paras. 42-47; 47 CFR § 64.1200(f)(15)(i)-(iii) (exempting certain types of calls from the definition of "telephone solicitation").  Telemarketers may claim a safe harbor by demonstrating that any violation was the result of an error.  *2003 TCPA Order*, 18 FCC Rcd at 14040, para. 38; 47 CFR § 64.1200(c)(2)(i)-(iii).

[41] 47 CFR § 64.1200(c)(2).  *See also 2003 TCPA Order*, 18 FCC Rcd at 14034, para. 28.

[42] 47 CFR § 64.1200(e).

[43] The Commission has previously concluded that SMS and MMS text messaging is an information service and not a common-carrier service. *See Messaging Declaratory Ruling*, 33 FCC Rcd at 12082-12089, paras. 17-32, *recon. pending*, Rept. No. 3011 (Feb. 5, 2019).

consumers from the increasing numbers of illegal text messages by extending to text messages some of the consumer protections that have been successful against illegal voice calls.[44] We proposed to adopt a rule requiring mandatory blocking of texts that purport to be from numbers on a reasonable DNO list. We also sought comment on whether to adopt a requirement that mobile service providers maintain a single point of contact for senders to report erroneously blocked texts. We also sought comment on the extent to which spoofing[45] is a problem with regard to text messaging and on applying caller ID authentication standards to text messaging.[46]

## III. REPORT AND ORDER

13.    In this Report and Order, we for the first time require mobile wireless providers[47] to take action to protect consumers from unwanted and illegal text messages. We require these mobile wireless providers to block texts that purport to be from numbers on a reasonable DNO list, which include numbers that purport to be from invalid, unallocated, or unused NANP numbers, and numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked; these are texts that no reasonable consumer would wish to receive because they are highly likely to be illegal. At the same time, and also consistent with our work on call blocking, we take steps to mitigate the risk of erroneous blocking by requiring mobile wireless providers to maintain a single point of contact for senders to report erroneously blocked texts.

14.    We recognize at the outset the efforts providers and others have made in protecting consumers from unwanted and illegal texts.[48] As commenters have discussed, providers and others have adopted measures to protect consumers from illegal and unwanted text messages, such as the Short Code Registry, the CTIA Messaging Principles and Best Practices, and providers' own requirements and guidance.[49] We believe that our actions and proposals today complement those efforts while ensuring customers of all providers get a baseline of protection. While we believe industry efforts to date are important to protect consumers, the increases in consumer complaints and consumer harm from unwanted robotext messages convinces us to take additional measures to protect consumers.[50] As some commenters

---

[44] *NPRM* at para. 18.

[45] Spoofing is falsifying the caller ID information that appears on the called party's phone with the intent to defraud, cause harm, or wrongfully obtain something of value. 47 U.S.C. § 227(e).

[46] We are not adopting a caller ID authentication requirement here. Commenters generally opposed this and explained that illegal and unwanted messages rarely come from spoofed numbers and a caller ID authentication solution, even if feasible, would be unlikely to reduce unwanted and illegal text messages. *See, e.g.*, CTIA Comments at 4-5, 11; EZ Texting Comments at 5-6; M³AAWG Comments at 10; NetNumber Comments at 7 & Reply at 2-3; Sinch Comments at 6-7; Telesign Comments at 2-3; T-Mobile Comments at 9-10; Verizon Comments at 7 & Reply at 4-5; WMC Global Comments at 2; AT&T Reply at 9-10; Cloud Communications Reply at 1-2; RWA Reply at 3-5; Vibes Reply at 2-4.

[47] The rules we adopt in this Order are limited to SMS and MMS text messaging; therefore, for purposes of this Order, the service providers offering SMS and MMS text messaging are "mobile wireless providers."

[48] *See, e.g.* CTIA Comments at 8-9; INCOMPAS Comments at 6; T-Mobile Comments at 6; VON Comments at 3; AT&T Reply at 5; NCLC/EPIC Joint Reply at 5.

[49] *See, e.g.*, CTIA Comments at 9; Sinch Comments at 3; T-Mobile Comments at 4-7; Verizon Comments at 2; AT&T Reply at 3-6.

[50] In 2018, the Commission found that "wireless providers have employed effective methods to protect consumers from unwanted messages and thereby make wireless messaging a trusted and reliable form of communication for millions of Americans." *Messaging Declaratory Ruling*, 33 FCC Rcd at 12095, para. 43. The Commission also observed that classifying messaging as an information service will enable providers to ensure that "wireless messaging remains relatively spam-free, and therefore a trusted form of communication for millions of Americans." *Id.* at 12097, para. 45. As we discuss in the text, however, illegal and unwanted texts and the consumer harm resulting from them have increased since the Commission adopted the *Messaging Declaratory Ruling* in 2018.

note, unwanted robotexts will likely increase as scammers migrate from calling to texting.[51]  We agree with industry commenters that say fostering information and collaboration is an important part of the effort.  But, in light of increased scams robbing consumers of their money and time, we disagree that we should wait to take targeted action.

15.    The rules we adopt today are a targeted first step.  We choose to act now and, for the first time, require text blocking by all mobile wireless providers so that all subscribers have a basic level of protection.[52]  As the number of illegal and wanted text messages grows, so does the risk to consumers.  Our action ensures protection for all wireless consumers, regardless of which mobile wireless provider they use to receive messages.  We therefore disagree with CTIA, that we could undermine current efforts by mobile wireless providers to protect consumers from scam texts because there is a risk that some providers will "divert resources away from innovative solutions that can more accurately and effectively target spam text messages."[53]  Given the limited nature of the rules we adopt and the unchallenged record data that consumers are increasingly harmed by text scams, we are not persuaded that mobile wireless providers would divert significant resources from other anti-spam initiatives and that they are not needed at this time.  Nor does anything in the rules we adopt here prevent mobile wireless providers from engaging in existing or future anti-spam efforts or require them to block messages from valid short codes or OTT applications.[54]

### A.    Mandatory Blocking of Texts that are Highly Likely to be Illegal

16.    We adopt our proposal to require mobile wireless providers to block text messages at the network level (i.e., without requiring consumer opt in or opt out).  The rule we adopt requires that they block texts purporting to be from numbers on a reasonable DNO list.[55]  As the Commission determined with calls, we find that no reasonable consumer would wish to receive text messages that spoof a number that is not in operation or, worse, purports to be from a well-known, trusted organization that does not send text messages and thus is highly likely to be a scam.  Our requirement to block texts that purport to be from numbers on a reasonable DNO list does not include text messages from valid short codes.

17.    We find it appropriate to adopt a mandatory rule here for blocking texts that purport to be from numbers on a reasonable DNO list for several reasons:  (i) the texts from such numbers are likely to be illegal; (ii) illegal text messages can have links to malware, a problem that voice calls do not have; (iii) the volume of unwanted and illegal text messages is increasing, particularly since we adopted measures to

---

[51] NORC Reply at 1.

[52] Commenters share this goal of protecting consumers from unwanted and illegal text messages.  NCLC/EPIC Joint Reply at 1.

[53] CTIA Comments at 13-14.

[54] *See* CTIA Comments at 14 (expressing concerns about blocking of legitimate text messages).

[55] *NPRM* at para. 19.  The text messaging services discussed in this proceeding are information services that route messages through the wireless mobile provider networks.  *Messaging Declaratory Ruling*, 33 FCC Rcd at 12078, para. 8.  In the *NPRM*, we observed that the definition of text message includes SMS messages but "does not include . . . a message sent over an IP-enabled messaging service to another user of the same messaging service." *NPRM* at para. 23.  Commenters generally agree that OTT messaging is not covered by our current definition of text messaging.  *See, e.g.*, ABA Joint Commenters at 8; CRC Comments at 3; INCOMPAS Comments at 7 & Reply at 7.  The App Association contends, and we agree, that imposing such new rules on OTT messaging services could disproportionately burden smaller carriers and OTT providers and suppress the development of new innovative solutions.  App Association Reply at 5.  Therefore, for purposes of this rule, we use the same definition of text message that the Commission has used for purposes of the Truth-in-Caller ID Act.  *See* 47 CFR § 64.1600(o) *et seq*.  That is, a "text message" is a "message consisting of text, images, sounds or other information that is transmitted to or from a device that is identified as the receiving or transmitting device by means of a 10-digit telephone number or N11 service code." *Id*.  It includes SMS and MMS messages, but does not include voice communication or messages sent over an IP-enabled messaging service to another user of the same messaging service. *See id*.

block such voice calls; (iv) consumers expect to receive texts from unfamiliar numbers, e.g., as appointment reminders and for double factor authentication, and therefore are more likely to open such messages even when they do not recognize the sending party; and (v) our approach provides benefits to consumers while imposing minimal burden on mobile wireless providers.

18.      Our decision to require blocking here, rather than simply rely on industry's voluntary efforts to block, as we have done in the past with certain call blocking, is in part the result of the heightened risk of text messages as both annoyance and vehicles for fraud.  The ubiquity and familiarity of text messaging and the alerts that accompany texts contribute to consumers' receptiveness to text messages.[56]  Data indicates that consumers read nearly all texts they receive, and do so nearly immediately.[57]  Indeed, industry data suggests that consumers open a far larger percentage of text messages than email, and open such messages much more quickly.[58]  This stands in contrast to calls where, as we have said repeatedly, consumers report no longer trusting calls from an unfamiliar number and refusing to answer them.  Further, we believe this requirement does not impede text messaging by legitimate businesses because our rule is narrowly focused on a set of messages that are highly likely to be illegal:  they purport to be from numbers from which no consumer should receive a text message.[59]

19.      As the Senate Committee on Commerce, Science, and Transportation (Senate Commerce Committee) observed:  "In recent years, spoofing scams in the United States have used text messaging services and other alternative voice communications services."[60]  And Senator Schatz explains, "[t]exts from these numbers are surely illegal or unwanted, and it makes sense that mobile wireless carriers should block them."[61]  Fifty-one State Attorneys General, a frontline of law enforcement, observe that they are receiving an increasing number of consumer complaints concerning illegal and/or unwanted text messages.[62]  They contend:

> As with voice calls purporting to be from [a reasonable DNO list], text messages from such numbers are also highly likely to be illegal.  Simply stated, no wireless subscriber should be receiving any voice call or text message from these numbers.  For example, a person receiving a text message from a number purporting to have an area code "000" would be receiving a text message from an invalid phone number.  In this circumstance, a scammer has most likely spoofed an invalid number when sending the text message, and this type of fraudulent and misleading representation of information by the purported sender of the text message should not be permitted.[63]

---

[56] *Messaging Declaratory Ruling*, 33 FCC Rcd at 12079-80, para 12 & n.41.

[57] *Id.*

[58] *Id*.

[59] *See* ABA Joint Commenters at 3; Weave Reply at 2-3.  We agree with commenters that this is a necessary first step to combatting the rise of text message scams that rely on spoofing.  *See, e.g*., Ad Hoc Comments at 3; ABA Joint Commenters at 5; Public Knowledge Reply at 3-4; Neustar Comments at 1; Schatz Letter at 1; State AGs Reply at 3-4.  For example, iconectiv observes that SMS fraudsters often use unallocated numbers from foreign jurisdictions.  iconectiv Comments at 1-2.  For this reason, some mobile wireless providers already incorporate this DNO information into their blocking algorithms.  iconectiv Comments at 2.

[60] *See Spoofing Prevention Act of 2017*, *Report of the S. Comm. On Commerce, Sci. & Transp. On S. 134*, S. Rep No. 115-91, at 2 (2017) (Spoofing Prevention Act of 2017), available at https://www.congress.gov/congressional-report/115th-congress/senate-report/91/1 (last visited Feb. 22, 2023) (explaining proposed changes to 47 U.S.C. § 227(e)).

[61] Schatz Letter at 1.

[62] State AGs Reply at 2.

[63] *Id.* at 3.

We agree with the State AGs that this is a commonsense approach to blocking because it attacks those texts that are most likely to be fraudulent.[64]

20.     Even if the number of texts using such spoofing is small, the costs to individual consumers that receive them can be high.  For example, AB Handshake observes that the daily damage caused by "smishing" cases to the consumers of a single financial institution can reach $85,000.[65] AB Handshake agrees that blocking invalid numbers can help to filter out some illegal messages.[66] Further, the Senate Commerce Committee mentioned in its report accompanying the Spoofing Prevention Act of 2017 that phone fraud cost Americans $8.6 billion in 2014.[67]  We further agree with Public Knowledge, which notes that current voluntary text blocking means that mandatory blocking may not have considerable additional effect for some providers' customers, but it also means that implementation should be relatively easy, inexpensive, and unlikely to result in excessive blocking.[68]  Indeed, commenters do not argue otherwise.[69]

21.     We also find that the rule we adopt today will impose a minimal burden on mobile wireless providers while providing a necessary baseline level of protection to consumers.  As many industry commenters note, many mobile wireless providers already employ measures to block text messages.[70]  These efforts include DNO-based blocking.[71]  For providers that already employ such measures, our rule imposes no additional burden.  For the limited number of providers that do not currently employ such measures, our rule will provide consumers with a baseline level of protection against illegal and fraudulent text messages.  We believe the rule we adopt today strikes the best balance between protecting consumers from illegal text messages while imposing minimal burden on mobile wireless providers.

22.     We disagree with commenters who argue that consumers will become accustomed to seeing their text messages periodically blocked and will seek other messaging solutions.[72]  Because this blocking will occur at the network level, consumer recipients will not be aware of each blocked text, but

---

[64] State AGs Reply at 3.

[65] AB Handshake Comments at 1.

[66] AB Handshake Comments at 3.

[67] *See* Spoofing Prevention Act of 2017 at 2.

[68] Public Knowledge Reply at 3.

[69] *See, e.g.*, CTIA Comments at 17 (mobile messaging networks already incorporate a substantial degree of authentication, and the wireless industry is working to improve its authentication capabilities today); T-Mobile Comments at 7 (T-Mobile only allows active, provisioned telephone numbers to originate text messages on the T-Mobile network); Vibes Reply at 3 (the industry already includes substantial registration and verification processes that are not present in the voice world).

[70] *See, e.g.*, AAPC Comments at 2; Blooston Comments at 3; CCA Comments at 3; CTIA Comments at 6-11 & Reply at 3-7; EZ Texting Comments at 6; M³AAWG Comments at 10; iconectiv Comments at 2; Pinger Comments at 2; Sinch Comments at 7-8; Somos Comments at 7-8; Telesign Comments at 3; T-Mobile Comments at 3, 7-8; Verizon Comments at 2; VON Comments at 3; AT&T Reply at 5; Infobip Reply at 2.  Such efforts include a common means for consumers to report unwanted text messages through "7726 (SPAM)."  *See* CTIA Comments at 8-9.  Wireless providers use information from this reporting mechanism to "track and aggregate the information that consumers report . . . and further calibrate their spam filters and blocking tools."  *Id.*

[71] *See, e.g.*, CTIA Comments at 11 (explaining that existing countermeasures prevent messages from invalid, unallocated, unused, or DNO telephone numbers from being transmitted to consumer's wireless devices); T-Mobile Comments at 7-8 (messages on T-Mobile's network are either consumer messages, directly originated on a device with a valid number and sent to another device with a valid number, or they are non-consumer messages that must be part of a pre-approved campaign with validated origination information).

[72] CCA Comments at 8.

will be protected before illegal robotexts ever reach their phones. We do not believe that any reasonable consumer would seek other messaging solutions because illegal texts, particularly scam texts, did not reach their phones. And we agree with Public Knowledge that commenters opposing this step have provided no evidence that texts are not delivered using such numbers or that that their current voluntary blocking already stops them.[73]

23. We disagree with CTIA's argument that "given that the Commission's call blocking rules for voice services—a service generally governed by Title II common carrier obligations—are largely *permissive*, it would be highly incongruous for the Commission to adopt *mandatory* blocking rules for text messaging, a Title I information service."[74] We recognize that, historically, our rules for voice calls generally permit and do not mandate blocking.[75] However, we have recently adopted mandatory blocking requirements for gateway providers, some of which are not Title II services.[76] Furthermore, the unique concerns of text messaging as vehicles for malware and as a more trusted form of communications than calling, convince us that we should act quickly to mandate specific blocking of a narrow set of texts that are highly likely to be illegal.

24. We also disagree with AT&T's contention that our estimation of costs to consumers due to illegal texts, at $6.3 billion, gives us the ability to justify any regulation as long as it costs the industry less than $6.3 billion to implement.[77] Although AT&T disagrees with our estimate of the cost to consumers, it has not provided an estimate of industry's cost to block texts that purport to be from numbers on a reasonable DNO list—a cost that we believe will be minimal due to the industry existing voluntary actions. These actions are reasonable responses to the harm and specifically focused to mitigate the ongoing damages consumers face from illegal, fraudulent text messages that mobile wireless providers transmit today.

25. Our requirement for mandatory blocking of texts that purport to be from numbers on a reasonable DNO list is straightforward and does not define "highly likely to be illegal" or ask mobile wireless providers to determine whether particular messages are "highly likely to be illegal." We therefore disagree with CTIA that regulation of criteria used by mobile wireless providers to determine which text messages are "highly likely to be illegal" would be inconsistent with the classification of

---

[73] Public Knowledge Reply at 3.

[74] CTIA Comments at 15 n.44.

[75] *See* 47 CFR § 64.1200(k)(1), (2).

[76] 47 CFR § 64.1200(o) provides:

> A provider that serves as a gateway provider for particular calls must, with respect to those calls, block any calls purporting to originate from a number on a reasonable do-not-originate list. A list so limited in scope that it leaves out obvious numbers that could be included with little effort may be deemed unreasonable. The do-not-originate list may include only:
>
> (i) Numbers for which the subscriber to which the number is assigned has requested that calls purporting to originate from that number be blocked because the number is used for inbound calls only;
>
> (ii) North American Numbering Plan numbers that are not valid;
>
> (iii) Valid North American Numbering Plan Numbers that are not allocated to a provider by the North American Numbering Plan Administrator; and
>
> (iv) Valid North American Numbering Plan numbers that are allocated to a provider by the North American Numbering Plan Administrator, but are unused, so long as the provider blocking the calls is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of blocking.

[77] AT&T Reply at 14.

wireless messaging as Title I information service.[78]

26.     We recognize that the Commission earlier concluded that, in the absence of Title II regulation, mobile wireless providers have employed effective methods to protect consumers from unwanted messages and thereby made wireless messaging a trusted and reliable form of communication for millions of Americans.[79]  The rule we adopt here does not affect providers' ability to continue to employ such methods to protect consumers.  Under our rules, mobile wireless providers are now required to block texts that purport to be from numbers on a reasonable DNO list.  Mobile wireless providers remain free to continue the measures they are currently using to protect consumers from unwanted and illegal text messages.[80]

### B.     Single Point of Contact

27.     We require each mobile wireless provider to make public a single point of contact for text senders.[81]  This single point of contact will enable texters to contact mobile wireless providers, with the goal of swiftly receiving and resolving complaints of unwarranted blocking of text messages.[82]  This requirement is similar to our existing, effective requirement for complaints regarding blocked voice calls.[83]  Several commenters observe that it would be helpful to have a single point of contact, as already exists for blocked voice calls, in order to address and mitigate any text blocking issues; no commenters oppose this proposal.[84]

28.     Just as for blocked voice calls, we find that an easy means for texters to resolve potentially erroneous blocking will help ensure that consumers are not deprived of texts they would want to receive.  While we anticipate minimal risk from our rule above, requiring mandatory blocking of texts from certain types of numbers,[85] there may be instances of erroneous blocking due to mobile wireless providers' voluntary blocking.[86]  For example, a provider could choose to block texts of a sender who

---

[78] CTIA Comments at 15.

[79] *Messaging Declaratory Ruling*, 33 FCC Rcd at 12095, para. 43.

[80] We recognize that CTIA and the industry has established guidelines to encourage the innovative use of messaging, while also guarding against unwanted and unlawful text messages.  For example, CTIA's Messaging Principles and Best Practices promote the establishment of expectations that non-consumer message senders will obtain consumer consent *prior* to messaging consumers, and that they will honor consumer opt-outs, among other practices.  CTIA Comments at 8.  The rules we adopt here are not inconsistent with the measures that the industry has taken already.

[81] *See NPRM* at para. 27 (seeking comment on requiring such single point of contact for resolving issues of erroneous blocking).

[82] We recognize that there may be instances where a sender cannot readily identify the mobile wireless provider that blocked the text message.  In such cases, we encourage the sender to work with its mobile wireless provider to identify the appropriate contact.  *See Call Blocking Fourth Report and Order*, 35 FCC Rcd at 15246 & n.175 (discussing requiring a point of contact for blocked calls).

[83] We adopted a single-point-of-contact requirement for voice calls in the *Call Blocking Third Report and Order*, 35 FCC Rcd at 7634, para. 54*; see* 47 CFR § 64.1200(k)(3)(vi)(8).

[84] *See, e.g.*, ABA Joint Commenters at 7; Ad Hoc Comments at 4-5; Cloud Communications Comments at 2 (the Commission should require the adoption of the same redress mechanisms that currently apply to blocking of voice calls); CRC Comments at 3.

[85] Sinch Comments at 10 (the risk of erroneous blocking is minimal when only text messages deemed "highly likely" to be illegal are subject to blocking); Public Knowledge Reply at 4.

[86] *See, e.g.*, ABA Joint Commenters at 7; CCA Comments at 10-11; Coalition for Open Messaging Comments at 3 (contending that wireless carriers impose barriers that prevent organizations' ability to use person-to-person (P2P) messaging because such messaging is classified by the providers as business-to-consumer (A2P, thereby requiring

fails to comply with its terms of usage or who exhibits suspicious texting behavior. For these and other reasons where otherwise legal texts may be blocked, it is important for senders to easily resolve their texting problems with mobile wireless providers. Our requirement that providers post a point of contact enables this easy resolution.

29. Just as we did in the call blocking context,[87] we require mobile wireless providers to post the contact information for their single point of contact on a public-facing website.[88] Commenters agree that it will be helpful to senders to have a single point of contact, as they already do for blocked calls, in order to address and mitigate any text blocking issues.[89]

30. We decline to set time limits on resolving blocking error complaints.[90] The ABA Joint Commenters contend that, when a sender makes a credible claim of erroneous blocking and the terminating provider determines that the text message should not have been blocked, the terminating provider should be required to cease blocking text messages from that number until circumstances change.[91] We cannot, based on the record, adopt a standard to determine whether a text should be blocked or a reasonable time for the mobile wireless provider to make such a determination. These commenters also ask us to require service providers to resolve disputes immediately, and no longer than six hours after receiving the dispute.[92] We do not have any information in the record regarding a reasonable amount of time to resolve a dispute.

the sender to register with carrier programs); INCOMPAS Comments at 3 & Reply at 4 (observing that some of the wireless carriers' methods, like The Campaign Registry, carry significant operational burdens, privacy concerns, and high costs, but with little demonstrable consumer value being added); NORC Comments at 6 & Reply at 5 (contending that discretion in blocking legal texts should not be unbounded and that carriers use non-transparent "trust scores" to block); Pinger Comments at 2 (stating that overly broad carrier classifications can lead to situations where analytics programs indiscriminately block essential, urgent, and wanted messages and such indiscriminate blocking jeopardizes individuals' health and safety); State Voices Comments at 12 (explaining that, if the text message sender exceeds a threshold of 0.1% of texts reported by consumers as spam, service providers may suspend services for that texter); Cloud Communications Reply at 2-5.

[87] *Call Blocking Third Report and Order*, 35 FCC Rcd at 7634, para. 54; 47 CFR § 64.1200(k)(8).

[88] *See* 47 CFR § 64.1200(k)(3)(vi)(8) which provides:

> Each terminating provider that blocks calls pursuant to this section or utilizes caller ID authentication information in determining how to deliver calls must provide a single point of contact, readily available on the terminating provider's public-facing website, for receiving call blocking error complaints and verifying the authenticity of the calls of a calling party that is adversely affected by information provided by caller ID authentication. The terminating provider must resolve disputes pertaining to caller ID authentication information within a reasonable time and, at a minimum, provide a status update within 24 hours. When a caller makes a credible claim of erroneous blocking and the terminating provider determines that the calls should not have been blocked, or the call delivery decision is not appropriate, the terminating provider must promptly cease the call treatment for that number unless circumstances change. The terminating provider may not impose any charge on callers for reporting, investigating, or resolving either category of complaints, so long as the complaint is made in good faith.

[89] *See, e.g.*, ABA Joint Commenters at 7; Ad Hoc Comments at 4-5; Cloud Communications Comments at 2 (the Commission should require the adoption of the same redress mechanisms that currently apply to blocking of voice calls); CRC Comments at 3.

[90] *See NPRM* at para. 27.

[91] ABA Joint Commenters at 7.

[92] *Id.*

### C. Other Proposals

31.     We decline to adopt rules for several of the other topics on which we sought comment.[93] First, we decline to require text blocking notifications.[94]  The record indicates that service providers are already providing adequate notice when they block texts.[95]  For instance, NORC states that "wireless carriers already have an established response system that consists of approximately 2,000 codes" and, "[w]hen a text fails to send, the sender will receive a code reply from a specific carrier's number with granular information about why the text failed, e.g., 'Failed because of analytics blocking by carriers.'"[96]

32.     We also decline at this time to enact rules regarding safeguarding against blocking of texts to 911 and other emergency numbers based on the record.  For example, the Texas 911 Entities state that illegal texting to 911 currently does not appear to be a problem at Public Safety Answering Points (PSAPs).[97]  We will continue to monitor potential threats from unauthorized 911 communications to public safety and PSAPs, as these commenters suggest.[98]  Should industry or consumer complaints indicate that the situation has changed and that this category of texts is being blocked in a way that is problematic, we will not hesitate to revisit the issue.

33.     Additionally, we are not adopting standards to ensure competitively-neutral and content-neutral grounds for blocking;[99] the rule we are adopting here, mandatory blocking of texts that purport to be from numbers on a reasonable DNO list, does not require a mobile wireless provider to examine the content of texts themselves.  Mandatory blocking is based solely on the spoofed number associated with the text message.  We also decline to adopt a safe harbor for text blocking.[100]  Because the blocking we adopt is mandatory rather than discretionary, and because the texts that may be blocked are highly likely to be illegal, we do not believe a safe harbor is necessary.

34.     In the *NPRM*, we asked how consumer education and outreach could help address the problem and if there are ways the Commission can enhance its spam text message consumer education

---

[93] In the *NPRM*, we sought comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility.  One commenter observed that our proposal may have a disparate effect on deaf, hard of hearing, visually impaired, impoverished, and neurodivergent people because they are more likely to rely on text messages than phone calls.  CRC Comments at 3-4.  However, the rules we adopt here should protect all consumers, including deaf, hard of hearing, visually impaired, impoverished, and neurodivergent persons from illegal texts.  We do not find, based on the record, that this Report and Order will inhibit advances in diversity, equity, inclusion, and accessibility.

[94] *See, e.g.*, ABA Joint Commenters at 7; Ad Hoc Comments at 4-5; CCA Comments at 10-11; INCOMPAS Reply at 4-5; Weave Reply at 5-6.

[95] *See, e.g.*, NORC Comments at 5; Campaign Registry Reply at 3 (parties can track messaging back to its origins so that they can conduct the necessary follow up for the messaging in question); Verizon Reply at 3.  Consumers may use apps or features on their mobile device to filter or block texts; the reply code discussed by commenters would apply to texts blocked by the mobile wireless providers.

[96] NORC Comments at 5.  Likewise, providers following CTIA's "Messaging Security Best Practices" consent requirements, or similar standards, are blocking texts that fail to comply with such best practices.  *See Messaging Security Best Practices*, https://api.ctia.org/wp-content/uploads/2022/06/Messaging-Security-Best-Practices-June-2022.pdf.  The CTIA Messaging Security Best Practices provides that "parties should respond within a reasonable timeframe to lawful inquiries from other stakeholders regarding the sending of Unwanted Messages or other potential abuses."  CTIA Messaging Security Best Practices at 3.22.

[97] Texas 911 Entities Comments at 2.

[98] *Id.*

[99] *See NPRM* at para. 24.

[100] *See NPRM* at para. 27.

outreach and content.[101]  We are encouraged by the measures that mobile wireless providers are taking to inform their customers about unwanted and illegal text messages and the ways that they have facilitated consumer reporting of such texts, such as forwarding spam to 7726 in order to report spam to wireless service providers.[102]  As CTIA explains, wireless providers have established 7726 (SPAM) for consumers to report unwanted text messages.[103]  Mobile wireless providers use information consumers report through 7726 to further calibrate their spam filters and blocking tools.[104]  Further, reporting tools native to wireless device operating systems, from both Apple and Google, provide consumers with a more streamlined means of reporting spam text messages.[105]  In addition, our website and the FTC's website offer helpful information on spam prevention to assist consumers.[106]

35.      Finally, we decline to adopt caller ID authentication requirements for text messages based on record uncertainty about the current feasibility of such a requirement.[107]  For example, CTIA explains that the architecture of wireless messaging platforms is such that wireless providers already know the transmitting provider (e.g., wireless provider or messaging solutions aggregator) and user identifier (whether long code, short code, or other marker) for text messages.[108]  CTIA notes that mobile wireless providers use this information to deliver text messages typically only from authorized providers and user identifiers using valid originating information through appropriate routing channels, and to more readily identify unauthorized traffic using illegitimate channels.[109]  T-Mobile also notes that the current anti-robocall regime is targeted at the primary sources of illegal robocalls, i.e., unverified telephone caller

---

[101] *See NPRM* at paras. 37-38.

[102] *See, e.g.*, CTIA Comments at 8-9; M³AAG Comments at 4; Sinch Comments at 4; T-Mobile Comments at 6 (explaining that consumers can report spam by forwarding the message to 7726 (SPAM) and responding with the message sender's telephone number or other identifier); AT&T Reply at 5.  T-Mobile also notes that it works with Apple and Google to allow customers to report spam text messages.  T-Mobile Comments at 6-7.  Commenters observe that device software automatically asks the device holder if a deleted message should be reported as "junk," which streamlines the spam reporting process for consumers and yields useful information about bad actors. Telesign Comments at 4; T-Mobile Comments at 6-7.

[103] CTIA Comments at 8.

[104] CTIA Comments at 8-9.

[105] CTIA Comments at 9, citing Apple, *Block, filter, and report messages on iPhone*, https://support.apple.com/guide/iphone/block-filter-and-report-messages-iph203ab0be4/ios; Google Android, *Report Spam*, https://support.google.com/messages/answer/9061432?hl=en.  *See also* Apple, *Recognize and avoid phishing messages, phony support calls, and other scams,* https://support.apple.com/en-us/HT204759 (last visited Feb. 17, 2023).

[106] *See, e.g.*, FCC, Consumer Alert, *Scam Robotexts are a Rising Threat*, (July 28, 2022), https://www.fcc.gov/robotext-scams-rise; FCC, Consumer Guides, *Stop Unwanted Robocalls and Texts*, https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Dec. 19, 2022); Federal Trade Commission, Consumer Advice, *How to Recognize and Report Spam Text Messages*, https://consumer.ftc.gov/articles/how-recognize-and-report-spam-text-messages (last visited Feb. 2, 2023).

[107] *See* CTIA Comments at 18 (noting that STIR/SHAKEN applies exclusively to SIP technology, which does not apply to the majority of text messages).  Commenters explain that illegal and unwanted messages rarely come from spoofed numbers and a caller ID authentication solution, even if feasible, would be unlikely to reduce unwanted and illegal text messages.  *See, e.g.*, CTIA Comments at 4-5, 11; EZ Texting Comments at 5-6; M³AAWG Comments at 10; NetNumber Comments at 7 & Reply at 2-3; Sinch Comments at 6-7; Telesign Comments at 2-3; T-Mobile Comments at 9-10; Verizon Comments at 7 & Reply at 4-5; WMC Global Comments at 2; Cloud Communications Reply at 1-2; RWA Reply at 3-5; Vibes Reply at 2-4.

[108] CTIA Comments at 17.

[109] CTIA Comments at 17.

ID information and a common carrier regulatory regime, which does not apply to text messages.[110]  Other commenters explain that STIR/SHAKEN would not be a viable solution if spoofing were more prevalent, because among other reasons, STIR/SHAKEN only works on the Session Internet Protocol (SIP).[111]  We agree with providers, who argue that caller authentication solutions are "being actively considered that may be able to complement the vetting and monitoring solutions in use today," but that these efforts are preliminary and require more study.[112]  In the *Further Notice*, we seek comment on whether and how the Commission can encourage efforts to develop technical solutions for text message authentication.

### D.     Legal Authority

36.     We find that we have ample legal authority to implement these requirements.  First, we find that, under the TCPA, the Commission has authority over unsolicited text messages.[113]  The TCPA restricts certain autodialed and prerecorded or artificial voice calls to residential and wireless telephone numbers absent the prior express consent of the called party.[114]  The Commission has found that, for the purposes of the TCPA, texts are included in the term "call."[115]  Because the Commission has authority to regulate certain text messages under the TCPA, particularly with regard to messages sent using an autodialer and without the consent of the called party, we have legal authority for the rules we adopt today.

37.     Second, we find that our control over the NANP under section 251(e) of the Act gives us authority to adopt regulations to prevent misuse of NANP numbers in text messages.[116]  We find that our plenary numbering authority and exclusive jurisdiction over the NANP provides us the authority to take action with respect to robotexts that make use of the numbering resources.  Section 251(e) of the Act gives the Commission "exclusive jurisdiction over those portions of the [NANP] that pertain to the United States."[117]  We agree with Public Knowledge that, as the Commission concluded in the *2017 Call Blocking Report and Order*, spoofing an invalid, unallocated, or unused number was a violation of its numbering rules and similar logic also extends to spoofing a number from a DNO list.[118]  As Public Knowledge explains, the same logic applies to text messages that make use of NANP numbers as does to voice telephone calls.[119]  We agree that the use of invalid, unallocated, or unused NANP numbers, or

---

[110] T-Mobile Comments at 2.

[111] CTIA Comments at 18-19; Verizon Comments at 8; AT&T Reply at 9-10.

[112] *See, e.g.*, CTIA Comments at 18-19 & Reply at 13; iconectiv Comments at 3; NTCA Comments at 2-3; Sinch Comments at 14; T-Mobile Comments at 10.

[113] The Commission stated in the *2003 TCPA Order* that the authority to regulate telemarketing derives from the TCPA.  *2003 TCPA Order*, 18 FCC Rcd at 14070, para. 95.  The Commission also observed that Congress anticipated "that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Id*. at 14092, para. 132.

[114] 47 U.S.C. § 227(b)(1)(A).

[115] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[116] Terra Nova Comments at 2; Somos Comments at 4 (observing that our proposal concerns the use of numbers, not texting as a service); Public Knowledge Reply at 7.

[117] 47 U.S.C. § 251(e).

[118] Public Knowledge Reply at 7.

[119] Public Knowledge Reply at 7.

numbers on a DNO list[120] is, on its face, a violation of the Commission's numbering rules[121] and thus, under its authority in section 251(e), the Commission can mandate blocking of text messages that purport to be from such numbers.[122]

38.    We disagree with AT&T's contention that section 251(e) of the Act does not provide the Commission with the authority to address text messages because (1) it is limited to voice calls and (2) it is limited to services that connect with the public switched telephone network (PSTN).[123]  First, there is no explicit language in section 251(e) that limits our authority over numbering in the United States to voice calls.  Nor, contrary to AT&T's assertion, has section 251(e) been interpreted to be so limited.[124]  Both text messages, as defined in our rules, and voice calls utilize NANP numbers.  Therefore, the Commission has authority to address the misuse of NANP numbers, whether that misuse occurs with respect to the transmission of voice calls *or* text messages.  Although the Commission has not previously invoked its section 251(e) authority with respect to text messages that utilize NANP numbers, that history does not mean that we lacked authority in that proceeding, or later proceedings like this one, to address the misuse of NANP numbers.  Second, there is no explicit language in section 251(e) that limits our authority over numbering in the United States to communications over the PSTN.  Nor does AT&T identify any direct support for its purported limitation, and we decline to find one.  We find that section 251(e) gives us authority to protect against the misuse of NANP numbers even where such misuse does not involve transmission over the PSTN.

39.    Third, we find that we have authority under the Truth in Caller ID Act to adopt a blocking requirement.  That Act makes unlawful the spoofing of caller ID information "in connection with any voice service or text messaging service . . . with the intent to defraud, cause harm, or wrongfully obtain anything of value."[125]  We find that adopting this requirement is necessary to block calls that unlawfully spoof numbers on reasonable DNO lists, and thus is authorized by the Truth in Caller ID Act.

---

[120] A DNO list is a registry for numbers that are used solely for inbound calls and, therefore, would never appear as the true calling number in caller ID.  *Advanced Methods To Target And Eliminate Unlawful Robocalls*, CG Docket 17-59, Order on Reconsideration, Sixth Further Notice of Proposed Rulemaking, and Waiver Order, 36 FCC Rcd 17962, __, para. 24 & n.74.

[121] Under the Commission's rules, assigned numbers are numbers working in the Public Switched Telephone Network under an agreement such as a contract or tariff at the request of specific end users or customers for their use, or numbers not yet working but having a customer service order pending.  Numbers that are not yet working and have a service order pending for more than five days shall not be classified as assigned numbers.  47 CFR § 52.15(f)(iii).  Available numbers are numbers that are available for assignment to subscriber access lines, or their equivalents, within a switching entity or point of interconnection and are not classified as assigned, intermediate, administrative, aging, or reserved.  47 CFR § 52.15(f)(iv).  An invalid number would include those that use an unassigned area code; that use an abbreviated dialing code, such as 911 or 411, in place of an area code; that do not contain the requisite number of digits; and that are a single digit repeated, such as 000-000-0000, with the exception of 888-888-8888, which is an assignable number.  *See 2017 Call Blocking Report and Order*, 32 FCC Rcd at 9713, para. 19.

[122] Public Knowledge Reply at 7; *see also* Somos Comments at 4 ("Given the Commission's exclusive authority over numbering, and the need to protect the integrity of the numbering system for all users, it has the authority to allow or to require mobile wireless providers to block text messages using a DNO list.").

[123] AT&T Reply at 11-12; *see also* CTIA Comments at 22 n.71 (noting that "the Commission has never relied upon Section 251(e) to regulate activities that make use of telephone numbers for purposes unrelated to the routing of voice traffic over the PSTN").

[124] AT&T cites as support a Commission order from 1996, but that order did not interpret section 251(e) to apply to the routing of only voice calls on U.S. telephone networks, as AT&T claims.  *See* AT&T Reply at 12 (citing *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, Second Report and Order and Memorandum Opinion and Order, 11 FCC Rcd 19392, 19404-05, paras. 18-20 (1996)).

[125] 47 U.S.C. § 227(e)(1).

40.    Finally, we find that we have authority under Title III of the Act to adopt these measures. As courts have recognized, Title III "endow[s] the Commission with 'expansive powers' and a 'comprehensive mandate to "encourage the larger and more effective use of radio in the public interest."'[126]  Section 303 of the Act grants the Commission authority to establish operational obligations for licensees that further the goals and requirements of the Act if such obligations are necessary for the "public convenience, interest, or necessity" and are not inconsistent with other provisions of law.[127]  In particular, section 303(b) authorizes the Commission to "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within each class," and that is what our mandatory blocking rule addresses here.[128]  In addition, sections 307 and 316 of the Act allow the Commission to authorize the issuance of licenses or adopt new conditions on existing licenses if such actions will promote public interest, convenience, and necessity.[129]  We find the requirements we adopt for mobile wireless providers here are necessary to protect the public from unwanted and illegal text messages and that such a requirement is in the public interest.

41.    We disagree with AT&T's position that our regulatory intervention would have "an enormous economic impact, and in view of the lack of clear statutory authority . . . the Commission should await more direct authorization from Congress before proceeding to rules."[130]  First, AT&T's reliance on the Supreme Court's decision in *West Virginia v. EPA* is inapt in this regulatory context, where Congress has granted the Commission "expansive powers" and a "comprehensive mandate" to "encourage the larger and more effective use of radio in the public interest" in Title III of the Act.[131]  Congress's delegation of broad spectrum management authority to the Commission—which is longstanding and remains unaltered—recognizes that the field of radio communications is "dynamic" and rapidly changing, and court decisions such as *Cellco Partnership* have recognized that the Commission has broad authority under Title III to adopt rules addressing what services must be rendered by licensees.[132]  Second, the limited obligations on mobile wireless providers adopted here are far from the "extraordinary case" involving the kind of "transformative" regulations at issue in *West Virginia v. EPA*,[133] especially given the record evidence regarding licensees' existing blocking practices.[134]

---

[126] *Cellco P'ship v. FCC,* 700 F.3d 534, 542 (D.C. Cir. 2012) (*Cellco Partnership*) (upholding the Commission's authority under Title III to adopt data roaming rules) (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943) (*Nat'l Broad Co.*)).

[127] 47 U.S.C. § 303.

[128] *See Cellco P'ship,* 700 F.3d at 543 ("Like other rules that govern Title III services, the data roaming rule merely defines the form mobile-internet service must take for those who seek a license to offer it.").  We find several other provisions of Section 303 relevant here.  *See* 47 U.S.C. § 303(g) (requiring the Commission to "encourage the larger and more effective use of radio in the public interest"); *id*. § 303(r) (authorizing the Commission to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this [Act]").

[129] *See* 47 U.S.C. § 307; 316*; see also Cellco P'ship,* 700 F.3d at 543 (recognizing section 316 as additional Title III authority for our data roaming rules).

[130] AT&T Reply at 14 (citing *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022)).

[131] *Nat'l Broad. Co.*, 319 U.S. at 219.

[132] *See Cellco P'ship,* 700 F.3d at 542-43; *see also Implementation of the National Suicide Hotline Improvement Act of 2018*, Second Report and Order. 36 FCC Rcd 16901, 16933 (2021) (relying on the Commission's Title III authority, including sections 303, 307, and 316, to impose text-to-988 obligations on CMRS providers).

[133] *West Virginia v. EPA*, 142 S. Ct. at 2608, 2610.

[134] *See, e.g.*, AAPC Comments at 2; Blooston Comments at 3; CCA Comments at 3; CTIA Comments at 6-11 & Reply at 3-7; EZ Texting Comments at 6; M³AAWG Comments at 10; iconectiv Comments at 2; Infobip Reply at 2; Pinger Comments at 2; Sinch Comments at 7-8; Somos Comments at 7-8; Telesign Comments at 3; T-Mobile

42.     AT&T's argument is based on the premise that we would be adopting rules on the full range of issues on which we sought comment in the *NPRM*, including caller ID authentication for text messages, as well as an unsupported assertion that the rules would have an "enormous economic impact."[135]  However, we are adopting only two narrow rules in this Report and Order, and we find that these rules will not have an enormous economic impact and will not be overly burdensome for mobile wireless providers to implement (in part, because some providers, like AT&T, are already "broadly block[ing] text messages sent from invalid, unallocated, unassigned, and spoofed numbers").[136]  Further, AT&T has not provided any evidence that the two rules adopted here would, in fact, have an enormous economic impact.  For the reasons explained above, we find that the Commission does have ample authority to adopt these new rules.

### E.     Cost Benefit Analysis

43.     AT&T challenges the proposed cost benefit analysis in the *NPRM*, but it provides no basis for challenging the assumptions behind it.[137]  In the analysis of the expected benefits, we estimated that consumers incur a 5 cent nuisance harm for each spam text received.[138]  Further, we estimated that consumers incur $2 billion in harm due to fraudulent spam texts annually.[139]  Our estimates were based on our experience estimating the harms caused by illegal robocalls.  In that context, we assumed that each robocall causes a 10 cent nuisance harm and that fraudulent robocalls result in annual harm of $10.5 billion.[140]  We proposed to attribute a lower nuisance harm of 5 cents to a spam text because we believed that they are less disruptive to consumers, e.g., because consumers can simply delete a text instead of having to listen to a robocall first then delete it.  Further, we assumed that harm from fraudulent spam texts is about 20% of the harm caused by fraudulent robocalls fraud costs.

44.     Our estimate of the harm due to fraudulent texts was conservative.  For example, one source puts financial losses due to spam texts at $28 billion in 2022.[141]  In total, we estimated that the blocking of illegal robotexts would achieve an annual benefit of at least $6.3 billion.[142]  In the *NPRM* we sought comment on these assumptions and received no alternatives in the record.[143]

45.     Since we released the *NPRM*, the number of spam texts has increased to an estimated 147 billion annually.[144]  Assuming a 5 cent nuisance cost per spam text and a conservative $2 billion fraud

---

Comments at 3; Verizon Comments at 2; VON Comments at 3; AT&T Reply at 5 (AT&T employs a multi-layered defense against illegal and unwanted text messages that incorporates technological innovation and proactive collaboration).

[135] AT&T Reply at 5.

[136] AT&T Reply at 5.

[137] AT&T Reply at 13-14.

[138] *NPRM* at para. 43.

[139] *NPRM* at para. 44.

[140] *Call Authentication Trust Anchor, Implementation of TRACED Act Section 6(a)—Knowledge of Customers by Entities with Access to Numbering Resources*, WC Docket Nos. 17-97, 20-67, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241, 3263, paras. 47-48  (2020) (*STIR/SHAKEN Order*).

[141] Robokiller, The Robokiller Report:  2022 Mid-Year Phone Scam Insights at 9 (2022), https://www.robokiller.com/the-robokiller-report (last visited Feb. 14, 2023).

[142] *See NPRM* at para. 43.

[143] We note that AT&T offers no alternative estimate of the economic benefit from blocking illegal texts.  *See* AT&T Reply at 13-14.

[144] *Id.* at 4.

cost for all spam texts, the total harm of spam texts would be $9.35 billion annually.[145]  While the rule we adopt today will not block all spam texts, it will block some percentage of them.  Even a small reduction in spam texts would result in benefit to consumers of many millions of dollars annually.  Because costs to providers are expected to be modest, given the record evidence regarding licensees' existing blocking practices,[146] we expect the benefits of this policy to exceed its costs.

46.     In our analysis of the expected costs in the *NPRM*, we estimated that the text blocking requirement would result in an overall *reduction* of costs to text service providers due to the expected reduction in network congestion costs incurred by providers as a result of spam texts.[147]  We sought comment on these estimated net cost savings due to reduction in network congestion,[148] and received no comments challenging this estimate.[149]  In addition, we estimate that out-of-pocket costs to mobile wireless providers to comply with the new blocking rule will be modest given the record evidence regarding providers' existing blocking practices and, as noted above, that any such costs will be more than offset by cost savings from reduced network congestion.

47.     Based on the analysis of the anticipated benefits and costs discussed above, and in light of the record evidence regarding mobile wireless providers' existing blocking practices, we believe the benefits of the rules adopted in this Report and Order significantly outweigh their costs.

# IV.     FURTHER NOTICE OF PROPOSED RULEMAKING

48.     In this Further Notice of Proposed Rulemaking, we seek comment on additional protections for consumers against illegal and unwanted robotexts.  We first seek comment on whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams.  We also seek comment on text message authentication.  Next, we propose to extend Do-Not-Call protections to marketing text messages.  Finally, we seek to ban the practice of obtaining a single consumer consent as justification for calls and texts from multiple, sometimes hundreds, of sellers and potential fraudsters.

49.     Our action in the Report and Order above provides a baseline level of consumer protection from spoofed text messages.  The actions we propose below would address more potentially illegal messages and unwanted, annoying messages.  Consumers have come to rely on texts from trusted institutions that may not be on a DNO list, such as a child's school, a doctor's office, state and local governments, utility providers, and financial institutions.  The messages they carry are often brief and consumers' expectation upon receipt is that such messages contain important, and perhaps urgent, information.  For that reason, consumers may have a more difficult time recognizing these scams.[150]

## A.     Block Texts Upon Commission Notification

50.     We propose to require terminating mobile wireless providers to investigate and potentially block texts from a sender after they are on notice from the Commission that the sender is transmitting suspected illegal texts, similar to our requirement for gateway providers with respect to voice

---

[145] $0.05*147 billion + $2 billion = $9.35 billion.

[146] *See* para. 35, *supra*.

[147] *See NPRM* at para. 47.

[148] *See NPRM* at para. 46.  The *NPRM* stated that the Commission would analyze "any detailed cost data" received in comments.  *See id.* at para. 47.  However, no detailed cost data was submitted in the record.

[149] We note that AT&T does not challenge this point.  *See* AT&T Reply at 13-14.

[150] Public Knowledge Reply at 2.  Some of these messages may come from short codes, which are five-to-six digit numbers used to send SMS and MMS messages.  These short codes may generally be unfamiliar to consumers.  The Short Code Registry is a database administered by CTIA.  *See* Short Code Registry, Getting Started with Short Codes, http://www.usshortcodes.com (last visited Jan. 6, 2023).

calls. Where texts are clearly illegal, and where the Commission has put providers on notice of the illegal texts, we believe mobile wireless providers have no legitimate reason to transmit the texts. We therefore seek comment on extending this approach, which the Commission has in place for call blocking, to text blocking.[151]

51.    In the *Gateway Provider Report and Order*, the Commission required gateway providers to block illegal voice traffic when notified of such traffic by the Commission through the Enforcement Bureau.[152]  We seek comment on whether we should adopt the same process here for mobile wireless providers and texts, as we did there for gateway providers and voice calls.

52.    Specifically, our rules (in section 64.1200(n)(5)) require the Enforcement Bureau to issue a Notification of Suspected Illegal Traffic that: (1) identifies with as much particularity as possible the suspected illegal traffic; (2) provides the basis for the Enforcement Bureau's reasonable belief that the identified traffic is unlawful; (3) cites the statutory or regulatory provisions the suspected illegal traffic appears to violate; and (4) directs the provider receiving the notice that it must comply with the requirements in section 64.1200(n)(5) of the Commission's rules by a specified date that gives the provider a minimum of 14 days to comply.[153]  Notified gateway voice providers must then promptly investigate the identified traffic and either block the identified traffic and substantially similar traffic on an ongoing basis or respond to the Commission that the provider has a reasonable basis for concluding that the identified calls are not illegal.[154]  If a provider fails to comply, the Commission established a process through which the Enforcement Bureau can require all providers immediately downstream from that gateway provider to block all traffic from that provider.[155]

53.    We seek comment on whether there are any differences between calling and texting that would suggest that this model would not work well for texting. What would be the cost to providers of implementing such a requirement? Can providers and the Commission's Enforcement Bureau properly trace text messages to their originating provider to effectuate these rules? Are there additional requirements the Commission should adopt to ease any traceback efforts for text messaging? Because providers state that they already do a considerable amount of text blocking,[156] we would not expect our proposal to impose material additional costs. Is that correct? We seek comment on these questions specifically and this recommendation generally.

## B.    Text Message Authentication

54.    In the *Order*, we declined to adopt caller ID authentication requirements for text messages based on the current record.[157]  We determined that current caller ID authentication standards,

---

[151] *See* 47 CFR § 64.1200(n)(2).

[152] *Gateway Provider Report and Order*, XX FCC Rcd XX, XX, paras. 74-86; *see* 47 CFR § 64.1200(n)(5).

[153] 47 CFR § 64.1200(n)(5)(i)(A); *see also Gateway Provider Report and Order*, XX FCC Rcd at XX, para. 80.

[154] 47 CFR § 64.1200(n)(5)(i)(A), (B); *see also Gateway Provider Report and Order*, XX FCC Rcd at XX, para. 83.

[155] 47 CFR §§ 64.1200(n)(5)(ii), (iii), 64.1200(o); *see also Gateway Provider Report and Order*, XX FCC Rcd at XX, paras. 84-86.

[156] *See, e.g.*, AAPC Comments at 2; Blooston Comments at 3; CCA Comments at 3; CTIA Comments at 6-11 & Reply at 3-7; EZ Texting Comments at 6; M³AAWG Comments at 10; iconectiv Comments at 2; Infobip Reply at 2; Pinger Comments at 2; Sinch Comments at 7-8; Somos Comments at 7-8; Telesign Comments at 3; T-Mobile Comments at 3; Verizon Comments at 2; VON Comments at 3; AT&T Reply at 5.

[157] Most commenters to our NPRM observe that illegal and unwanted messages rarely come from spoofed numbers and a caller ID authentication solution, even if feasible, would be unlikely to reduce unwanted and illegal text messages. *See, e.g.*, CTIA Comments at 4-5, 11; EZ Texting Comments at 5-6; M³AAWG Comments at 10; NetNumber Comments at 7 & Reply at 2-3; Sinch Comments at 6-7; Telesign Comments at 2-3; T-Mobile

which focus primarily on voice caller ID authentication, may not currently be feasible for text message authentication.  We now seek comment on whether and how the Commission can encourage efforts to develop technical solutions for text message authentication.

55.     What problem or problems should any technical solution seek to address?  How might the Commission encourage industry members to collaborate and finalize any such technical solution?  Once the scope and goal of a technical solution is established, should the Commission, for example, adopt a deadline for providers to develop such a technical solution?  Are arguments against an authentication requirement, including that providers already sufficiently vet texters to preclude the need for authentication, correct?[158]

56.     We seek comment on the extent of number spoofing and if there are other solutions that are better targeted to address the problem of spoofed text messages.  If so, what are they and how can the Commission encourage their development and adoption?  We note that, while some commenters say number spoofing is not a problem for text messages,[159] others say bad actors spoof their phone numbers or identities.[160]  In the robocalling context, the Commission has found that a subset of small voice service providers are responsible for a large number of illegal robocalls.[161]  Is a similar dynamic at issue with robotexts?  If so, how might the Commission target these specific providers?  Commenters should address how the Commission can ensure non-discriminatory policies in adopting text authentication measures.[162]

## C.     Extending Do-Not-Call Protections to Text Messages

57.     We propose to extend National DNC Registry protections to text messages.  The National Do-Not-Call Registry has been operational for almost two decades and currently protects over 246 million telephone numbers from telemarketing sales calls, or "telephone solicitations."[163]  As such, it represents a critical component of our policy strategy against unwanted calls.  Although the Commission has stated that "text messages" are "calls" for TCPA purposes,[164] it has never stated that text messages are subject to DNC protections.  The Commission's DNC rules protect wireless phone subscribers by requiring prior

---

Comments at 9-10; Verizon Comments at 7 & Reply at 4-5; WMC Global Comments at 2; Cloud Communications Reply at 1-2; RWA Reply at 3-5; Vibes Reply at 2-4.

[158] *See* CTIA Comments at 18; Terra Nova Comments at 5; CCA Comments at 7, 10-11.

[159] CTIA Comments at 4-5.

[160] ABA Joint Commenters Comment at 3 (stating that "[o]ur members report that bad actors illegally 'spoof' phone numbers belonging to legitimate businesses when sending text messages – i.e., the bad actor sends a text message from a number that appears to belong to the legitimate business or sends a text message from the bad actor's own number, making it appear that it is from a legitimate business, with the intent to defraud the recipient").

[161] *Call Blocking Fourth Report and Order*, 36 FCC Rcd at 17844-17845, paras. 10-13.

[162] *See, e.g.*, VON Comments at 5 (observing that competitive neutrality must be at the forefront of any solution to illegal texting and solutions must not endorse or enable anti-competitive practices that providers have seen in the industry); Cloud Communications Reply at 3 (noting concerns that the industry's application of current principles and practices has led to discriminatory conduct and the blocking of legitimate texts); NORC Reply at 2 (noting that the record demonstrates that there is a lack of transparency and accountability in blocking by mobile wireless providers).

[163] *See* FTC National Do-Not-Call Registry Data Book for Fiscal Year 2022, https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2022 (last visited Feb. 2, 2023).  The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" but not including calls or messages made with prior express invitation or permission, to any person with whom the caller has as established business relationship, or by a tax exempt nonprofit organization.  47 U.S.C. § 227(a)(3).

[164] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

express invitation or permission in writing for calls to wireless numbers on the DNC Registry.[165]

58.　Commenters ask us to clarify that the DNC rules apply to both voice calls and texts.[166] As these commenters note, the DNC rules would bring considerable protection for recipients of marketing texts.  Specifically, our rules require that, before sending a marketing text to consumers, the texter must have the consumer's prior express invitation or permission, which must be evidenced by a signed, written agreement between the consumer and seller, which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed.[167]

59.　We seek comment on this proposal.  Would extending DNC protections to marketing texts further protect consumers from unwanted marketing text messages?  We note that the DNC protections do not depend on whether the caller uses an autodialer, unlike some provisions of the TCPA.[168]  In this regard, would our proposal also represent an important expansion of consumer protections?  Are there downsides to our proposal, e.g., increased burdens on texters that could result in a reduction of text messages consumers may want to receive?

### D.　Closing the Lead Generator Loophole

60.　We propose to ban the practice of obtaining a single consumer consent as grounds for delivering calls and text messages from multiple marketers on subjects beyond the scope of the original consent.

61.　In an illustration of the issue, Assurance IQ describes a website that purports to enable consumers to comparison shop for insurance.[169]  The website sought consumer consent for calls and texts from insurance companies and other various entities, including Assurance IQ's "partner companies."[170] The "partner companies" were listed in a hyperlink on the web page (i.e., they were not displayed on the website without clicking on the link) and the list of "partner companies" included both insurance companies and other entities that did not appear to be related to insurance.[171]

62.　Public Knowledge argues that lead generators and data brokers use hyperlinked lists to harvest consumer telephone numbers and consent agreements on a website and pass that information to telemarketers and scam callers.[172]  Commenters also provide an example of another insurance company

---

[165] 47 CFR § 64.1200(e), (c)(2)(ii); *2003 TCPA Order*, 18 FCC Rcd at 14034, paras. 28, 36.  As we stated in the *2003 TCPA Order*, "wireless subscribers may participate in the national do-not-call list" and "we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers'" for purposes of our DNC rules.  *2003 TCPA Order*, 18 FCC Rcd at 14039, para. 36.

[166] NCLC/EPIC Joint Reply at 7 (the prohibition against making telephone solicitation calls to telephone numbers registered on the National DNC Registry without consent applies to texts and calls that include solicitations).

[167] 47 CFR 64.1200(c)(2)(ii).

[168] *See* 47 U.S.C. §§ 227(b)(1)(A), (b)(1)(D), (d)(1)(A).

[169] Assurance IQ filed a petition before the Commission seeking clarification that a caller may rely on presumed consent from online forms for TCPA purposes, among other things.  Comments were due July 6, 2020.  Assurance IQ Petition (CG Docket No. 02-278, filed May 12, 2020) (Assurance IQ Petition). A request to withdraw the Assurance IQ Petition was submitted May 10, 2022.  Letter from Paul C. Besozzi, counsel for Assurance IQ, LLC, to Marlene H. Dortch, Secretary, Federal Communications Commission (May 10, 2022), filed in CG Docket No. 02-278.

[170] Assurance IQ Petition at 2-3 (CG Docket No. 02-278, filed May 12, 2020).

[171] Assurance IQ Petition at 2-3 (CG Docket No. 02-278, filed May 12, 2020).

[172] Public Knowledge Reply at 5-6.  Commenters explain that telemarketers ignore the requirement that the express invitation or permission can only be provided by the consumer directly to the seller.  NCLC Reply at 7-8.

website that has 8,423 entities on the hyperlinked page.[173]  The telemarketer that obtains the consumer's contact information from the lead generator may believe that it has the consumer's prior express consent, but, commenters argue, the consumer has not consented to the particular caller or callers, which may be listed as "partner companies" in these arrangements.[174]

63.     We seek comment on amending our TCPA consent requirements to require that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page.[175]  The Commission has not addressed this aspect of consent in the past.  Would our proposal better protect consumers from receiving large numbers of calls and texts they do not wish to receive when they visit websites such as comparison shopping websites?  Consumers may find comparison shopping websites helpful; how can we ensure that they can consent to obtain further information from the site without receiving numerous calls and texts from unrelated companies?  Commenters should discuss whether our proposal would limit the value of comparison-shopping sites to consumers.  Are there alternatives to our proposal that would better protect consumers from the harms we have identified?  We also seek comment on Public Knowledge's request that prior express consent to receive calls or texts must be made directly to one entity at a time.[176]

64.     More broadly, we seek comment on the extent of the problem, our proposed rule, and whether the proposed rule will clarify consent and help to eliminate unwanted and illegal text messages and calls.  Are there different or additional limitations on multi-party consent we should consider?

**E.      Digital Equity and Inclusion**

65.     The Commission, as part of its continuing effort to advance digital equity for all,[177] including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, invites comment on any equity-related considerations[178] and benefits (if any) that may be associated with the proposals and issues discussed herein.  Specifically, we

---

[173] Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, Secretary, Federal Communications Commission (Dec. 16, 2022) at slide 10-11 (NCLC/EPIC 12/16 *ex parte*).

[174] NCLC/EPIC Joint Comments at 4; NCLC/EPIC Joint Reply at 8 (explaining that clicking on a link that contains a hidden URL with the names of thousands of sellers does not meet the E-Sign definition of an "electronic signature," because there was no separate agreement with each seller, and the consumer could not have had the intent to sign such a separate agreement with each of the thousands of sellers listed on the webpage connected with the URL).

[175] Under our Truth in Billing rules, "clear and conspicuous" is notice that would be apparent to a reasonable consumer.  47 CFR § 64.2401(e).  We use the same definition for junk fax opt-out notice requirements.  *See Rules and Regulations Implementing the Telecommunications Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005*, CG Docket 02-278, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787, 3801, para. 26 (2006) (Consistent with the definition in our truth-in-billing rules, "clear and conspicuous" for purposes of the opt-out notice means a notice that would be apparent to a reasonable consumer.).

[176] Public Knowledge Reply at 5.

[177] Section 1 of the Communications Act provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

[178] We define the term "equity" consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality. *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility.

## F.    Legal Authority

66.    In the Further Notice of Proposed Rulemaking, we seek comment on four issues:  (i) whether to require terminating mobile wireless providers to block text messages when notified by the Commission that they are likely scams; (ii) text message authentication; (iii) extending Do-Not-Call protections to marketing text messages; and (iv) preventing marketers from using a single consumer consent as justification for calls and texts from numerous parties.

67.    We seek comment on our authority to adopt each of the measures.  We note that the Commission has authority to regulate certain text messages under the TCPA, particularly with regard to messages sent using an autodialer and without the consent of the called party.  We seek comment on whether we have legal authority for the proposed rules under the TCPA.  Do the TRACED Act or the TCPA provide authority for our proposals?  Do we have authority for our proposals under section 251(e) of the Act, which provides us "exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States?"[179]  The Commission found authority to implement STIR/SHAKEN for voice service providers under section 251(e) in order to prevent the fraudulent exploitation of numbering resources.[180]  Does section 251(e) of the Act grant us authority to adopt implementation of authentication for text messages?  We seek comment on whether that authority extends to text messages.  We seek comment on our authority under the Truth in Caller ID Act for these proposals.  The Commission found authority under this provision to mandate STIR/SHAKEN implementation, explaining that it was "necessary to enable voice service providers to help prevent these unlawful acts and to protect voice service subscribers from scammers and bad actors."[181]  We believe that same reasoning applies here, especially given Congress's focus on text messages, and seek comment on that conclusion.

# V.    PROCEDURAL MATTERS

68.    *Paperwork Reduction Act*.  This document does not propose new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  In addition, therefore, it does not propose any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).  [[Revise if we adopt 64.1200(n)-type of requirement.]]

69.    *Regulatory Flexibility Act*.  The Regulatory Flexibility Act of 1980, as amended (RFA),[182] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[183]  Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the impact of the rule changes contained in the Report and Order on small entities.  The FRFA is set forth in Appendix D.  We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the possible impact of the rule changes

---

[179] 47 U.S.C. § 251(e).

[180] *STIR/SHAKEN Order*, 35 FCC Rcd at  3260-61, para. 42.

[181] *STIR/SHAKEN Order*, 35 FCC Rcd at 3262, para. 44.

[182] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. § 601, *et seq*., has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996).  The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

[183] *Id*. § 605(b).

contained in the Further Notice on small entities.  The IRFA is set forth in Appendix E.

70.     *Congressional Review Act*.  [[The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).]]

71.     *Ex Parte Rules*.  The proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[184]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b) of the Commission's rules.  In proceedings governed by section 1.49(f) of the Commission's rules or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.[185]

72.     *Filing of Comments and Reply Comments*.  Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See* Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

• Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS: http://apps.fcc.gov/ecfs/.

• Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

• Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

• Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701. U.S. Postal Service first class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, D.C. 20554.

• Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings.  This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19.  *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy*, Public

---

[184] 47 CFR §§ 1.1200 *et seq*.

[185] 47 CFR § 1.49(f).

Notice, 35 FCC Rcd 2788 (OMD 2020).

73. *People with Disabilities*. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice).

74. *Availability of Documents*. Comments, reply comments, *ex parte* submissions, and the Report and Order and Further Notice of Proposed Rulemaking will be available via ECFS. Documents will be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat. When the FCC Headquarters reopens to the public, documents will also be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 45 L Street NE, Washington, D.C. 20554.

75. *Additional Information*. For additional information on this proceeding, contact Mika Savir, mika.savir@fcc.gov or 202 418-0384, of the Consumer and Governmental Affairs Bureau, Consumer Policy Division.

## VI. ORDERING CLAUSES

76. Accordingly, **IT IS ORDERED**, pursuant to sections 4(i), 4(j), 227, 251(e), 301, 303, 307, and 316 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 227, 251(e), 301, 303, 307, and 316, that this Report and Order and Further Notice of Proposed Rulemaking IS ADOPTED.

77. **IT IS FURTHER ORDERED** that, pursuant to applicable procedures set forth in sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on the Further Notice of Proposed Rulemaking on or before 30 days after publication in the Federal Register, and reply comments on or before 60 days after publication in the Federal Register.

78. **IT IS FURTHER ORDERED** that the Report and Order SHALL BE EFFECTIVE 30 days after publication in the Federal Register

79. **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order and Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis and the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

80. **IT IS FURTHER ORDERED** that the Office of the Managing Director, Performance Evaluation and Records Management, SHALL SEND a copy of this Report and Order in a report to be sent to Congress and to the Governmental Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

# APPENDIX A

## Final Rules

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS
Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

1. Amend § 64.1200 by adding new paragraphs (p) and (q) to read:

(p) A mobile wireless provider that delivers text messages must provide a single point of contact, readily available on the provider's public-facing website, for receiving text blocking error complaints. This point of contact for text message blocking error complaints may be the same point of contact established for voice call blocking error complaints. When a sender makes a credible claim of erroneous blocking and the provider determines that the text messages should not have been blocked, the provider must promptly cease blocking that number unless circumstances change.

(q) A mobile wireless provider must block a text message purporting to originate from any of the following:

(1) Numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked;

(2) North American Numbering Plan numbers that are not valid;

(3) Valid North American Numbering Plan numbers that are not allocated to a provider by the North American Numbering Plan Administrator; and

(4) Valid North American Numbering Plan numbers that are allocated to a provider by the North American Numbering Plan Administrator, but are unused, so long as the provider blocking the message is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of blocking.

| Commenter | Abbreviated Name | Date Filed |
|---|---|---|
| Aaron Read | Aaron Read | 10/3/22 |
| AB Handshake Corporation | AB Handshake | 11/10/22 |
| Ad Hoc Telecom Users Committee | Ad Hoc | 11/10/22 |
| Aigbe Omoigui et al | Omoigui Express Comment | 10/11/22 |
| American Association of Political Consultants | AAPC | 11/10/22 |
| American Bankers Association, ACA International, American Financial Services Association, Credit Union National Association, Mortgage Bankers Association, National Association of Federally-Insured Credit Unions, National Council of Higher Education Resources, and Student Loan Servicing Alliance | ABA Joint Commenters | 11/10/22 |
| Anna K. | Anna K. Express Comment | 10/18/22 |
| Anonymous | | 10/13/22 |
| Belle Hillenburg | Hillenburg | 10/10/22 |
| Blooston Rural Carriers | Blooston | 11/10/22 |
| Cameron Boyd | Boyd Express Comment | 11/9/22 |
| CallFire, Inc. (EZ Texting) | EZ Texting | 11/10/22 |
| Campaign Verify, Inc. | Campaign Verify | 11/10/22 |
| Cloud Communications Alliance | Cloud Communications | 11/10/22 |
| Coalition for Open Messaging | Coalition for Open Messaging | 11/10/22 |
| Competitive Carriers Association | CCA | 11/10/22 |
| Consumer Relations Consortium | CRC | 11/9/22 |
| CTIA—The Wireless Association® | CTIA | 11/10/22 |
| Electronic Privacy Information Center (EPIC), the National Consumer Law (NCLC) on behalf of its low-income clients, Consumer Action, Consumer Federation of America, National Association of Consumer Advocates, National Consumers League, Public | NCLC/EPIC Joint Commenters | 11/10/22 |

| | | |
|---|---|---|
| Knowledge, and U.S. PIRG | | |
| INCOMPAS | INCOMPAS | 11/10/22 |
| iconectiv, LLC | iconectiv | 11/10/22 |
| Messaging Malware Mobile Anti-Abuse Working Group | M$^3$AAWG | 11/8/22 |
| National Opinion Research Center | NORC | 11/10/22 |
| NetNumber, Inc. | NetNumber | 11/10/22 |
| Neustar, Inc. | Neustar | 11/10/22 |
| NTCA—The Rural Broadband Association | NTCA | 11/10/22 |
| Pinger, Inc. | Pinger | 11/9/22 |
| Professional Associations for Customer Engagement | PACE | 11/10/22 |
| Rebekah Schmidt | Schmidt | 11/21/22 |
| Sinch America, Inc. | Sinch | 11/10/22 |
| Somos, Inc. | Somos | 11/10/22 |
| State Voices | State Voices | 11/10/22 |
| Telesign Corporation | Telesign | 11/9/22 |
| Terra Nova Telecom, Inc. | Terra Nova | 11/10/22 |
| Texas 9-1-1 Alliance, the Texas Commission on State Emergency Communications, and the Municipal Emergency Communication Districts Association | Texas 911 Entities | 11/10/22 |
| T-Mobile USA, Inc. | T-Mobile | 11/10/22 |
| Verizon | Verizon | 11/10/22 |
| Voice on the Net Coalition | VON | 11/10/22 |
| WMC Global | WMC | 10/21/22 |

| Reply Commenter | Abbreviated Name | Date Filed |
|---|---|---|
| ACT | The App Association | App Association | 12/9/22 |
| AT&T Services, Inc. | AT&T | 12/9/22 |
| Campaign Registry, Inc. | Campaign Registry | 12/9/22 |
| Cloud Communications Alliance | Cloud Communications | 12/9/22 |
| CTIA—The Wireless Association® | CTIA | 12/9/22 |
| Fifty-one State Attorneys General | State AGs | 12/9/22 |

| INCOMPAS | INCOMPAS | 12/11/22 |
|---|---|---|
| Infobip, Inc. | Infobip | 12/9/22 |
| NetNumber, Inc. | NetNumber | 12/9/22 |
| National Consumer Law Center (NCLC),  Electronic Privacy Information Center (EPIC) on behalf of NCLC's low-income clients, Appleseed Foundation, Center for Responsible Lending, Consumer Action, Consumer Federation of America, Jacksonville Area Legal Aid, Inc. (FL), Legal Services of New Jersey, Mobilization for Justice (NY), Mountain State Justice (WV), National Association of Consumer Advocates, National Consumers League, Shriver Center on Poverty Law (IL), South Carolina Appleseed, Texas Appleseed, Tzedek DC, U.S. PIRG, and Virginia Poverty Law Center. | NCLC/EPIC Joint Reply | 12/9/22 |
| National Opinion Research Center | NORC | 12/9/22 |
| Overwhelmed Citizen | | 11/28/22 |
| Public Knowledge | Public Knowledge | 11/25/22 |
| Rural Wireless Association, Inc. | RWA | 12/9/22 |
| Twilio, Inc. | Twilio | 12/9/22 |
| Verizon | Verizon | 12/9/22 |
| Vibes Media, LLC | Vibes | 12/9/22 |
| Weave Communications, Inc. | Weave | 12/8/22 |

| *Ex Parte* Filing/Congressional | Abbreviated Name | Date filed |
|---|---|---|
| Letter from The Honorable Brian Schatz, U.S. Senate, to Jessica Rosenworcel, Chairwoman, Federal Communications Commission | Schatz Letter | 12/19/22 |
| Letter from Nadejda Papernaia, AB Handshake Corp., to Marlene H. Dortch, Secretary, Federal Communications Commission (Nov. 4, 2022) | AB Handshake 11/4 *ex parte* | 11/4/22 |
| Letter from Nadejda Papernaia, AB Handshake Corp., to Marlene H. Dortch, Secretary, Federal | AB Handshake 12/13 *ex parte* | 12/13/22 |

| Communications Commission (Dec. 13, 2022) | | |
|---|---|---|
| Letter from Harold Feld, Public Knowledge, to Marlene H. Dortch, Secretary, Federal Communications Commission (Dec. 5, 2022) | Public Knowledge 12/5 *ex parte* | 12/5/22 |
| Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, Secretary, Federal Communications Commission (Dec. 16, 2022) | NCLC/EPIC 12/16 *ex parte* | 12/16/22 |

## APPENDIX C

## Proposed Rules

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS
Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

1. Amend § 64.1200 by revising section (e) to add "or texts" to read as follows:

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or texts to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

2. Amend § 64.1200 by revising section (f)(9) to read as follows:

(f)(9) The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. Prior express written consent for a call or text may be to a single entity, or to multiple entities logically and topically associated. If the prior express written consent is to multiple entities, the entire list of entities to which the consumer is giving consent must be clearly and conspicuously displayed to the consumer at the time consent is requested. To be clearly and conspicuously displayed, the list must, at a minimum, be displayed on the same web page where the consumer gives consent.

**APPENDIX D**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980,[1] as amended, an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Notice of Proposed Rulemaking (*NPRM*).[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  The Commission received no comments in response to the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.        Need for, and Objectives of, the Report and Order**

2.        The *Order* requires mobile wireless providers to block texts, at the network level, that purport to be from numbers on a reasonable Do-Not-Originate (DNO) list.  Such texts are highly likely to be illegal and for that reason the Commission is adopting a requirement to block at the network level.  The Commission also recognizes that service providers currently block many unwanted and illegal texts and in doing so may also erroneously block legal texts.  Therefore, the Commission is also adopting a requirement that mobile wireless providers maintain a single point of contact for senders to report erroneously blocked texts.

**B.        Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

3.        There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

**C.        Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

4.        None. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.

5.        The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

**D.        Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

6.        The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]  A "small

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Targeting and Eliminating Unlawful Text Messages*, CG Docket No. 21-402, Notice of Proposed Rulemaking, [cite xx] (2022) (NPRM).

[3] *See* 5 U.S.C. § 604.

[4] 5 U.S.C. § 603(b)(3).

[5] 5 U.S.C. § 601(6).

[6] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an

business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[7]

7.      *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[8]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[9]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.[10]

8.      Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[11]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[12]  Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[13]

9.      Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[14]  U.S. Census Bureau data from the 2017 Census

agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[7] 15 U.S.C. § 632.

[8] *See* 5 U.S.C. § 601(3)-(6).

[9] *See* SBA, Office of Advocacy, Frequently Asked Questions, "What is a small business?," https://cdn.advocacy.sba.gov/wp-content/uploads/2021/11/03093005/Small-Business-FAQ-2021.pdf (Nov 2021).

[10] *Id*.

[11] *See* 5 U.S.C. § 601(4).

[12] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number small organizations in this small entity description. S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[13] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii.  This data does not include information for Puerto Rico.

[14] *See* 5 U.S.C. § 601(5).

of Governments[15] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[16]  Of this number, there were 36,931 general purpose governments (county,[17] municipal, and town or township[18]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[19] with enrollment populations of less than 50,000.[20]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[21]

10.      *Wireless Telecommunications Carriers (except Satellite)*.  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[22]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services.[23]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[24]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[25]  Of that number, 2,837 firms employed fewer than 250

---

[15] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

[16] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes_Local Governments by Type and State_2017.

[17] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[18] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[19] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2017.

[20] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[21] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls.5, 6 & 10.

[22] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[23] *Id.*

[24] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[25] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312,

employees.[26]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 797 providers that reported they were engaged in the provision of wireless services.[27]  Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees.[28]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

11.     *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[29]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[30]  Providers of Internet services (e.g. dial-up ISPs) or voice over Internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[31]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[32]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[33]  Of those firms, 1,039 had revenue of less than $25 million.[34]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

### E.     Description of Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities

12.     This *Order* does not propose any changes to the Commission's current information collection, reporting, recordkeeping, or compliance requirements.

### F.     Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

13.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others:  "(1) the

---

https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[26] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[27] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[28] *Id.*

[29] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[30] *Id.*

[31] *Id*.

[32] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[33] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[34] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities."[35]

14.      The *Order* requires mobile wireless providers to block texts, at the network level, that purport to be from numbers on a reasonable Do-Not-Originate list.  Such texts are highly likely to be illegal and for that reason the Commission is adopting a requirement to block at the network level.  The Commission recognizes that mobile wireless providers, including small entities, already take measures to block illegal text messages from reaching their customers' phones and this requirement should not be burdensome.  Because service providers currently block many unwanted and illegal texts to protect their customers, they may also erroneously block legal texts.  Therefore, the Commission also adopted a requirement that mobile wireless providers maintain a single point of contact for senders to report erroneously blocked texts.  As service providers are already maintaining a single point of contact for reporting erroneously blocked calls, it should not be burdensome to include text messages.  Maintaining a single point of contact should facilitate addresses erroneously blocked texts for the sender and the service provider, either of which may be small entities.

### G.      Report to Congress

15.      The Commission will send a copy of the Report and Order, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[36]  In addition, the Commission will send a copy of the Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  The Order and FRFA (or summaries thereof) will also be published in the Federal Register.[37]

---

[35] 5 U.S.C. § 603(c)(1)–(c)(4).

[36] *See* 5 U.S.C. § 801(a)(1)(A).

[37] *See id.* § 604(b).

## APPENDIX E

### Initial Regulatory Flexibility Analysis

1.   As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies proposed in this *Further Notice of Proposed Rulemaking* (*FNPRM*).   Written public comments are requested on this IRFA.   Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the *FNPRM* provided on the first page of the *FNPRM*.   The Commission will send a copy of this entire *FNPRM*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]   In addition, the *FNPRM* and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

#### A.   Need for, and Objectives of, the Proposed Rules

2.   The *Notice* seeks comment on revising the Telephone Consumers Protection Act (TCPA) and Do-Not-Call (DNC) rules with respect to consent and text messaging, specifically, that (i) when a consumer is consenting to contact, with calls or texts, from multiple parties, the list of entities to which the consumer is giving consent must be clearly and conspicuously displayed where consent is requested and (ii) the DNC rules, which allow for the registration of wireless telephone numbers, include both texts and calls to registered wireless numbers.   The *Notice* also seeks comment on a requirement that providers block text messages after notice from the Commission of suspected illegality, including fraud.

#### B.   Legal Basis

3.   This action, including publication of proposed rules, is authorized under sections 4(i), 4(j), 201(b), 227(e), 251(e), 254, 257, 301, and 303 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 201(b), 227(e), 251(e), 254, 257, 301, and 303

#### C.   Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

4.   The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[4]   The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]   In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]   A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field

---

[1] 5 U.S.C. § 603.   The RFA, *see* 5 U.S.C. §§ 601-612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996)

[2] 5 U.S.C. § 603(a).

[3] *Id*.

[4] 5 U.S.C. § 603(b)(3).

[5] 5 U.S.C. § 601(6).

[6] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).   Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

of operation; and (3) satisfies any additional criteria established by the SBA.[7]

5. *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[8] First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[9] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.[10]

6. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[11] The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[12] Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[13]

7. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[14] U.S. Census Bureau data from the 2017 Census of Governments[15] indicate there were 90,075 local governmental jurisdictions consisting of general

---

[7] 15 U.S.C. § 632.

[8] *See* 5 U.S.C. § 601(3)-(6).

[9] *See* SBA, Office of Advocacy, Frequently Asked Questions, "What is a small business?," https://cdn.advocacy.sba.gov/wp-content/uploads/2021/11/03093005/Small-Business-FAQ-2021.pdf. (Nov 2021).

[10] *Id.*

[11] *See* 5 U.S.C. § 601(4).

[12] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number small organizations in this small entity description. S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[13] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii. This data does not include information for Puerto Rico.

[14] *See* 5 U.S.C. § 601(5).

[15] *See* 13 U.S.C. § 161. The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7". *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

purpose governments and special purpose governments in the United States.[16]  Of this number, there were 36,931 general purpose governments (county,[17] municipal, and town or township[18]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[19] with enrollment populations of less than 50,000.[20]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[21]

8. *Wireless Telecommunications Carriers (except Satellite).*  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[22]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services.[23]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[24]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[25]  Of that number, 2,837 firms employed fewer than 250 employees.[26]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report,

---

[16] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

[17] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[18] *See id.* at tbl.6. Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[19] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2017.

[20] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[21] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls.5, 6 & 10.

[22] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[23] *Id.*

[24] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[25] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[26] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

as of December 31, 2020, there were 797 providers that reported they were engaged in the provision of wireless services.[27]  Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees.[28]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

9.      *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[29]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[30]  Providers of Internet services (e.g. dial-up ISPs) or voice over Internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[31]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[32]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[33]  Of those firms, 1,039 had revenue of less than $25 million.[34]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

D.      **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

10.      This *Notice* does not propose any changes to the Commission's current information collection, reporting, recordkeeping, or compliance requirements.

E.      **Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

11.      The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others:  "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) and exemption from coverage of the rule, or any part thereof, for such small entities."

12.      The *Notice* seeks comment on revising the TCPA and DNC rules with respect to consent

[27] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[28] *Id.*

[29] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[30] *Id.*

[31] *Id*.

[32] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[33] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[34] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

and text messaging, specifically, that (i) when a consumer is consenting to contact, with calls or texts, from multiple parties, the list of entities to which the consumer is giving consent must be clearly and conspicuously displayed where consent is requested and (ii) the DNC rules, which allow for the registration of wireless telephone numbers, include both texts and calls to registered wireless numbers. The Notice also seeks comment on a requirement that service providers block text messages after notice from the Commission of suspected illegality, including fraud. The *Notice* does not propose any exemptions for small entities.

13.     These proposals would probably not be burdensome for small entities.  The proposal to require those seeking consent from consumers to a list of entities, to clearly and conspicuously display the list where consent is requested would, if adopted, prevent those lead generators or telemarketers from failing to advise the consumer of the list of entities; instead the list would be displayed where the consent is requested.  This should not be burdensome to small entities, as it merely requires disclosing the list where consent is requested, instead of in a hyperlink, and should reduce unwanted text messages and calls to consumers.  The proposal to include texts in the DNC rules should not have an impact on small entities. Wireline and wireless phones are already included and this would just clarify that not only calls to wireless phones on the DNC list are covered, but text messages, too.  The Commission anticipates that these rules, if adopted, would also reduce unwanted calls and texts to small entities.  Finally, the proposal to require service providers to block texts after notice from the Commission of suspected illegality, including fraud should not be burdensome for small entities.  Mobile wireless providers are already diligent in blocking fraudulent calls and texts to their customers and this would assist them in those efforts.

**F.     Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

14.     None.